ROBERT E. DUNN (SBN: 275600)
JOHN D. TRIPOLI (SBN: 262542)
**EIMER STAHL LLP**
99 South Almaden Boulevard, Suite 662
San Jose, CA 95113
(669) 231-8755
rdunn@eimerstahl.com
jtripoli@eimerstahl.com

RYAN J. WALSH (*pro hac vice* forthcoming)
JOHN K. ADAMS (*pro hac vice* forthcoming)
AMY C. MILLER (*pro hac vice* forthcoming)
**EIMER STAHL LLP**
10 East Doty Street, Suite 800
Madison, WI 53703
(608) 441-5798
rwalsh@eimerstahl.com
jadams@eimerstahl.com
amiller@eimerstahl.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR

## NORTHERN DISTRICT OF CALIFORNIA

**RITESH TANDON**, an individual; **KAREN BUSCH**, an individual; **TERRY GANNON**, an individual; **CAROLYN GANNON**, an individual; **JEREMY WONG**, an individual; **JULIE EVARKIOU**, an individual; **DHRUV KHANNA**, an individual; **CONNIE RICHARDS**, an individual; **FRANCES BEAUDET**, an individual; and **MAYA MANSOUR**, an individual,

            Plaintiffs,

            v.

**GAVIN NEWSOM**, in his official capacity as the Governor of California; **XAVIER BECERRA**, in his official capacity as the Attorney General of California; **SANDRA SHEWRY**, in her official capacity as the Acting State Director of the California Department of Public Health; **ERICA S. PAN**, in her official capacity as the Acting

Case No. _____

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND NOMINAL DAMAGES**

i

State Public Health Officer of the California Department of Public Health; **JEFFREY V. SMITH**, in his official capacity as County Executive of Santa Clara County; and **SARA H. CODY**, in her official capacity as the Health Officer and Public Health Director of Santa Clara County,

Defendants.

ii

Complaint

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

JURISDICTION AND VENUE ........................................................................... 5

PARTIES .............................................................................................................. 6

FACTUAL ALLEGATIONS ................................................................................ 8

   I.   Defendants Issue Emergency Orders Limiting Plaintiffs' Ability to Gather for Religious and Political activities or Run Their Businesses........................................................................... 8

       A.   The State Defendants Issue Restrictions on Gatherings............................................. 8

       B.   Santa Clara County Imposes Additional Restrictions on Public Gatherings and Businesses ........................................................................... 17

   II.  Defendants' Actions Infringe on Plaintiffs' Constitutional Rights ......................................... 19

       A.   Free Speech Plaintiffs............................................................................ 19

       B.   Free Exercise Plaintiffs ......................................................................... 21

       C.   Business Plaintiffs ................................................................................. 22

   III. Defendants' Actions Are Not Supported by Public Health Data............................................ 26

       A.   COVID-19 is Not as Dangerous as Initially Believed ........................... 26

       B.   The State's Reliance on the Single Metric of Positive Test Results is Unprecedented and Has No Scientific Basis........................................... 28

       C.   The State's Restrictions on Various Activities Are Arbitrary and Irrational ........... 32

CLAIMS ............................................................................................................. 32

   COUNT ONE: Violation of the First Amendment – Right to Free Speech and Assembly (42 U.S.C. § 1983)....................................................................... 32

   COUNT TWO: Violation of the First Amendment – Right to Free Exercise and Assembly (42 U.S.C. § 1983)........................................................................... 34

   COUNT THREE: Violation of the Fourteenth Amendment –Substantive Due Process Right to Earn a Living (42 U.S.C. § 1983)............................................... 36

   COUNT FOUR: Violation of the Fourteenth Amendment – Equal Protection (42 U.S.C. § 1983) 37

iii

Complaint

COUNT FIVE: Violation of the Fourteenth Amendment of the U.S. Constitution – Void for Vagueness (42 U.S.C. § 1983)........................................................................................... 38

PRAYER FOR RELIEF ........................................................................................................ 39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Complaint

**INTRODUCTION**

1.       California has now been in a state of emergency for seven months, with no end in sight. During this time, the basic religious, political, and economic freedoms guaranteed by the United States Constitution have been effectively abrogated for nearly 40 million people.  In the name of stopping the spread of COVID-19, state and local officials have closed churches and businesses; banned political events; and even prohibited individuals from hosting small gatherings in their homes. In normal times, federal courts would not hesitate to strike down such blatantly unconstitutional restrictions on civil liberties. Until recently, however, courts have largely suspended judicial review of pandemic-related executive actions, incorrectly citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), for the proposition that executives enjoy unfettered discretion to respond to public health emergencies. This judicial passivity in the face of executive overreach is reminiscent of the Supreme Court's disastrous decision in *Korematsu*, in which the Supreme Court erroneously sustained a gross violation of civil rights because it was unwilling to look behind the government's purported claims of exigency. As Justice Jackson correctly observed in his dissent, there was no justification for what was "one of the most sweeping and complete deprivations of constitutional rights in the history of this nation in the absence of martial law." *Id.* at 235 (Jackson, J., dissenting). The same is true here. COVID-19 is a serious disease—just as the threat of sabotage was a serious threat during World War II—but Defendants' unprecedented infringement on civil liberties bears no rational relationship to the realities of the public health situation in California. It is far past time to end the *Korematsu*-like deference that state and local officials have enjoyed since early March. *See* Lindsay F. Wiley and Stephen I. Vladeck, *Coronavirus, Civil Liberties, and the Courts: the Case Against "Suspending" Judicial Review*, 133 HARV. L. REV. F. 179 (2020).  Defendants must be required to defend their executive actions under normal constitutional standards. Because those actions cannot survive heightened scrutiny, they should be enjoined.

2.       Plaintiffs in this case are individuals who seek to exercise their First and Fourteenth Amendment rights to exercise their religion, engage in political speech, and earn a living. Yet because of the emergency orders issued by the Governor, the California Department of Public Health, and Santa Clara County officials, they cannot do so. This is because the State's so-called "Blueprint for a

1

Complaint

Safer Economy"—along with various guidance documents and Q&As—entirely prohibit most gatherings, put onerous restrictions on other types of gatherings, and prohibit Plaintiffs from operating their businesses or providing certain services. Santa Clara County has imposed additional restrictions that prevent any gatherings from occurring indoors at all, even where they would otherwise be allowed under the State's orders, and limit permissible outdoor gatherings to 60 people, even if the venue could safely accommodate many more.

3.      None of these restrictions on Plaintiffs' liberties can survive review under the appropriate legal standard. The limitations on religious and political gatherings infringe on core First Amendment-protected activities. They are also content based because Defendants explicitly exempt protests, cultural gatherings, and religious ceremonies from their restrictions, and thus disfavor the religious and political gatherings Plaintiffs seek to hold. Defendants' Orders are thus subject to heightened scrutiny. But whether the Orders are reviewed under strict or intermediate scrutiny, they are unconstitutional because Defendants have not even attempted to narrowly tailor their restrictions to their asserted interest. Given the current understanding of the virus, Defendants could target their mitigation efforts at vulnerable populations to ensure that individuals in nursing homes and long-term care facilities are not put at risk. Defendants have instead implemented a blunderbuss approach that imposes across-the-board restrictions on all citizens.

4.      Indeed, the Orders' restrictions on Plaintiffs' economic activities are not even rationally related to the government's asserted interest because they are based on metrics that have little correlation with public health. Public health officials in California and elsewhere have historically looked at the rates of hospitalizations and deaths to determine whether an infectious disease constitutes a public health emergency. These metrics are important because they allow public officials to act if it appears that a disease may overwhelm a community's healthcare infrastructure. As the Governor noted in his declaration of a state of emergency on March 4, 2020, if COVID-19 continued to spread at "a rate comparable to the rate of spread in other countries, the number of persons requiring medical care may exceed locally available resources," and it would "likely [ ] require the combined forces of a mutual aid region or regions to appropriately respond" to COVID-19.[1] As it turned out, however,

---

[1] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

Complaint

1   COVID-19 has not spread at anything approaching the feared rate, and the disease is far less deadly

2   than initially estimated.  As a result, hospitalizations in the state resulting from COVID-19 have never

3   exceeded 10% of total capacity, and no mutual aid region has ever been established. Moreover,

4   hospitalization rates have plummeted to roughly one third of their peak in late July.[2] According to the

5   metrics historically used to measure the severity of an epidemic, there is no ongoing state of

6   emergency in California.

7         5.      Defendants justify their continuing restrictions by focusing myopically on the number

8   of "cases" in the state—i.e., the number of people who test positive using the PCR test. But there is no

9   rational basis for using case counts as a basis for infringing on constitutionally protected liberties.

10   Because a majority of individuals who test positive experience no symptoms, case counts are not a

11   useful proxy for hospitalizations or deaths. Nor are case counts a useful proxy for infectiousness

12   because, as recent studies have confirmed, the PCR test can yield a positive result *weeks* after an

13   infected person has ceased to be infectious. This is because although infected individuals are typically

14   contagious from days 3 to 14 days after infection, the PCR test can detect traces of the virus up to 80

15   days after the initial infection. Some studies have estimated that up to 90% of positive results involve

16   people who are no longer infectious. Whatever the precise number, it is now clear that a large number

17   of the "cases" used to justify Defendants' Orders have absolutely no relevance to the public health

18   situation. It is irrational to make public policy based on this data, yet that is precisely what Defendants

19   are currently doing under the State's "Blueprint."

20         6.      Worse, Defendants have indicated that they have no intention of *ever* relinquishing

21   their extraordinary emergency powers. According to the State's Blueprint, even if a county has

22   reported *zero* positive cases for over three weeks—and thus is in the "yellow" tier—churches, gyms,

23   and movie theaters are limited to 50% capacity, and nearly every activity is subjected to

24   "modifications."[3] There is no "green" tier in which all restrictions are eliminated. In other words,

25   Defendants' regulations will extend indefinitely even after COVID-19 has disappeared from a county.

26

[2] https://public.tableau.com/views/COVID-19HospitalsDashboard/Hospitals?:embed=y&:showVizHome=no.

[3] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Dimmer-Framework-September_2020.pdf.

3

Complaint

7.      Defendants will no doubt contend here, as they have elsewhere, that the Court should defer to their judgment because the Orders are designed to address a public health emergency. Any such pleas should be rejected. Although federal courts may decide to defer to a state or local executive's emergency actions during the initial days and weeks of a public health crisis—when the severity of the disease, the rate of spread, and the ability of the public healthcare system to address it are uncertain—such deference must end as soon as there is publicly available data courts can use to judge the reasonableness of the State's response. Otherwise courts run the risk of repeating the error in *Korematsu*, which the Supreme Court has squarely renounced. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'") (quoting *Korematsu*, 323 U.S. at 248 (Jackson, J., dissenting)). In *Korematsu*, the majority followed the precedent it had established one year earlier in *Hirabayashi v. United States*, 320 U.S. 81 (1943), which upheld an executive order that imposed a curfew on people of Japanese ancestry in certain areas. The *Korematsu* court recognized that confinement in an internment camp was a "far greater deprivation" than a curfew, but nevertheless held that the "principles" announced in *Hirabayashi* compelled the Court to uphold the internment order. 323 U.S. at 218. As Justice Jackson recognized in dissent:

> [O]nce a judicial opinion rationalizes such an order to show that it conforms to the Constitution, or rather rationalizes the Constitution to show that the Constitution sanctions such an order, the Court for all time has validated the principle of racial discrimination in criminal procedure and of transplanting American citizens. The principle then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need. Every repetition imbeds that principle more deeply in our law and thinking and expands it to new purposes."
> *Id.* at 246 (Jackson, J., dissenting)

8.      Federal courts should not recapitulate the error in *Korematsu* by blindly following— and thereby expanding—the supposed "principle" in *Jacobson* that actions taken to address threats to public health are effectively unreviewable. As the supposed principle in that case has taken root, courts have become increasingly paralyzed in the face of proclaimed public health emergencies. Taken to the extreme, state officials could declare a public health emergency every winter during peak

4

Complaint

influenza season and justify substantial infringements on civil liberties without any judicial interference.[4] *Jacobson* does not endorse such deference, and the Constitution forbids it.

9. Because Defendants' Orders infringe on Plaintiffs' constitutional rights to free exercise of religion, freedom of speech, equal protection, and the right to earn a living, and are not narrowly tailored or rationally related to the government's asserted interest, the Orders violate the First and Fourteenth Amendments. Plaintiffs thus request declaratory and injunctive relief to end these unconstitutional infringements on their liberties.

## JURISDICTION AND VENUE

10. This action arises under the Constitution and laws of the United States. Plaintiffs assert that Defendants' Orders violate the U.S. Constitution's First and Fourteenth Amendments' guarantees of speech, association, and free exercise. Plaintiffs further assert that the Orders violate the Fourteenth Amendment's guarantees of due process and equal protection. This Court therefore has jurisdiction under Article III of the U.S. Constitution, 28 U.S.C. § 1331, and 42 U.S.C. § 1983. This Court also has authority to award attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law.

11. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by *Ex Parte Young*, 209 U.S. 123 (1908), and by the general and equitable powers of this Court.

12. The Northern District of California is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1)–(2) because Defendants maintain offices, exercise their authority in their official capacities, and will enforce the State and County Orders in this District; and because it is the District in which substantially all of the events giving rise to the claims occurred.

---

[4] Indeed, the Governor has already explained that the CDPH's current orders are, in part, a response to the upcoming flu season. *See Gov. Newsom Outlines California's New Simplified, 4-Tier COVID-19 Reopening Guidelines*, CBS SF BayArea (August 28, 2020), *available at* https://sanfrancisco.cbslocal.com/2020/08/28/gov-newsom-californias-new-simplified-color-coded-covid-reopening-guidelines/.

5

---

Complaint

**PARTIES**

**Plaintiffs**

13.    Plaintiff Ritesh Tandon ("Tandon") is a resident of Santa Clara County and a candidate for the U.S. Congress in California's 17th Congressional District, which covers portions of Santa Clara and Alameda Counties. Tandon is campaigning for elected office against an incumbent officeholder. Defendants' Orders prevent him from gathering in person with constituents and donors to discuss public issues and raise funds.

14.    Plaintiff Pastor Jeremy Wong ("Wong") is a resident of Santa Clara County.  Before the Orders, Pastor Wong would meet with members of his congregation about once a week for communal worship, including Biblical studies, theological discussions, collective prayer, and musical praise.  Since the Orders, Pastor Wong has been unable to host these sessions.

15.    Plaintiff Karen Busch ("Busch") is a resident of Santa Clara County.  Busch is a member of a Bible study group that, before the Orders, held bi-weekly Bible study sessions in their homes on a rotating basis.  Busch regularly hosted these Bible studies, but because of Defendants' Orders she has been unable to host any sessions since March.

16.    Plaintiffs Terry Gannon and Carolyn Gannon ("Gannons") are residents of San Mateo County. Before Defendants issued their shutdown Orders, the Gannons regularly hosted in-person gatherings in their home to debate state and national policies. These forums provided a medium for the Gannons to share their beliefs and convictions with others and raise awareness for their causes. Because of Defendants' Orders, the Gannons have not been able to host any such gatherings for nearly seven months.

17.    Plaintiff Connie Richards ("Richards") owns and operates Better Life Fitness Academy ("BLFA") located in Nevada County. The Orders have made it impossible to continue operations because Richards can no longer provide the services included in clients' memberships or offer group classes.

18.    Plaintiff Julie Evarkiou ("Evarkiou") is the co-owner of Wavelength salon located in Santa Clara County.  Wavelength leases space to stylists and hosts events that attract clients.

Complaint

Defendants' Orders have prohibited Wavelength from hosting wine tastings, botox parties, and other gatherings that are an important part of its business.

19.      Plaintiff Dhruv Khanna ("Khanna") owns Miranda Wines, LLC (doing business as Kirigin Cellars) in Santa Clara County. Kirigin Cellars produces small batch wines made with grapes from its vineyards, but a large component of its business is hosting events. Because of the limitations imposed by the state and county on gatherings, Kirigin Cellars' events business has been devastated.

20.      Plaintiff Frances Beaudet ("Beaudet") is the co-owner of Old City Hall Restaurant in Santa Clara County.  Under the County's Order, Old City Hall Restaurant may not utilize any of its indoor dining space and has therefore suffered a significant decrease in revenue.  Even under the State's less stringent Order, Old City Hall Restaurant would be allowed to utilize only 25% of its indoor dining space.

21.      Plaintiff Maya Mansour ("Mansour") is the owner of a salon, The Original Facial Bar, in Santa Clara County. Before the Orders forced her business to close, her salon offered facials and other skincare treatments to a devoted client base. Santa Clara County's Orders have prevented her from reopening her business.

**Defendants**

22.      Defendant Gavin Newsom ("Newsom") is made a party to this Action in his official capacity as the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1.

23.      Defendant Xavier Becerra ("Becerra") is made a party to this Action in his official capacity as the Attorney General of California. Under California law, Becerra is the chief law enforcement officer in the State. Cal. Const. Art. V, § 13.

24.      Defendant Sandra Shewry, MPH, MSW ("Shewry") is made a party to this Action in her official capacity as the Acting Director of the California Department of Public Health ("CDPH"). Shewry was selected to replace Sonia Angell, the former State Public Health Officer and Department of Public Health Director, after Angell's abrupt resignation in August 2020.

7

Complaint

25.     Defendant Erica S. Pan, MD, MPH ("Dr. Pan") is made a party to this Action in her official capacity as the Acting State Public Health Officer of the California Department of Public Health. Pan was selected to replace Sonia Angell, the former State Public Health Officer and Department of Public Health Director, after Angell's abrupt resignation in August 2020.

26.     Defendant Jeffrey V. Smith, MD, JD ("Dr. Smith") is made a party to this Action in his official capacity as the County Executive Officer of Santa Clara County.

27.     Defendant Sara H. Cody, MD ("Dr. Cody") is made a party to this Action in her official capacity as the Health Officer and Public Health Director of Santa Clara County.

## FACTUAL ALLEGATIONS

### I.   DEFENDANTS ISSUE EMERGENCY ORDERS LIMITING PLAINTIFFS' ABILITY TO GATHER FOR RELIGIOUS AND POLITICAL ACTIVITIES OR RUN THEIR BUSINESSES

28.     On March 4, 2020, Governor Newsom proclaimed a state of emergency to exist in California attributable to an outbreak of COVID-19.[5]

29.     Among other mandates, Governor Newsom's proclamation waived California Government Code § 8630 indefinitely, conferring perpetual powers on local governments to address the COVID-19 outbreak: "The 60-day time period in Government Code section 8630, within which local government authorities must renew a local emergency, is hereby waived for the duration of this statewide emergency. Any local emergency proclaimed will remain in effect until each local governing authority terminates its respective local emergency."

### A.  The State Defendants Issue Restrictions on Gatherings

30.     On March 16, 2020, CDPH issued a "guidance" memorandum prohibiting all indoor and outdoor gatherings "across the state of California."[6] The guidance defines a gathering as "any event or convening that brings together people in a single room or single space at the same time, such as an auditorium, stadium, arena, large conference room, meeting hall, cafeteria, or any other indoor or

---

[5] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.
[6] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/cdph-guidance-gatherings-covid19-transmission-prevention-03-16-2020.pdf.

Complaint

outdoor space." The guidance further states that the prohibition on indoor and outdoor gatherings "will remain in place until further guidance is released by the [CDPH]."

31.     On March 19, 2020, Governor Newsom issued Executive Order N-33-20 ("EO N-33-20"), which imposed two pertinent mandates. First, it directed all California residents "to immediately heed the State public health directives from the Department of Public Health." Second, it "order[ed] all individuals living in the State of California to stay home or at their place of residence except as needed" to maintain continuity of operations of "Essential Critical Infrastructure" sectors and additional sectors as the State Public Health Officer may designate. The order also clarified its purported aim: "Our goal is simple, we want to bend the curve, and disrupt the spread of the virus." EO-N-33-20 has no end date and invokes California Government Code § 8665, which provides: "Any person who ... who refuses or willfully neglects to obey any lawful order or regulation promulgated or issued as provided in this chapter, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine of not to exceed one thousand dollars ($1,000) or by imprisonment for not to exceed six months or by both such fine and imprisonment."

32.     On May 4, 2020, Governor Newsom issued Executive Order N-60-20 ("EO N-60-20"), directing all California residents "to continue to obey State public health directives, as made available [online] and elsewhere as the State Public Health Officer may provide."[7] EO-N-60-20 also directs the State Public Health Officer "to establish criteria and procedures … to determine whether and how [local health officers] may implement public health measures" less restrictive than those of the State.

33.     The online resource referenced in EO N-60-20 is titled "Stay home Q&A" and addresses CDHP's health directives, including restrictions placed upon political and religious gatherings.[8] This webpage claims that its contents "have the same force and effect as other State Public Health Officer directives."

34.     While State agencies like CDPH ordinarily must follow rulemaking procedures under California's Administrative Procedure Act when issuing guidance, including comprehensive notice and comment requirements, Governor Newsom suspended these requirements because he concluded

[7] https://www.gov.ca.gov/wp-content/uploads/2020/05/5.4.20-EO-N-60-20.pdf.
[8] https://covid19.ca.gov/stay-home-except-for-essential-needs/.

Complaint

that they would "prevent, hinder, or delay" CDPH actions and the enforcement of EO-N-60-20. As a result, Plaintiffs lack any recourse to challenge CDPH's orders, guidance, or directives under California's Administrative Procedure Act (Government Code § 11340 *et seq*.).

35.     EO N-60-20 therefore purports to vest unchecked executive power in the State Public Health Officer to regulate all public, private, and commercial affairs in California: "Nothing … shall limit the authority of the State Public Health Officer to take any action she deems necessary to protect public health in the face of the threat posed by COVID-19." Like EO-N-33-20, EO-N-60-20 also invokes California Government Code § 8665, which subjects any person "who refuses or willfully neglects to obey any lawful order or regulation promulgated or issued," to a crime punishable by a fine, six-month imprisonment, or both.

### Pandemic Resilience Roadmap

36.     In late April 2020, the State Public Health Officer issued a "Pandemic Resilience Roadmap" that outlined a four-stage framework to reopening the State:

- Stage 1: Safety and preparation;
- Stage 2: Reopening of lower-risk workplaces and other spaces;
- Stage 3: Reopening of higher-risk workplaces and other spaces;
- Stage 4: Easing of final restrictions leading to the end of stay-at-home order.

37.     Several weeks later, CDPH issued another public health order stating that "the statewide data now supports the gradual movement of the entire state from Stage 1 to Stage 2 of California's Pandemic Resilience Roadmap."[9] The order does not specify the precise "data" supporting this transition, but states that the State Public Health Officer "will progressively designate … activities that may reopen with certain modifications, based on public health and safety needs." The order also authorized "local health jurisdiction[s]" to "implement or continue more restrictive public health measures if the jurisdiction's Local Health Officer believes conditions in that jurisdiction warrant it."

---

[9] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%205-7-2020.pdf.

10

Complaint

38.     On July 13, 2020, the CDPH reversed course and issued another public health order providing that the "statewide data [have] since demonstrated a significant increase in the spread of COVID-19, resulting in public health conditions that demand measures responsive to those conditions be put into place with haste."[10]

39.     Among those measures, the July 13 order commands counties that appear on CDPH's "County Monitoring List" for three consecutive days to "close all indoor operations" of several venues and events, including "Places of Worship" and "Protests." The order allows "[o]utdoor operations … under a tent, canopy, or other sun shelter but only as long as no more than one side is closed," and it states that the March 16, 2020 "guidance prohibiting gatherings continue to apply statewide, except as specifically permitted in other orders or guidance documents."

**Blueprint for a Safer Economy**

40.     On August 28, 2020, Defendant Erica Pan issued a third CDPH order replacing the "County Monitoring List" with a four-tiered, color-coded system called "California's Plan for Reducing COVID-19 and Adjusting Permitted Sector Activities to Keep Californians Healthy and Safe."[11] Under this tiered system, more commonly known as the "Blueprint for a Safer Economy" ("Blueprint"), "all local health jurisdictions in the state may reopen specified sectors according to their respective county's Tier."

41.     The Blueprint places strict reopening requirements on counties and emphasizes a slower reopening timeline. As Governor Newsom stated, the Blueprint is "statewide, stringent and slow."[12] It specifically relies on two health metrics (both of which utilize a seven-day average):

(1) the average amount of "cases" per 100,000 residents, and

(2) the average amount of COVID-19 tests that come back "positive."

---

[10] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf.

[11] https://rivcoph.org/Portals/0/Documents/CoronaVirus/August/GovernorOrders/8-28-20_Order-Plan-Reducing-COVID19-Adjusting-Permitted-Sectors-Signed.pdf?ver=2020-08-31-102913-927&timestamp=1598894957501.

[12] Press Release, Office of Governor Gavin Newsom, Governor Newsom Unveils Blueprint for a Safer Economy, a Statewide, Stringent and Slow Plan for Living with COVID-19 (Aug. 28, 2020), https://tinyurl.com/y5al8vo5.

11

Complaint

CDPH publishes its metrics calculations on its website.[13]

42.     Under the Blueprint, a county must remain in a tier for a minimum of three weeks before it can advance to a less restrictive tier. Also, before a county can advance, it must meet the criteria for both metrics (rate of "cases" and rate of "positive" tests) of the next less-restrictive tier for two consecutive weeks immediately prior to advancement. Conversely, a county that fails to meet the metrics for their current tier for two consecutive weeks must be sent back to the more restrictive tier.

43.     On September 30, 2020, CDPH added an additional requirement for counties to advance to the next tier: the health equity metric.  Under this metric, counties with a population over 106,000 are divided by census tract.  These counties must identify their "most disadvantaged neighborhoods," determined as "the lowest quartile of the Healthy Places Index census tracts." [14]  In order to advance to the next tier, a county's lowest quartile must meet certain thresholds for case and positivity rate, in addition to the thresholds that must be met on a county-wide basis.

44.     The California Healthy Places Index was "developed by the Public Health Alliance of Southern California in partnership with the Virginia Commonwealth University's Center on Society and Health."[15]  The Index "combines 25 community characteristics into a single indexed HPI Score." Many of these characteristics—such as the percentage of registered voters who voted in the 2012 election—are entirely unrelated to the likelihood of COVID-19 transmission and severity.

45.     The Blueprint's tiers are designated by four colors: purple (widespread), red (substantial), orange (moderate) and yellow (minimal with the lowest restrictions):

- Tier 1 (Purple): Widespread. More than 7 new daily cases per 100,000 residents or a positive test rate of more than 8%. Most nonessential indoor business operations must close.

---

[13] Available at https://tinyurl.com/y4bjr3np. The case rate is adjusted based on testing volume per 100,000 population. *Id.*

[14] CDPH, *Blueprint for a Safer Economy: Equity Focus* (September 30, 2020), *available at* https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CaliforniaHealthEquityMetric.aspx.

[15] About, The California Healthy Places Index, https://healthyplacesindex.org/about/ (last visited October 5, 2020).

Complaint

- Tier 2 (Red): Substantial. Between 4 and 7 new daily cases per 100,000 residents or a positive test rate between 5% and 8%. Some nonessential indoor business operations must close.

- Tier 3 (Orange): Moderate. Between 1 and 3.9 new daily cases per 100,000 residents or a positive test rate between 2% and 4.9%. Some business operations are open with modifications.

- Tier 4 (Yellow): Minimal. Less than 1 new case daily per 100,000 residents or less than 2% positive tests. Most business operations are open with modifications.

46.     There is no "Green" tier in which a county may return to pre-pandemic operations. Nor is there any expiration date to the tier system. Californians must endure the Blueprint's restrictions indefinitely. Governor Newsom recently confirmed the open-ended nature of Blueprint when he stated at a press conference: "We don't believe that there is a green light, which says go back to the way things were or back to the pre-pandemic mindset. Quite the contrary."[16]

**State Restrictions on Places of Worship and Other Gatherings**

47.     CDPH has also promulgated industry guidance documents that supplement the Blueprint and provide specific restrictions for various industries and activities.[17] The restrictions specifically placed on "places of worship and cultural ceremonies" include

- Tier 1 (Purple): Widespread. Indoor activities are prohibited.

- Tier 2 (Red): Substantial. Indoor activities must be limited to 25% of capacity or 100 people, whichever is less.

- Tier 3 (Orange): Moderate. Indoor activities must be limited to 50% of capacity or 200 people, whichever is less.

- Tier 4 (Yellow): Minimal. Indoor activities must be limited to 50% of capacity.[18]

---

[16] Available at https://tinyurl.com/y3xnf7ae.
[17] Available at https://covid19.ca.gov/industry-guidance.
[18] The limitations applicable to counties in tiers 3 and 4 conflict with a separate guidance document CDPH issued on July 29, 2020, which limits indoor attendance to 25% of building capacity or a maximum of 100 attendees.  https://files.covid19.ca.gov/pdf/guidance-places-of-worship--en.pdf. Although this guidance document is still in force, these statewide attendance limitations presumably have been superseded by the Blueprint.

13

Complaint

48.    In other words, even if a county has had an average of *zero* cases for more than three weeks, churches and other places of worship are not allowed to meet indoors with more than 50% of capacity. Under EO-N-60-20, the failure to comply with the Blueprint subjects an offender to a fine, six-month imprisonment, or both.

49.    Under the "Stay home Q&A" webpage, faith-based services and may be held outdoor as long as "coverings are worn and people are physically distanced.["][19] "Places of worship may only open indoor operations when permitted by relevant local restrictions and must comply with all applicable attendance limitations and guidance requirements." It is unclear, however, where religious services may be held because CDPH does not define "place of worship." Nor is it clear what qualifies as a "religious ceremony." Someone wishing to host a Bible Study in their backyard, for example, cannot determine from the text of the Orders whether such a gathering is permissible.

50.    The "Stay home Q&A" guidance allows outdoor "protests" so long as participants are socially distanced or wearing masks, but prohibits indoor "protests" in counties assigned to "Tier 1," the widespread (purple) tier.[20] For all other counties, CDPH directives "do not prohibit in-person indoor protests as long as (1) attendance is limited as required by the relevant restrictions on places of worship, (2) physical distancing of 6 feet between persons or groups of persons from different households is maintained at all times, and (3) singing and chanting activities are discontinued."

51.    Other than referring to citizens' "right to engage in political expression," CDPH has failed to define "protest." While a prototypical protest is clearly permissible so long as public health measures are followed, it is unclear whether gatherings for other types of political activities— speeches, debates, fundraisers, etc.—are permissible under the exception for "protests."

52.    On September 12, 2020, CDPH issued an "updated" Guidance for the Prevention of COVID-19 Transmission for Gatherings. The guidance provides that all "gatherings unless otherwise specified are not permitted across the State of California."[21] Because all "materials linked" on the

---

[19] https://covid19.ca.gov/stay-home-except-for-essential-needs/

[20] *Id.*

[21] Cal. Dep't of Pub. Health, *CDPH Guidance for the Prevention of COVID-19 Transmission for Gatherings* (Sept. 12, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings.aspx.

14

Complaint

CDPH's website constitute "directives of the State Public Health Officer," citizens must scour CDPH's website to determine which gatherings are permissible.[22]

53.     On October 9, 2020, CDPH "updated" its gatherings guidance yet again.[23] This new guidance directs that "[a]ll gatherings must be held outside" and "[g]atherings that include more than 3 households are prohibited." The guidance also limits outdoor gatherings to a maximum of two hours and provides that the outdoor venue space must allow at least six feet "in all directions—front-to-back and side-to-side" from others "at all times." The new rule even restricts bathroom use: "Attendees may go inside to use restrooms as long as the restrooms are frequently sanitized." And to prevent citizens from circumventing this "outdoors only" rule, the guidance prohibits "multiple gatherings of three households" from being "jointly organized or coordinated to occur in the same public park or other outdoor space at the same time."

54.     CDPH has directed citizens to comply with both state- and county-level orders, and the most restrictive order applies.

**State Restrictions on Businesses**

55.     Under CDPH's tier system, different industries are subject to different restrictions in each tier.[24] For "Restaurants, wineries, and bars," the restrictions are:

• Tier 1 (Purple): Widespread. Restaurants and wineries: Outdoor only with modifications. Bars, breweries, and distilleries: Closed.

• Tier 2 (Red): Substantial. Restaurants: Indoor with modifications, capacity must be limited to 25% or 100 people, whichever is less.  Wineries: Outdoor only with modifications.  Bars, breweries, and distilleries: Closed.

---

[22] Cal. Dep't of Pub. Health, "What is the relationship between the stay at home order and these questions and answers?," *State Q&A*, https://covid19.ca.gov/stay-home-except-for-essential-needs/ (last accessed Sept. 28, 2020).

[23] Cal. Dep't of Pub. Health, *Guidance for Private Gatherings* (Oct. 9, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings-10-09.aspx.

[24] *See* CDPH, *Industry guidance to reduce risk*, available at https://covid19.ca.gov/industry-guidance/; https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Dimmer-Framework-September_2020.pdf.

15

Complaint

• Tier 3 (Orange): Moderate. Restaurants: Indoor with modifications, capacity must be limited to 50% or 200 people, whichever is less.  Wineries: Indoor with modifications, capacity must be limited to 25% or 100 people, whichever is less.  Bars, breweries, and distilleries: Outdoor only with modifications.

• Tier 4 (Yellow): Minimal. Restaurants: Indoor with modifications, capacity must be limited to 50%.  Wineries: Indoor with modifications, capacity must be limited to 50% or 200 people, whichever is less.  Bars, breweries, and distilleries: Indoor with modifications, capacity must be limited to 50%.

56.     CDPH also issued several guidance documents requiring restaurants, bars, and wineries to implement various safety and cleaning measures.[25]

57.     Hair salons, barbershops, and nail salons are allowed to "[o]pen indoors with modifications" in all Tiers.[26]  However, personal care services are more limited:[27]

• Tier 1 (Purple): Widespread.  "Tattooing, piercing, and non-medical electrolysis must close and cannot be performed outdoors."  However, "[n]ail services and physician-ordered electrolysis may be performed indoors."  All other personal care services are limited to outdoor services only.

• Tier 2 (Red): Substantial.  All personal care services are allowed indoors with modifications.

• Tier 3 (Orange): Moderate.  All personal care services are allowed indoors with modifications.

• Tier 4 (Yellow): Minimal.  All personal care services are allowed indoors with modifications.

58.     CDPH has also issued guidance for all personal care services, including cleaning and distancing requirements.[28]

---

[25] https://files.covid19.ca.gov/pdf/guidance-restaurants-bars.pdf;
https://files.covid19.ca.gov/pdf/guidance-dine-in-restaurants.pdf;
https://files.covid19.ca.gov/pdf/guidance-takeout-restaurants.pdf.
[26] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Dimmer-Framework-September_2020.pdf.
[27] https://covid19.ca.gov/industry-guidance/.
[28] https://files.covid19.ca.gov/pdf/guidance-expanded-personal-care-services--en.pdf.

Complaint

59.     Gyms and fitness centers are subject to strict limits:[29]

•    Tier 1 (Purple): Widespread.  Outdoor only with modifications, saunas and steam rooms must close.

•    Tier 2 (Red): Substantial.  Indoor with modifications, capacity must be limited to 10%.

•    Tier 3 (Orange): Moderate.  Indoor with modifications, capacity must be limited to 25%. Indoor pools can open.

•    Tier 4 (Yellow): Minimal.  Indoor with modifications, capacity must be limited to 50%. Indoor pools, saunas, spas, and steam rooms can open.

60.     CDPH has also issued guidance for gyms and fitness centers to follow, including yoga and dance studios.[30]

### B.  Santa Clara County Imposes Additional Restrictions on Public Gatherings and Businesses

61.     On July 2, 2020, the Santa Clara County Public Health Officer issued an Order "Establishing Mandatory Risk Reduction Measures Applicable to All Activities and Sectors to Address the COVID-19 Pandemic."[31]   The Order explains that, where there is conflict between the County and the State Orders, the stricter order controls.  This Order, among other things, prohibits opening "[a]ny indoor facility that is used for an activity inherently necessitating the removal of a face covering," including all indoor dining and indoor bars.  The order also requires all businesses to fill out and submit a Social Distancing Protocol to the County. Failure to comply with this directive "is a misdemeanor punishable by fine, imprisonment, or both."

62.     On July 14, 2020, the Santa Clara County Health Officer issued a "Mandatory Directive for Outdoor Dining, Wineries, and Outdoor Tasting Rooms," which the Health Officer updated on October 4, 2020[32]   This order requires any outdoor seating area to have either 50% or 25% "of its perimeter [ ] open to the outdoors," depending on whether the roof is open, and to "[s]eparate all tables to ensure that at least 6 feet of distance . . .  can easily be maintained," which "will generally

---

[29] https://covid19.ca.gov/industry-guidance/.
[30] https://files.covid19.ca.gov/pdf/guidance-fitness--en.pdf.
[31] https://www.sccgov.org/sites/covid19/Documents/07-02-20-Health-Officer-Order.pdf.
[32] https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-outdoor-dining.aspx.

Complaint

require that the edge of each table be spaced at least 10 feet apart from the edge of the nearest table," and to "[a]llow no more than six people per table."

63.     On July 14, 2020, the Santa Clara County Health Officer issued a "Mandatory Directive for Personal Care Services Businesses," which the Health officer updated on September 8, 2020 and October 4, 2020.[33]  The Order requires, among other things, that anyone performing a service that requires the client to remove their mask wear an N95 mask.

64.     Also on July 14, 2020, the Santa Clara County Health Officer issued a "Mandatory Directive for Gatherings," which the Officer revised on September 24, 2020.[34]  The Order sets out the county's limitations on in-person gatherings. Under Santa Clara's Mandatory Directive, a "gathering" is "an event, assembly, meeting, or convening that brings together multiple people from separate households in a single space, indoors or outdoors, at the same time and in a coordinated fashion—like a wedding, banquet, conference, religious service, festival, fair, party, performance, movie theater operation, barbecue, protest, or picnic."

65.     Santa Clara's Mandatory Directive "prohibits any gatherings from occurring indoors." The directive continues: "[W]orship services, cultural ceremonies, protests, and political events may occur outdoors subject to the requirements of this Directive, but they may not occur indoors." Relying on CDPH's prohibitions, Santa Clara's Mandatory Directive also restricts familial, cultural, traditional, and historic gatherings associated with marriage ceremonies: "[T]he State has clarified that 'wedding receptions/parties/celebrations are NOT permitted at this time' under State Public Health Officer's Orders."

66.     Even those outdoor gatherings that are "allowed" in Santa Clara County are severely restricted. Although CDPH's orders do not limit the number of people who can attend an outdoor religious service, protest, or cultural event, under Santa Clara County's guidance, "the maximum number of people allowed at an outdoor gathering of any type is 60 people (even if the space is big enough to allow proper social distancing for more than 60 people). This includes everyone present,

---

[33] https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-personal-care.aspx.
[34] https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-gatherings.aspx.

Complaint

such as hosts, workers, and guests. The space must be large enough so that everyone at a gathering can maintain at least 6-foot social distance from anyone (other than people from their own household)."

67.     Santa Clara County's Order requires "[a]ll businesses (including nonprofits, educational entities, and any other business entity, regardless of its corporate structure) that organize or host gatherings," including "religious institutions," to submit a "social distance protocol" ensuring compliance with the directive, and to certify that protocol "under penalty of perjury."

68.     Like CDPH's bans on gatherings, Santa Clara County officials can create, amend, enforce, or retract directives involving political and religious activities.

69.     On October 5, 2020, the Santa Clara County Public Health Officer issued an Order "Establishing Revised Mandatory Risk Reduction Measures Applicable to All Activities and Sectors to Address the COVID-19 Pandemic." This revised directive purports to "supersede[] the July 2, 2020 Risk Reduction Order of the Health Officer."[35] It also instructs: "Participants in gatherings of any size must adhere to Health Officer directives applicable to gatherings, including restrictions on the size of gatherings . . . ."

## II.   DEFENDANTS' ACTIONS INFRINGE ON PLAINTIFFS' CONSTITUTIONAL RIGHTS

### A.  Free Speech Plaintiffs

70.     Plaintiffs Tandon and the Gannons want to speak about important policy and political issues at in-person gatherings at their homes and outdoors, but the County's Orders prohibit them from holding indoor gatherings, and the State's Orders likely prohibit them from meeting outdoors because their gatherings are not "protests" or "cultural gatherings." And even if they could meet outdoors, the County's Orders would limit their assemblies to no more than 60 persons.

71.     **Plaintiff Tandon**, for example, would like to host outdoor gatherings of more than 60 persons to share his message about why he is running for the U.S. Congress and his ideas for how best to represent the 17th Congressional District. Before Governor Newsom issued the first safer-at-home order, Tandon had generated significant support by way of traditional campaigning, such as fundraising events at the homes of friends, via invitations to concerts and speaker events, meet-the-

---

[35] https://www.sccgov.org/sites/covid19/Pages/order-health-officer-10-05-20.aspx.

Complaint

candidate events and other gatherings, policy discussions, debates, and more. All these activities ground to a halt when the Defendants released the Orders. As a result, Tandon has been unable to express his ideas and policies during the most crucial moments of a political campaign—the weeks right before election day.

72.      Part of Tandon's campaign strategy is to conduct fundraisers where supporters can hear his ideas and support his candidacy. The Orders' ban on gatherings curtails his ability to host fundraisers. He cannot host such gatherings indoors, and any outdoor events are limited to no more than 60 people in Santa Clara, if they are even allowed at all under the State's Orders, which authorize only "protests" and religious and cultural ceremonies.  Although Tandon can reach donors through online outreach, running advertisements on social media and elsewhere costs significant amounts of money, which he cannot raise because the Orders ban in-person gatherings. The Orders have thus put Tandon in a Catch 22: He must move his campaign online, but he is prohibited from holding the type of events that would generate the necessary funds to run a successful online campaign.  Regardless, online campaigning is no substitute for the person-to-person interaction necessary to truly communicate with his district's constituents and understand their concerns.

73.      To make matters worse, social media platforms have announced that they will not host political ads during the most important time in an election—one week before the vote.[36] Tandon is therefore effectively silenced while his opponent, by virtue of his incumbency, can exploit free media coverage. Indeed, the current officeholder Tandon is hoping to unseat has appeared on CNBC,[37] NBC,[38] and MSNBC [39] to discuss his views on current affairs.

74.      Similarly, **Plaintiffs Terry and Carolyn Gannon** have hosted a broad and diverse network of persons in their home for over twelve years to discuss public policy. At these in-home

---

[36] *See, e.g.*, Steven Overly, *Facebook bans new political ads in the week before Election Day*, POLITICO (Sept. 3, 2020), available at https://tinyurl.com/y4nf7o6y.
[37] *Rep. Ro Khanna on appointment to White House coronavirus advisory council*, CNBC (April 16, 2020), available at https://tinyurl.com/y5x9jdtt.
[38] *Rep. Ro Khanna Discusses Coronavirus Stimulus Bill*, NBC Bay Area (March 26, 2020), available at https://tinyurl.com/yxnanspr.
[39] *Rep. Ro Khanna with Chris Hayes, MSNBC, Coronavirus,* Youtube.com (April 20, 2020), available at https://tinyurl.com/y2hozlh5.

Complaint

assemblies, their group would propose topics to discuss, hear each other's views on the issues, probe the evidentiary support for the ideas, debate the merits of the proposals, and then try and reach a consensus on the best solution. One recent discussion, for example, involved American policy concerning climate change. Since the Defendants banned in-person gatherings, however, the Gannons have not been able to host any in-person events.

75.     The Free Speech Plaintiffs are eager to host in-person gatherings to discuss and support their ideas—either indoor or outdoor—and they are capable of doing so safely. Each has ample home or outdoor space to host persons with social distancing of more than six feet the entire time. People attending their assemblies would also be asked to wear masks, and the Free Speech Plaintiffs are willing to provide gloves, screens, or other devices to prevent the spread of COVID-19. To further guard against infection and contagion, they would sterilize the venue just as many businesses and schools currently do.

76.     These assemblies, which would all be planned and controlled one-off events with strict social distancing procedures, present a much smaller risk of contagion than the weeks-long racial-justice protests Defendants have condoned—and even championed—despite the lack of social distancing.[40]

**B.  Free Exercise Plaintiffs**

77.     **Plaintiff Wong** wants to host a small number of his congregation in his home for communal worship, including Biblical studies, theological discussions, collective prayer, and musical praise, as he has done regularly for nearly three years.  However, Defendants' Orders prohibit Wong from hosting such in-person gatherings at his house. Wong may not hold communal worship and Bible study in the privacy of his home with a few members of his congregation, even though he could employ social distancing and other mitigation measures that Defendants have deemed sufficient for other indoor activities. Indeed, under CDPH's Order, which prohibits all gatherings except for religious ceremonies, protests, and cultural gatherings, Wong likely cannot hold a Bible study in his backyard either.

---

[40] *See* Eric Tang, *Gavin Newsom asked to reconcile support for protests with new warnings on gatherings*, SF Gate (July 2, 2020), available at https://tinyurl.com/y5d3p4ly.

Complaint

78.     Virtual meetings are an inadequate substitute for Wong's gatherings.  Communal worship, congregational study, and collective prayer are central tenets of Wong's faith and ministry. These types of in-person gatherings are impossible to replicate in an online format. An online or virtual sermon cannot replicate the communal aspect of an assembled church. In-person worship is indispensable. The Bible commands people to engage in certain activities together, and that means in-person gatherings are essential.  Every description of the church in the New Testament is that of a physically gathered people.  Thus, in-person gathering is a matter of obedience to the Word of God.

79.     **Plaintiff Busch** likewise wants to host small, in-person Bible studies in her home, as she has done regularly for over two years, but Defendants' Orders prevent her from doing so.  This is true even though the group could maintain social distancing and employ other mitigation techniques that Defendants have deemed sufficient for other indoor activities. And although Busch, like Wong, could host the event outdoors, CDPH's ban on gatherings likely prohibits her from holding her Bible study in her own backyard.

80.     Although Busch and her group have attempted to host Zoom meetings, several of the group members do not have computers and are only able to phone in to the session. The online format also fails to provide the same level of engagement and fellowship as in-person gatherings.

### C. Business Plaintiffs

81.     **Plaintiff Richards** opened her business, Better Life Fitness Academy ("BLFA"), four years ago. BLFA is a fitness center that offers personal training, group workouts, fitness classes, and access to their gym facilities.

82.     After the Governor declared a state of emergency in California, BLFA remained closed for several months. During this time, Richards continued paying for basic business expenses like rent and electricity while generating no revenue.

83.     After some time, BLFA was permitted to reopen in an extremely limited capacity by the State of California and Nevada County. At that point, Nevada County was in the Red Tier. Under the Blueprint and CDPH's Guidance, BLFA could only operate indoors at 10% capacity. BLFA does not have the resources or space to offer fitness services outdoors.

Complaint

84.     Operating at 10% capacity was not sufficient to sustain Richards' business. Richards could no longer offer group classes or workout sessions. Access to gym equipment was sharply limited. As a result, Richards lost over 85% of her clients.

85.     The fact that Nevada County moved to the Orange Tier on September 22, 2020, allowing gyms to operate at 25% capacity, has not been enough to save BLFA.[41] Because Defendants' Orders have made her business unsustainable, Richards may be forced to close BLFA by the end of October.

86.     **Plaintiff Evarkiou** is a small business owner who co-owns and operates a relatively new salon called Wavelength. Wavelength, like many other businesses, shut down soon after Governor Newsom issued a state of emergency in California. Although Wavelength is now allowed to operate, Defendants' Orders still prohibit Wavelength from offering its group events, which are critical marketing tools for this new business.

87.     Evarkiou can operate Wavelength safely. Because the health and well-being of the stylists and community are Evarkiou's top priority, Wavelength has expanded its disinfecting practices and currently follows all safety protocols and guidelines from the State of California, Santa Clara County, the California State Board of Barbering Cosmetology, and the Centers for Disease Control. These policies help ensure a safe working environment, safer than the many other similarly situated establishments that continue to operate unencumbered by Defendants' Orders.

88.     Nevertheless, Defendants' Orders prohibit Wavelength from operating at full capacity or hosting key events. As a result, Evarkiou has suffered severe financial hardship.

89.     **Plaintiff Khanna** owns one of the oldest vineyards in California, Kirigin Cellars. At the time he bought Kirigin Cellars in 2000, it had fallen into disrepair. Khanna replanted the vineyards, built a new event space, added sports fields, and restored some of the vineyard's original buildings. Today, Kirigin Cellars has ten acres of outdoor event space and nine thousand square feet of indoor event space.

---

[41] Nevada Cty. Pub. Health, *Continue to be COVID safe: Nevada County Moves into the Orange "Moderate" Tier* (Sept. 22, 2020), https://www.mynevadacounty.com/CivicAlerts.aspx?AID=3268.

Complaint

90.     Today, Khanna bottles and sells small batch wine using the grapes grown on his land. The overwhelming majority of Khanna's business, however, involves renting event space. Before Defendants required Khanna's business to shut down, he hosted over 1,000 youth soccer games, which provided advertising and customers to the business.  Approximately one third of Kirigin's revenues came from events such as weddings and corporate gatherings.

91.     After the Governor declared a state of emergency, Kirigin Cellars was unable to host any events for months. Under Defendants' current Orders, all gatherings are prohibited except for weddings, religious services, cultural ceremonies, and protests.[42] Even at these few events, only 60 people are permitted to attend due to Santa Clara's more restrictive provisions.[43] As a result, more than 30 events have been cancelled in 2020.

92.     Khanna is able to host more than 200 people outdoors while maintaining a six-foot distance between households. Because the Defendants' Orders have gutted its events revenue, Kirigin Cellars been forced to reduce payroll by 30 percent.

93.     **Plaintiff Mansour** incorporated her business, Lash Me, Inc. d/b/a The Original Facial Bar, in 2017. Her entire livelihood depends on The Original Facial Bar's continued success. The Original Facial Bar shut down on March 17, 2020, shortly after the Governor declared a state of emergency. Mansour was forced to lay off her entire staff of nine.

94.     While the Original Facial Bar could have operated under State guidance, including by providing outdoor services,[44] until October 4, 2020, Santa Clara County's "Mandatory Directive for Personal Care Services" prevented Mansour from reopening her business. Under Santa Clara County's Order, "No personal care services business may offer or perform any service that requires or would

---

[42] Cal. Dep't of Pub. Health, "Are gatherings permitted?," *Stay home Q&A* (Oct. 8, 2020), https://covid19.ca.gov/stay-home-except-for-essential-needs/.

[43] Santa Clara Cty. Dep't of Pub. Health, *Mandatory Directive for Gatherings* (Sept. 24, 2020), https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-gatherings.aspx.

[44] The State Order permits personal care services businesses to operate outdoors in counties in the purple tier, and indoors "with modifications" in the red tier. Cal. Dep't of Pub. Health, *Blueprint Activity and Business Tiers*, https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Dimmer-Framework-September_2020.pdf (last accessed Oct. 9, 2020).

24

Complaint

likely lead the client to remove or adjust a face covering."[45] Providing "facials and facial massages" was explicitly prohibited.[46]

95.     On October 4, 2020, Santa Clara County updated its order relating to personal care services.  Under the updated Order, businesses can provide personal care services to the face and neck area, but workers performing these services must wear N95 masks and eye protection.[47] However, it is virtually impossible to obtain N95 masks if you are not a healthcare worker.

96.     The Original Facial Bar has been closed for almost seven months now.  And while the newest guidance from Santa Clara County theoretically allows The Original Facial Bar to reopen, the salon has not yet been able to obtain sufficient staffing and supplies to reopen.

97.     Meanwhile, medical facilities in Santa Clara County have been allowed to perform elective procedures like teeth whitening, botox, and facials. These elective services offered in medical facilities office require patients to remove their facial coverings. And some of the skincare treatments (i.e. facials) offered in medical facilities are similar to those offered by the Original Facial Bar.

98.     Mansour's business is fully capable of adhering to public health measures to prevent the spread of infection. Her employees are prepared to wear disposable gloves and smocks and sterilize instruments and surfaces. They have also been trained to prevent the spread of infection even before the start of the pandemic. If The Original Facial Bar is permitted to remain open, it will comply with all required social distancing measures, such as requiring employees to wear masks and eye coverings, and maintaining six feet of distance between clients.

---

[45] Santa Clara Cty. Dep't of Pub. Health, *Mandatory Directive for Personal Care Services Businesses* (Sept. 8, 2020), https://web.archive.org/web/20201001010934/https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-personal-care.aspx.
[46] *Id. Compare* Cal. Dep't of Pub. Health, *Guidance for the Use of Face Coverings* (June 29, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf (stating that individuals must wear face coverings except when they are "obtaining a service involving the nose or face for which temporary removal of the face covering is necessary to perform the service").
[47] Santa Clara Cty. Dep't of Pub. Health, *Mandatory Directive for Personal Care Services Businesses* (Oct. 4, 2020), https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-personal-care.aspx.

Complaint

99.     **Plaintiff Frances Beaudet** is the co-owner of Old City Hall Restaurant located in Gilroy, California, in Santa Clara County. The restaurant is within historic downtown Gilroy, in the former municipal building. Beaudet has owned the restaurant since 2012.

100.     Old City Hall Restaurant has approximately 25,000 square feet of indoor dining space and can seat up to 254 customers indoors. The restaurant also has an outdoor patio that can seat up to 66 customers.

101.     Since Governor Newsom, CDPH, and Santa Clara County issued their safer-at-home orders restricting businesses, Old City Hall Restaurant has suffered significant losses. The restaurant is unable to utilize any of its indoor dining space. This has reduced the restaurant's business by 60 percent compared to last year. Beaudet is thus experiencing extreme financial hardship as a result of Defendants' Orders.

### III.     DEFENDANTS' ACTIONS ARE NOT SUPPORTED BY PUBLIC HEALTH DATA
#### A.  COVID-19 is Not as Dangerous as Initially Believed

102.     When Governor Newsom first declared a state of emergency, some public health experts were predicting that 2 million people in the United States would die from COVID-19.[48]  The actual number has been far lower, and the infection fatality rate from COVID-19 appears to be ten to forty times lower than estimates that motivated extreme isolation. [49]

103.     It is also now well established that COVID-19 is not equally dangerous across all age groups. In fact, younger, healthier people have virtually zero risk of death from COVID-19. The CDC's current best estimates are that the infection fatality rate from COVID-19 among persons less than 19 years old is 0.003%, or 3 in 100,000; 0.02% for those between ages 20 and 49, or 2 in 10,000; 0.5% for those ages 50 to 69, and 5.4% for those 70 and above.[50]

---

[48] *See* Alan Reynolds, *How One Model Simulated 2.2 Million U.S. Deaths from COVID-19*, CATO Institute (April 21, 2020), https://www.cato.org/blog/how-one-model-simulated-22-million-us-deaths-covid-19.

[49] *See* John P.A. Ioannidis, *The infection fatality rate of COVID-19 inferred from seroprevalence data, MedRxiv,* BMJ Yale, https://www.medrxiv.org/content/10.1101/2020.05.13.20101253v2 (July 14, 2020).

[50] Centers for Disease Control and Prevention, *COVID-19 Pandemic Planning Scenarios*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited Sept. 24, 2020).

Complaint

104.     According to a CDC update published on October 7, 2020, of the first 198,809 US deaths involving COVID-19, 0.2% occurred in people under 25 years of age while 79% were in people over 65.[51]

105.     Over 40% of the COVID-19 deaths in the United States have occurred in nursing homes. And 94% of all deaths associated with the COVID-19 condition involved victims with pre-existing underlying medical conditions—such as diabetes or heart disease.[52]

106.     The numbers in California are similar. As of October 8, 2020, 73% of deaths in the state were in those over the age of 65; 93% were in people over 50.[53]

107.     The infection fatality rate from the Santa Clara County seroprevalence study conducted by Dr. Jayanta Bhattacharya is 0% among people between 0 and 19 years (there were no deaths in Santa Clara in that age range up to that date); 0.013% for people between 20 and 39 years (1.3 deaths per 10,000 infections); 0.16% for people between 40 and 69 years (1.6 deaths per 1,000 infections); and 1.3% for people above 70 years. 77.5% of all COVID-19 related deaths in the county occurred in patients 65 and older.

108.     Given the disparate risks COVID-19 presents for various populations, Defendants could target their public health interventions at the most vulnerable. Nursing home patients and those in long-term care facilities are most at risk, and there are numerous precautions the state could take to protect that population without burdening other people's ability to work and gather together. For example, employees at these facilities could be tested regularly—perhaps even daily—to ensure that they are not spreading infection to the elderly. People working in nursing homes could also be required to wear the same PPE employed in hospitals to prevent infection. Those in nursing homes could also undergo more regular testing to ensure that needed interventions are provided as soon as

---

[51] Centers for Disease Control and Prevention, *Weekly Updates by Select Demographic and Geographic Characteristics,* https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm (October 9, 2020).
[52] *Id.*
[53] California Dep't of Pub. Health, *Cases and Deaths Associated with COVID-19 by Age Group in California*, (last visited October 8, 2020) https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID-19-Cases-by-Age-Group.aspx.

Complaint

possible and to quickly quarantine infected individuals in these settings. A recent article published in Politico highlighted the dramatic difference between the death rate in nursing homes operated by California's Veterans Affairs Department and other nursing homes.[54] The article noted that "an average nursing home patient in California is 31 times more likely to die from the coronavirus than a resident of a CalVet home" because of the rigorous precautions taken by CalVet facilities.[55] If every nursing home had implemented the same precautions, the total number of deaths in the state from COVID-19 would be a fraction of the current total.

109.     In short, reducing the risk of infection and severe illness in nursing homes and long-term care facilities would dramatically reduce the mortality rates from COVID-19 without imposing onerous restrictions on the lives of younger, working-age people. Those under the age of 65 with comorbidities—the same population at a slightly heightened risk from influenza—could also be provided with special accommodations. Yet the state and county regulations infringing on Plaintiffs' constitutional rights treat all population groups equally and impose across-the-board restrictions on people of all ages.

## B.  The State's Reliance on the Single Metric of Positive Test Results is Unprecedented and Has No Scientific Basis

110.     When the Governor first declared a state of emergency, he argued that this drastic measure was necessary to protect the public health system from being overwhelmed.[56] The declaration asserted that "if COVID-19 spreads in California at a rate comparable to the rate of spread in other countries, the number of persons requiring medical care may exceed locally available resources."[57]

---

[54] Maggie Severns, *Could massive numbers of nursing home deaths have been prevented?*, POLITICO, (August 10, 2020), https://www.politico.com/news/2020/08/10/could-nursing-home-deaths-be-prevented-393131.

[55] *Id.*

[56] *See* Governor Gavin Newsom, *Proclamation of a State of Emergency* (March 4, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf; Press Release, Office of Governor Gavin Newsom, *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19* (March 4, 2020), https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/.

[57] Proclamation of State of Emergency, https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

28

Complaint

The declaration further asserted that the "conditions caused by COVID-19 are likely to require the combined forced of a mutual aid region or regions to appropriately respond"—suggesting that county hospital systems could be overwhelmed with COVID-19 patients and thus require assistance from other counties.[58] The Governor's early focus on burdens to the public health system was consistent with CDPH's longstanding use of the rates of hospitalizations and deaths to measure the severity of an epidemic. It was also consistent with the CDC's current practice and recent scholarship indicating that new hospital admissions for SARS-CoV-2 compatible disease syndromes are the most reliable and timely measures for pandemic surveillance.[59]

111.    As it turns out, the state's hospital system has never come close to being overwhelmed. Although many counties set up surge units to handle expected capacity, most of these units were never utilized and were quickly dismantled. Even at their July peak, hospitalizations resulting from COVID-19 did not exceed 10% of total capacity.[60] And hospitalizations attributable to COVID-19 have plummeted by more than two-thirds from their mid-July highs, and are now at their lowest levels since early April.[61] The number of patients in the ICU with COVID-19 has dropped to its lowest level since late March.[62] There are now more than 2,900 ICU beds available across the state.[63] Indeed, the state has never had fewer than 1,800 ICU beds available during the entirety of the pandemic.[64] According to

---

[58] *Id.*

[59] Centers for Disease Control and Prevention, *COVID View: A weekly surveillance summary of U.S. COVID-19 activity*. Available at: https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html; García-Basteiro AL, Chaccour C, Guinovart C, Llupià A, Brew J, Trilla A, Plasencia A, *Monitoring the COVID-19 epidemic in the context of widespread local transmission*, LANCET RESPIR MED, 2020 May;8(5):440-442.

[60] COVID-19: Hospitals, California Department of Public Health https://public.tableau.com/views/COVID-19HospitalsDashboard/Hospitals?:embed=y&:showVizHome=no.

[61] COVID-19: Hospitals, California Department of Public Health, https://public.tableau.com/views/COVID-19HospitalsDashboard/Hospitals?:embed=y&:showVizHome=no.

[62] *Id.*

[63] *Id.*

[64] *Id.*

Complaint

the traditional measures used by the State, any public health emergency in California has long since abated.

112.    The State's Blueprint ignores this data because it relies exclusively on case counts and positivity rates to determine the level of restrictions to be imposed on each county's residents and businesses. CDPH has not previously calculated the severity of influenza or other respiratory disease by focusing on positive test results. For example, in 2009, CDPH did not measure the severity of H1N1 using case rates.[65]  The CDC also stopped collecting individual case counts and instead collected weekly state reports of hospitalizations and deaths.[66] There is no rational scientific explanation as to why CDPH is now relying exclusively on case rates to measure the severity of the novel coronavirus.

113.    New hospital admissions would be a much more reliable measure of harm, as it is directly correlated with pandemic infection rates and serious consequences of infection, and the state could easily use laboratory confirmed hospitalized cases as an alternative measure of public harm.

114.    Defendants' narrow focus on case counts provides a grossly misleading picture of the state's public health situation.  Over the course of the epidemic, laboratory positive case counts have not tracked well with severe disease and death. This is partly because case counts are largely dependent on supply and demand for testing, which has varied considerably over the course of the epidemic.

115.    It is also partly because the PCR test, as it is currently used, can yield positive results even for individuals with trace amounts of the virus in their bodies who are neither symptomatic nor

---

[65] California Department of Public Health, *Influenza Surveillance Program*, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/Flu-Reports.aspx.

[66] Jhung MA, Swerdlow D, Olsen SJ, Jernigan D, Biggerstaff M, Kamimoto L, Kniss K, Reed C, Fry A, Brammer L, Gindler J, Gregg WJ, Bresee J, Finelli L, *Epidemiology of 2009 pandemic influenza A (H1N1) in the United States*, CLINICAL INFECTIOUS DISEASE 2011 Jan 1;52 Suppl 1:S13-26. https://doi.org/10.1093/cid/ciq008 PMID: 21342884.

Complaint

infectious.[67] Evidence shows that because of the way the PCR tests are evaluated, individuals can test "positive" up to 80 days following their initial infection, weeks after they have ceased to be infectious.[68] One survey of PCR results concluded that up to 90 percent of positive SARS-CoV-2 PCR test results may be clinically insignificant or non-contagious.[69] Even if the percentage is lower, Defendants are justifying their draconian Orders on the basis of positive test results from a large number of asymptomatic and non-infectious individuals that do not present *any* risk to the public healthcare system.

116.     The use of cases also overstates the rate of community spread because California has not adopted random testing for SARS-CoV-2, but rather has focused on symptomatic and high-risk populations. This approach makes sense to the extent the State is attempting to locate infected individuals for treatment and/or quarantine.  But it makes no sense to use those case counts as a reflection of the overall level of community spread within a county.

117.     Additionally, individuals who have COVID-19 can be tested multiple times and counted as multiple "cases," further inflating the case count numbers.[70]

118.     The CDC test kits for SARS-CoV-2 have also been found to generate up to 30% false positives.[71] When the virus is prevalent in the population at low levels and testing is done in high

---

[67] *See* T. Jefferson, E.A. Spencer, J. Brassey, and C. Heneghan "Viral Cultures for COVID-19 Infectivity Assessment – A Systematic Review (Update 3)" medRxiv, August 2020, https://www.medrxiv.org/content/10.1101/2020.08.04.20167932v3.full.pdf Accessed Sept. 30, 2020.
[68] *Id.*
[69] Rachel Schraer, *Coronavirus: Tests 'could be picking up dead virus'*, BBC News (Sept. 5, 2020), https://www.bbc.com/news/health-54000629; Just the News, *Report: Up to 90% of confirmed COVID-19 cases might not be contagious* (Sept. 1, 2020), https://justthenews.com/politics-policy/coronavirus/report-90-covid-19-cases-might-not-be-contagious.
[70] *See*, John Hopkins Coronavirus Resource Center, *Testing FAQ* https://coronavirus.jhu.edu/testing/testing-faq/overview#why-are-thereinconsistencies-among-testing-data-for-covid-19.
[71] Businesswire, *CDC Coronavirus Test Kits Generate 30% False Positive and 20% False Negative Results – Connecticut Pathologist's Newly Published Findings Confirm* (July 17, 2020) https://www.businesswire.com/news/home/20200717005397/en/CDC-Coronavirus-Test-Kits-Generate-30-False; Prof. Carl Henegan, *How many Covid diagnoses are false positives?*, The Spectator (July 20, 2020) https://www.spectator.co.uk/article/how-many-covid-diagnoses-are-false-positives-.

Complaint

numbers, even a small error rate creating false positives will dramatically inflate the number of positive tests, making positive test results an unreliable metric for determining public health strategy.[72] Indeed, PCR tests have led to pseudo-epidemics in the past, with healthcare responses to perceived disease being driven almost entirely by false positives.[73] This is why public health officials have historically used hospitalization and death rates to determine the presence and severity of epidemics.

119.     Yet despite the fact that hospitals across the state were never close to being overwhelmed, and that total hospitalizations of COVID-19 patients have dropped by two-thirds since the July peaks, the majority of the state continues to be in the "purple" or "red" tier, and Defendants continue to impose onerous restrictions that infringe on Plaintiffs' constitutional rights.

### C.  The State's Restrictions on Various Activities Are Arbitrary and Irrational

120.     Neither the County nor the State has published credible scientific evidence to demonstrate that the specific restrictions adopted will result in either reductions in laboratory-positive counts or, more importantly, reductions in severe disease and death.

121.     Neither the County nor the State has reported information collected in its contact tracing investigation that could shed light on the relative importance of settings of exposure and risk, which might support a nexus between specific restrictions on various activities and infection risk. The State and County have also failed to provide any valid way of measuring how their restrictions on California citizens are affecting the spread of the disease. In other words, both the County and State appear to be imposing restrictions based solely on intuition and guesswork.

### CLAIMS

**COUNT ONE: Violation of the First Amendment – Right to Free Speech and Assembly**
**(42 U.S.C. § 1983)**

122.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

123.     Under the First Amendment, Plaintiffs are guaranteed freedom of speech and freedom

---

[72] Prof. Carl Henegan, *How many Covid diagnoses are false positives?*, The Spectator (July 20, 2020) https://www.spectator.co.uk/article/how-many-covid-diagnoses-are-false-positives-.
[73] Gina Kolata, *Faith in Quick Test Leads to Epidemic that Wasn't*, The New York Times (Jan. 22, 2007), https://www.nytimes.com/2007/01/22/health/22whoop.html.

Complaint

of peaceable assembly. Political speech is at the core of the First Amendment. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."); *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989) (The First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office.") (citation omitted).

124.     Free Speech Plaintiffs seek to exercise their right to speech and assembly in the weeks leading up to and after the November election. However, the Orders burden Plaintiffs' First Amendment rights because they make it impossible for Plaintiffs to hold indoor or outdoor gatherings, including for the purpose of fundraising and campaigning, and simply for the purpose of discussing and debating important current events and government policies.

125.     The Orders' burden on Tandon's First Amendment rights is particularly severe because he is running for elected office this November. And Plaintiffs Terry and Carolyn Gannon wish to share their beliefs and convictions with others, including through in-person discussions and debates about state and national policies.

126.     There are no viable alternative avenues by which Free Speech Plaintiffs can exercise their First Amendment rights. Social media platforms are expensive, and they will ban Tandon's political advertisements right before the election. This means that he will have no mainstream way to connect to his voters. He cannot host a rally, attend a meet-the-candidate event, or advertise on Facebook. The Orders effectively silence him while the current officeholder can take advantage of free media coverage by virtue of his incumbency.

127.     Moreover, these restrictions on speech are clearly content based. Whereas CDPH allows "protests" to take place outdoors, it does not allow other types of political gatherings. Because the Orders effect a complete ban on certain types of political activities, and are not content neutral, they are subject to strict, or at least intermediate, scrutiny.

128.     Even assuming Defendants have a compelling interest in limiting the harms caused by COVID-19, the Orders are not narrowly tailored. Defendants could implement policies that target those most at risk instead of arbitrarily restricting Plaintiffs' freedoms. The state's one-size-fits-all

33

Complaint

regulations are the opposite of a narrowly tailored approach. Moreover, there is no evidence that the risk of viral spread is substantial when persons are practicing social distancing and wearing face masks in a constantly sanitized environment. This is especially true of gatherings that take place outdoors.

129.     Even if Defendants' Orders burdening the Free Speech Plaintiffs' rights were subject only to intermediate scrutiny they should be invalidated because Defendants' use of case counts and testing positivity to impose restrictions on Plaintiffs First Amendment rights is not a narrowly tailored response to the supposed public health emergency. Case counts generated by the PCR test have little relationship to any potential burden to the public health system situation in any given county, and Defendants' Orders *do not even consider* hospitalization or death rates—the traditional metrics used to evaluate the seriousness of an epidemic—in the Blueprint for reopening.

130.     In sum, Defendants' Orders—including EO N-60-20, Blueprint, Stay Home Q&A, CDPH gatherings guidance, and Santa Clara Mandatory Directive for Gatherings—unconstitutionally burden Free Speech Plaintiffs' rights to the freedom of speech and peaceable assembly.

**COUNT TWO: Violation of the First Amendment – Right to Free Exercise and Assembly (42 U.S.C. § 1983)**

131.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

132.     The Free Exercise Clause of the First Amendment protects the right to participate in religious activities, both formal worship services at Church and other less formal religious activities. In-person gatherings for the study of Biblical text and other books on Biblical topics, are central to the faith of Plaintiffs Wong and Busch.

133.     Defendants' Orders prohibit Wong and Busch from hosting Bible studies indoors because their homes are not "places of worship." And although Santa Clara would allow these gatherings to take place outside, CDPH's guidance does not permit *any* outdoor gatherings that are not worship services, cultural ceremonies, or protests. Accordingly, Plaintiffs are unable to hold Bible studies in person.

134.     The Orders are subject to strict scrutiny because in addition to burdening religious exercise, they infringe on other First Amendment Rights, including the right to speech and peaceable assembly. *See San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004)

("In such 'hybrid' cases, the law or action must survive strict scrutiny."). The Orders are also subject to strict scrutiny because they are neither neutral nor generally applicable, and they impose a content-based restriction on religiously-motivated expressive speech. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2015 (2017) ("It has remained a fundamental principle of this Court's free exercise jurisprudence that laws imposing special disabilities on the basis of religious status trigger the strictest scrutiny." (internal quotation marks and ellipses omitted)); *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015) ("For laws that are not neutral or not generally applicable, strict scrutiny applies."). The bans on gatherings do not apply to protests, and they allow religious activity at "places of worship." Yet the State and County purport to ban other types of religious expression—such as studying the Bible in a group—whether conducted indoors or outdoors.

135.     Even assuming Defendants have a compelling interest in limiting the harms caused by COVID-19, the Orders are not narrowly tailored. Defendants could implement policies that target those most at risk instead of arbitrarily restricting the freedoms of younger, healthier people. The state's one-size-fits-all regulations are the opposite of a narrowly tailored approach. Moreover, there is no evidence that the risk of viral spread is substantial when persons are practicing social distancing outdoors and wearing face masks in a constantly sanitized environment.

136.     Plaintiffs Wong and Busch can host gatherings safely, using the same mitigation techniques as other activities that are permitted indoors. Indeed, Defendants recognize that events can be held with proper social distancing, because they allow protests, cultural gatherings, and religious ceremonies, and do not prohibit people from congregating on public buses, at airports, and in stores and other similar venues. None of these permitted activities are less risky than small gatherings in the home

137.     Even if Defendants' Orders were subject only to rational basis review they should be invalidated because Defendants' use of case counts and testing positivity to impose restrictions on Plaintiffs First Amendment rights is irrational. Case counts generated by the PCR test have little relationship to any potential burden to the public health system situation in any given county, and Defendants' Orders *do not even consider* hospitalization or death rates—the traditional metrics used to evaluate the seriousness of an epidemic—in the Blueprint for reopening.

Complaint

138.     In sum, Defendants' Orders—including EO N-60-20, Blueprint, Stay Home Q&A, CDPH gatherings guidance, Santa Clara Mandatory Directive for Gatherings, and the Religious Gatherings Guidance—unconstitutionally burden Plaintiffs Wong and Busch's right to the free exercise of their religion and the right to peaceably assemble.

**COUNT THREE: Violation of the Fourteenth Amendment –Substantive Due Process Right to Earn a Living (42 U.S.C. § 1983)**

139.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

140.     The Due Process Clause of the Fourteenth Amendment includes a substantive component that bars arbitrary, wrongful, government action "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

141.     The right of citizens to support themselves by engaging in a chosen occupation is deeply rooted in our nation's history and has long been recognized as a component of the liberties protected by the Fourteenth Amendment. *See, e.g.*, *Conn v. Gabbert*, 526 U.S. 286, 292 (1999) ("[T]he liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment …"); *Erotic Service Provider Legal Education and Research Project v. Gascon*, 880 F.3d 450, 459 (9th Cir. 2018) ("The fundamental right to make contracts is guaranteed by the Constitution, which forbids the government from arbitrarily depriving persons of liberty, including the liberty to earn a living and keep the fruits of one's labor.") (citing *Lowe v. S.E.C.*, 472 U.S. 181, 22 (1985)).

142.     Defendants have deprived Plaintiff Mansour of her right to earn a living by arbitrarily forcing her to close her business.

143.     Mansour is prepared to run her business in a safe and responsible manner that allows her to earn a living. Her skincare salon had measures in place even before the pandemic to prevent the spread of infection. And she has implemented safety protocols to mitigate the spread of COVID-19 while providing her services.

144.     Mansour has been financially devastated by the Orders, and there is no telling how long they will remain in place.

145.     There is no rational basis for Defendants' arbitrary deprivation of Mansour's liberty

36

Complaint

based on factors unrelated to her capacity or fitness to operate her business safely. The restrictions imposed under the Blueprint are based on case counts and positivity rates, but case counts have never been used to craft public policy, and the results of the PCR test have little relationship to any potential burden to the public health system situation in any given county. Defendants' Orders do not even consider hospitalization or death rates—the traditional metrics used to evaluate the seriousness of an epidemic—in the Blueprint for reopening. Most importantly, none of these metrics evaluate Plaintiffs' ability to practice their professions safely.

146.     In sum, Defendants' Orders—EO N-60-20, Blueprint, and Stay Home Q&A—unconstitutionally and arbitrarily burden Plaintiff Mansour's right to earn a living.

**COUNT FOUR: Violation of the Fourteenth Amendment – Equal Protection (42 U.S.C. § 1983)**

147.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

148.     The equal protection doctrine prohibits "government classifications that affect some groups of citizens differently than others." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (citations omitted). The touchstone of this analysis is whether a state creates disparity "between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 471 U.S. 600, 609 (1974).

149.     The Orders treat Plaintiffs Richards, Evarkiou, Mansour, Khanna, and Beaudet, and their businesses differently than other similarly situated individuals and businesses.

150.     For example, Mansour has been forced to close her skincare salon while dermatologists' offices can perform the same or similar skin treatments. There is no significant difference between the facials Mansour offered at The Original Facial Bar and a facial provided by a dermatological staff member. The Original Facial Bar is just as capable of adhering to public health measures as a dermatologist's office. The Original Face Bar complied with hygiene and sanitation standards set by the state and county. Its staff was trained how to prevent infection and maintain a clinically clean space prior to the pandemic. Yet, The Original Face Bar has been closed while dermatologist's offices are allowed to remain open.

151.     Similarly, while Defendants' Orders allow outdoor church services, protests, and cultural events, Kirigin Cellars is prohibited from holding an outdoor wedding reception or other

37

gathering. There is no rational basis for this discriminatory treatment, especially since Kirigin Cellars has enough outdoor space to ensure that all guests comply with social distancing guidelines.

152.     The Orders also discriminate against businesses based solely on which county they are in. Whereas businesses in Humboldt County can operate with few restrictions, businesses in Santa Clara County, which remains in the Red Tier, are subject to onerous regulations. There is no rational basis for this unequal treatment because the metrics Defendants are using to determine the tiers—case counts and positivity rates—do not accurately reflect the state of community spread or the signal anything meaningful about the risks to the public health system.

153.     In sum, Defendants' Orders—including EO N-60-20, Blueprint, and Stay Home Q&A, and Santa Clara Mandatory Directive for Gatherings —irrationally and arbitrarily shutters Plaintiffs' businesses while simultaneously permitting similarly situated businesses to open.

**COUNT FIVE: Violation of the Fourteenth Amendment of the U.S. Constitution – Void for Vagueness (42 U.S.C. § 1983)**

154.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

155.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

156.     The Supreme Court has held that penal laws are unconstitutionally vague where they fail to define criminal conduct with sufficient precision that "ordinary people" can understand what conduct is prohibited, and where the statute encourages arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983). While the doctrine focuses both on actual notice and arbitrary enforcement, the more important aspect of vagueness doctrine is the "requirement that a [State] establish minimal guidelines to govern law enforcement." *Id*. at 358.

157.     Additionally, "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television*, 567 U.S. 239, 253–54 (2012).

158.     After declaring a state of emergency due to the COVID-19 pandemic, Governor

38

Complaint

Newsom issued orders requiring the people of California to "heed the current State public health directives" which are available online. EO-N-33-20 at 1. All "orders and regulations" issued by the Governor during a state of emergency "shall have the force of law." Cal. Govt. § 8567. Violating any of Defendants' Orders is thus a criminal act. Cal. Govt. § 8665.

159.    The State Public Health Officer and the California Department of Public Health have issued a tangle of confusing and opaque orders without guidance as to how those orders will be enforced. For example, it is unclear whether an outdoor Bible study is an allowable religious ceremony, or whether a political rally on behalf of a candidate counts as a protest. As a result of this confusion, Plaintiffs are unable to determine which types of gatherings are permitted under the Orders and which are prohibited.

160.    The vagueness of these orders and lack of guidance from government agencies chills constitutionally protected speech and other expressive conduct because Plaintiffs fear prosecution authorized by Cal. Code. § 8665.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

1.  An order and judgment declaring that the Orders and the associated guidance, facially and as applied to Plaintiffs, violate the Free Speech, Free Exercise, and Free Association Clauses of the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution.

2.  An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants from enforcing the Orders or otherwise interfering with Plaintiffs' constitutional rights and federal guarantees;

3.  An award of nominal damages against Santa Clara County for violation of Plaintiffs' constitutional rights;

4.  For attorneys' fees and costs;

5.  Such other and further relief as the Court deems appropriate and just.

Complaint

Date: October 13, 2020

By:   /s/ *Robert E. Dunn*

ROBERT E. DUNN (SBN: 275600)
JOHN D. TRIPOLI (SBN 262542)
**EIMER STAHL LLP**
99 South Almaden Boulevard, Suite 662
San Jose, CA 95113
(669) 231-8755
rdunn@eimerstahl.com

RYAN J. WALSH (*pro hac vice* forthcoming)
JOHN K. ADAMS (*pro hac vice* forthcoming)
AMY C. MILLER (*pro hac vice* forthcoming)
**EIMER STAHL LLP**
10 East Doty Street, Suite 800
Madison, WI 53703
(608) 441-5798
rwalsh@eimerstahl.com
jadams@eimerstahl.com
jtripoli@eimerstahl.com
amiller@eimerstahl.com

*Attorneys for Plaintiffs*

40

Complaint