ROBERT E. DUNN (SBN: 275600)
JOHN D. TRIPOLI (SBN: 262542)
**EIMER STAHL LLP**
99 South Almaden Boulevard, Suite 662
San Jose, CA 95113
(669) 231-8755
rdunn@eimerstahl.com
jtripoli@eimerstahl.com

RYAN J. WALSH (*pro hac vice* pending)
JOHN K. ADAMS (*pro hac vice* pending)
AMY C. MILLER (*pro hac vice* pending)
**EIMER STAHL LLP**
10 East Doty Street, Suite 800
Madison, WI 53703
(608) 441-5798
rwalsh@eimerstahl.com
jadams@eimerstahl.com
amiller@eimerstahl.com

*Plaintiffs for Attorneys*

# UNITED STATES DISTRICT COURT FOR

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RITESH TANDON**, an individual; **KAREN BUSCH**, an individual; **TERRY GANNON**, an individual; **CAROLYN GANNON**, an individual; **JEREMY WONG**, an individual; **JULIE EVARKIOU**, an individual; **DHRUV KHANNA**, an individual; **CONNIE RICHARDS**, an individual; **FRANCES BEAUDET**, an individual; and **MAYA MANSOUR**, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> **GAVIN NEWSOM**, in his official capacity as the Governor of California; **XAVIER BECERRA**, in his official capacity as the Attorney General of California; **SANDRA SHEWRY**, in her official capacity as the Acting State Director of the California Department of Public Health; **ERICA S. PAN**, in her official capacity as the Acting | Case No. 5:20-cv-07108-LHK <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Judge:            Hon. Lucy H. Koh. <br> Hearing Date:  December 3, 2020 <br> Time:             1:30 p.m. <br> Courtroom:     8 – 4th Floor |

State Public Health Officer of the California Department of Public Health; **JEFFREY V. SMITH**, in his official capacity as County Executive of Santa Clara County; **SARA H. CODY**, in her official capacity as the Health Officer and Public Health Director of Santa Clara County,

Defendants.

## NOTICE OF MOTION AND MOTION

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on December 3, 2020, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Lucy H. Koh, United States District Court, Northern District of California, Robert F. Peckham Federal Building and United States Courthouse, Courtroom 8, 4th floor, 280 South 1st Street, San Jose, CA, 95113, Plaintiffs will and hereby do move the Court for a preliminary injunction.

Plaintiffs are a diverse group of individuals who seek to peaceably assemble, engage in political speech, exercise their religion, earn a living, and run their businesses. Emergency orders, guidance, and restrictions issued since March 4, 2020, by the Governor of California, the California Department of Public Health, and Santa Clara County officials in response to an asserted health emergency (collectively, the "Orders"), prohibit them from doing so. Plaintiffs respectfully request a preliminary injunction, enjoining Defendants from enforcing the Orders because they violate Plaintiffs' rights protected by the First and Fourteenth Amendment.

In particular, Plaintiffs Ritesh Tandon, Karen Busch, Terry Gannon, Carolyn Gannon, Jeremy Wong, Julie Evarkiou, Dhruv Khanna, Connie Richards, Frances Beaudet, and Maya Mansour seek to enjoin Defendants Gavin Newsom, Xavier Becerra, Sandra Shewry, Erica Pan, Jeffrey Smith, and Sara Cody from enforcing the Orders as follows.

Ritesh Tandon seeks to enjoin the Orders' gatherings restrictions to the extent that they prohibit him from engaging in indoor political events involving more than 100 people and outdoor political events involving more than 200 people, including fundraising events, political rallies, bus tours, meet-the-candidate events, and debates.

Terry and Carolyn Gannon seek to enjoin the Orders insofar as they (1) ban indoor gatherings at their home to discuss matters of public policy; and (2) limit outdoor gatherings involving such policy discussions to three households.

Jeremy Wong and Karen Busch seek to enjoin the Orders' insofar as they (1) ban indoor religious gatherings at their homes, including Bible studies, theological discussions, collective prayer, and musical prayer; and (2) limit outdoor religious gatherings at their homes to three households.

Maya Mansour seeks to enjoin the Orders insofar as they (1) require her to equip her staff with N95 masks; and (2) treat her business differently, imposing more stringent restrictions on her business than those imposed on similar elective skincare businesses, along with other similar businesses and activities that present an equal or higher risk of viral transmission.

Dhruv Khanna seeks to enjoin the State's Orders insofar as they (1) prevent his winery business from hosting outdoor gatherings with more than three households, and (2) limit all outdoor gatherings to no more than 200 people.

Frances Beaudet seeks to enjoin the Orders insofar as they prevent her restaurant business from utilizing its indoor dining space.

Julie Evarkiou seeks to enjoin the Orders insofar as they (1) prevent her salon business from operating at full capacity; and (2) ban all indoor gatherings and limit outdoor gatherings to three households.

Connie Richards seeks to enjoin the Orders insofar as they prevent her fitness center business from operating at full capacity.

All Plaintiffs seek to enjoin the Orders insofar as they place restrictions on activities and businesses based solely on a county's number of positive COVID-19 cases and positivity rates.

This motion is based on the Complaint in this action; this Notice of Motion; the Memorandum of Points and Authorities filed herewith; the Declaration of Robert E. Dunn filed herewith, along with its accompanying exhibits; the expert Declarations of Dr. Jayanta Bhattacharya and Dr. Rajiv Bhatia; and the Declarations of Plaintiffs Ritesh Tandon, Terry Gannon, Jeremy

iii

Wong, Karen Busch, Maya Mansour, Julie Evarkiou, Dhruv Khanna, Frances Beaudet, and Connie

Richards; all material of which this Court may take judicial notice; and such oral and documentary

evidence as may be presented to the Court.

Date: October 22, 2020                                  Respectfully submitted,

                                                        EIMER STAHL LLP

                                    By:    /s/ Robert Dunn
                                           ROBERT DUNN
                                           RYAN J. WALSH (*pro hac vice* pending)
                                           JOHN D. TRIPOLI
                                           JOHN K. ADAMS (*pro hac vice* pending)
                                           AMY C. MILLER (*pro hac vice* pending)

                                           *Attorneys for Plaintiffs*

ROBERT DUNN (SBN: 275600)
JOHN D. TRIPOLI (SBN: 262542)
EIMER STAHL LLP
99 South Almaden Blvd., Suite 662
San Jose, CA 95113
(669) 231-8755
rdunn@eimerstahl.com
jtripoli@eimerstahl.com

RYAN J. WALSH (*pro hac vice* pending)
JOHN K. ADAMS (*pro hac vice* pending)
AMY C. MILLER (*pro hac vice* pending)
EIMER STAHL LLP
10 East Doty Street, Suite 800
Madison, WI 53703
(608) 441-5798
rwalsh@eimerstahl.com
jadams@eimerstahl.com
amiller@eimerstahl.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RITESH TANDON**, an individual; **KAREN BUSCH**, an individual; **TERRY GANNON**, an individual; **CAROLYN GANNON**, an individual; **JEREMY WONG**, an individual; **JULIE EVARKIOU**, an individual; **DHRUV KHANNA**, an individual; **CONNIE RICHARDS**, an individual; **FRANCES BEAUDET**, an individual; and **MAYA MANSOUR**, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> **GAVIN NEWSOM**, in his official capacity as the Governor of California; **XAVIER BECERRA**, in his official capacity as the Attorney General of California; **SANDRA SHEWRY**, in her official capacity as the Acting State Director of the California | Case Number: 5:20-cv-07108-LHK <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge:        Hon. Lucy H. Koh <br> Hearing Date:   December 3, 2020 <br> Time:         1:30 p.m. <br> Courtroom:     8 – 4th Floor |

Department of Public Health; **ERICA S. PAN**, in her official capacity as the Acting State Public Health Officer of the California Department of Public Health; **JEFFREY V. SMITH**, in his official capacity as County Executive of Santa Clara County; **SARA H. CODY**, in her official capacity as the Health Officer and Public Health Director of Santa Clara County,

        Defendants.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

    I.      Governor Newsom Declares a State of Emergency And Confers Unbounded, Unilateral Lawmaking Authority to CDPH and County Health Officials ...................... 3

          A.     CDPH Restrictions ........................................................................................ 3

          B.     Santa Clara County Restrictions ................................................................. 5

    II.     Plaintiffs Have Been and Will Continue to be Harmed by Defendants' Orders ............. 6

    III.    Defendants' Restrictions Have No Scientific Justification ................................................. 9

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT ..................................................................................................................... 11

    I.      Plaintiffs Have a Strong Likelihood of Success on the Merits ....................................... 11

          A.     Defendants' Orders Violate Plaintiffs' First and Fourteenth Amendment Rights to Free Speech and Assembly .......................................................... 12

          B.     Defendants' Orders Violate Plaintiffs' First and Fourteenth Amendment Rights to Free Exercise and Assembly ....................................................... 18

          C.     Defendants' Orders Violate The Due Process and Equal Protection Clauses of The Fourteenth Amendment .................................................................... 21

    II.     Plaintiffs Face Irreparable Harm Absent Immediate Injunctive Relief ........................ 24

    III.    The Remaining Factors Weigh in Favor of Granting Injunctive Relief ........................ 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ................................................................. 11

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011) ............................................................................... 12

*Az. Dream Act Coalition v. Brewer*,
855 F.3d 957 (9th Cir. 2017) ................................................................. 24

*Bates v. City of Little Rock*,
361 U.S. 516 (1960) ............................................................................... 12

*Bd. of Airport Com'rs v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987) ............................................................................... 15

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) ......................................................................... 22, 23

*Buck v. Bell*,
274 U.S. 200 (1927) ............................................................................... 17

*Cal. Dem. Party v. Lungren*,
919 F. Supp. 1397 (N.D. Cal. 1996) ................................................. 13, 14

*Calvary Chapel Dayton Valley v. Sisolak*,
140 S. Ct. 2603 (Mem) .................................................................... passim

*Capitol Hill Baptist Church v. Bowser*,
2020 WL 5995126 (D.D.C. Oct. 9, 2020) ......................................... 16, 17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........................................................... 18, 19, 20, 21

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ......................................................................... 12, 24

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ............................................................................... 22

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) ................................................................................. 13

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) ................................................................. 15

*Conn v. Gabbert*,
526 U.S. 286 (1999) ............................................................................... 22

*Cty. of Butler v. Wolf*,
2020 WL 5510690 (W.D. Pa. Sep. 14, 2020) ....................................... 17

*De Jonge*,
299 U.S. ............................................................................... 14, 15, 16

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................................... 24

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
494 U.S. 872 (1990) ......................................................................... 18, 19

*Ex Parte Milligan*,
71 U.S. (4 Wall.) 2 (1866) ..................................................................... 17

viii

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) .................................................................................... 14

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) .................................................................................................. 19

*Harvest Rock Church, Inc. v. Newsom*,
-- F.3d – 2020 WL 5835219 (9th Cir. Oct. 1, 2020) ............................................... 17

*Heller v. Doe by Doe*,
509 U.S. 312 (1993) .................................................................................................. 21

*Hirabayashi v. United States*,
320 U.S. 81 (1943) .................................................................................................... 18

*IMDb.com Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ........................................................................... 13, 14

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905) ...................................................................................................... 2

*Kaahumanu v. Hawaii*,
682 F.3d 789 (9th Cir. 2012) ............................................................................. 12, 14

*Korematsu v. United States*,
323 U.S. 214 (1944) ............................................................................................ 16, 18

*Krislov v. Rednour*,
226 F.3d 851 (7th Cir. 2000) ............................................................................. 13, 14

*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008) .................................................................................... 22

*Long Beach Area Peace Network v. City of Long Beach*,
574 F.3d 1011 (9th Cir. 2009) ..................................................................... 2, 13, 15

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .................................................................................... 24

*Merrifield v. Lockyer*,
547 F.3d 978 (9th Cir. 2008) .................................................................................... 21

*Meyer v. Grant*,
486 U.S. 414 (1988) .................................................................................................. 13

*Meyer v. Nebraska*,
262 U.S. 390 (1923) .................................................................................................. 21

*Nat'l Ass'n for Gun Rights, Inc. v. Mangan*,
933 F.3d 1102 (9th Cir. 2019) ........................................................................... 12, 13

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................................. 24

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) .................................................................................. 19

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) .................................................................................................. 13

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) .................................................................................................. 12

*Roberts v. Neace*,
958 F.3d 409 (6th Cir. 2020) ............................................................................... 2, 16

*Sagana v. Tenorio*,
384 F.3d 731 (9th Cir. 2004) .................................................................................... 21

*San Jose Christian Coll. v. City of Morgan Hill*,
360 F.3d 1024 (9th Cir. 2004) .................................................................................. 21

ix

*Schwarz v. Bd. of Bar Exam'rs of the State of N.M.*,
   353 U.S. 232 (1957)...................................................................................... 21
*South Bay United Pentecostal Church v. Newsom*,
   140 S. Ct. 1613 (2020)................................................................................. 17
*Thomas v. Collins*,
   323 U.S. 516 (1945)..................................................................................... 12
*Truax v. Raich*,
   239 U.S. 33 (1915)....................................................................................... 21
*Ward v. Polite*,
   667 F.3d 727 (6th Cir. 2012) ...................................................................... 21
*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)........................................................................ 11, 15, 16, 24
*Yellowbear v. Lampert*,
   741 F.3d 48 (10th Cir. 2014) ...................................................................... 20

**Statutes**

Cal. Gov't Code § 8631 ..................................................................................... 3
Cal. Gov't Code § 8630 ..................................................................................... 3
Cal. Gov't Code § 8665 ................................................................................ 3, 19
U.S. Const. amend. I ......................................................................................... 18

**Other Authorities**

*Coronavirus, Civil Liberties, and the Courts: The Case Against "Suspending" Judicial Review*,
   133 Harv. L. Rev. F. 179 (2020)................................................................... 16
*The Supreme Court in Context: Conceptual, Pragmatic, and Institutional*,
   69 Vand. L. Rev. 1115 (2016) ...................................................................... 18

Memorandum of Points & Authorities                                Case No. 5:20-cv-07108

**INTRODUCTION**

California has now been in a state of "emergency" for nearly eight months, with no end in sight. Since the Governor's March 4, 2020 emergency declaration, the California Department of Public Health ("CDPH") has assumed control over the lives and the livelihoods of California's 40 million residents, closing schools, shutting down businesses, banning multi-family gatherings, and even quarantining healthy people within their homes. Local officials in Santa Clara County have imposed even more onerous restrictions, prohibiting indoor church services, arbitrarily capping the number of people who may gather outdoors, and restricting the operations of countless businesses. In short, state and local officials are engaging in the most widespread infringement of liberty, in the name of responding to an "emergency," since the Japanese internment. Unfortunately, the courts of that generation failed to uphold the Constitution and defend individual civil liberties, and the Supreme Court's decision in *Korematsu* has been soundly (and rightly) rejected. The lesson of *Korematsu* is clear: because the executive branch—whether federal, state, or local—will often overreach when combatting a perceived emergency, it is the role of the courts to defend the constitutional liberties of those trampled in the process.

Plaintiffs are but a few of the citizens whose rights have been sacrificed, supposedly for the greater good, over the past seven months. They seek to engage in constitutionally protected activities, including campaigning for political office, running businesses, gathering for public policy discussions, earning a living, and hosting Bible studies. They cannot do so, however, because Defendants—state and county officials—have criminalized this innocent conduct in the name of "flattening the curve" and slowing the spread of the coronavirus. No one denies that the COVID-19 pandemic warrants an energetic response from state and local leaders, and Governor Newsom was correct to focus on the risk that hospitals would be overrun when he issued his emergency declaration in early March. But hospitalizations due to COVID-19 *never* exceeded 10 percent of total capacity, and hospitalizations have decreased by *two thirds* from their highest point. And instead of targeting their recent interventions to prevent hospitalizations and deaths among the most vulnerable populations—the approach recommended by the CDC and adopted by CDPH during previous epidemics—Defendants have instead myopically focused on the number of people testing positive for the virus. But this pivot from protecting hospitals to reducing the

Memorandum of Points & Authorities                                    Case No. 5:20-cv-07108

1   number of "positive" cases lacks any scientific or ethical justification. Many, perhaps most, of

2   the people testing positive are asymptomatic—and thus pose no burden to the public health

3   system—and the most widely used test can yield positive results *weeks* after the individual has

4   ceased to be infectious. In short, the data Defendants are using to impose their restrictions have

5   little relationship to the Governor's original goal of preventing hospitals from being overstretched

6   or any other legitimate public-health objective. An injunction lifting Defendants' arbitrary

7   restrictions is thus in the public interest.

8           A preliminary injunction is also warranted because Plaintiffs have a strong likelihood of

9   success on their constitutional claims. When the government decides to substantially burden core

10  First Amendment–protected activity using content-based restrictions, as they have done here,

11  federal courts must subject the challenged regulations to the "most exacting scrutiny." *Long

12  Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1024 (9th Cir. 2009) (*LBAPN*).

13  Defendants' restrictions cannot possibly survive such scrutiny because, even assuming that the

14  government has a compelling interest in preventing hospitalizations and deaths from COVID-19,

15  Defendants' blanket bans on gatherings are not narrowly tailored to achieve that goal. There are far

16  less restrictive (and more effective) means available to reduce the public health burden of COVID-

17  19, as Plaintiffs' experts explain at length. Defendants' onerous business restrictions, meanwhile,

18  violate the Fourteenth Amendment because they irrationally punish Plaintiffs' businesses based on

19  inapposite health metrics, while allowing similar activities elsewhere.

20          Federal courts, misreading *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), have given state

21  and local officials extreme deference for the past seven months, upholding numerous government

22  actions that could not survive judicial review under ordinary circumstances. It is time for such

23  deference to end. As the Sixth Circuit succinctly put it, "[w]hile the law may take periodic naps

24  during a pandemic, we will not let it sleep through one." *Roberts v. Neace*, 958 F.3d 409, 414–15

25  (6th Cir. 2020). This Court, like every federal court, "ha[s] a duty to defend the Constitution, and

26  even a public health emergency does not absolve [it] of that responsibility." *Calvary Chapel Dayton

27  Valley v. Sisolak,* 140 S. Ct. 2603, 2604 (Mem) (Alito, J., dissenting from denial of application for

28  injunctive relief). Because Defendants have violated and continue to violate Plaintiffs'

constitutional rights, this Court should issue a preliminary injunction.

2

# FACTUAL BACKGROUND

## I.   Governor Newsom Declares a State of Emergency And Confers Unbounded, Unilateral Lawmaking Authority to CDPH and County Health Officials

Governor Newsom proclaimed a state of emergency on March 4, 2020, after the initial outbreak of COVID-19 in the state.[1] Dunn Decl., Ex. 1.[2] Shortly thereafter, Newsom issued Executive Order N-33-20 ("EO N-33-20"), which directed all California residents "to immediately heed the [ ]State public health directives" from the Department of Public Health, and "order[ed] all individuals living in the State of California to stay home or at their place of residence except as needed." Ex. 2. EO-N-33-20 has no end date. The "goal" of this order was "to bend the curve, and disrupt the spread of the virus." *Id*.

On May 4, 2020, Newsom issued Executive Order N-60-20 ("EO N-60-20"), directing all California residents "to continue to obey State public health directives, as made available [online] and elsewhere as the State Public Health Officer may provide." Ex. 3. The order commands that "[n]othing … shall limit the authority of the State Public Health Officer to take any action she deems necessary to protect public health in the face of the threat posed by COVID-19." The online resource mentioned in EO N-60-20, titled "Stay home Q&A," claims its content "ha[s] the same force and effect as other State Public Health Officer directives." Ex. 29. Both EO N-33-20 and EO-N-60-20 invoke California Government Code § 8665, threatening any person who fails to obey the orders with a misdemeanor conviction, $1,000 fine, and six-months' imprisonment. Exs. 2–3; Cal. Gov't Code § 8665.

### A.   CDPH Restrictions

CDPH used its newly vested power to impose and then eliminate several regulatory frameworks—including a four-stage framework for reopening the state, Ex. 4, and a "County Data Monitoring List," Ex. 5—before issuing the current four-tiered, color-coded system commonly

---

[1] Filed in support of this brief is a Declaration from Robert Dunn ("Dunn Decl."). Unless stated otherwise, all exhibits cited herein are attached to the Dunn Decl. and will be cited as "Ex.__."

[2] That proclamation waived California Government Code § 8630 indefinitely, meaning local governments need not renew local emergency declarations after sixty days or "terminate[e] … the local emergency at the earliest possible date that conditions warrant." Cal. Gov't Code § 8630. As a result, local governments, including Santa Clara County, "have full power" to regulate indefinitely "any affected area in accordance with local … emergency plans." Cal. Gov't Code § 8631.

known as the "Blueprint for a Safer Economy" ("Blueprint").

**The Blueprint's Restrictions**.  On August 28, 2020, CDPH replaced its "County Monitoring List" with the Blueprint. Ex. 8. Under this color-coded, four-tier system, "all local health jurisdictions in the state may reopen specified sectors according to their respective county's Tier." The reopening timeline is designed to be "statewide, stringent and slow." Ex. 12.

Three metrics govern the Blueprint's tier system: (1) the average number of "cases" per 100,000 residents over a seven-day period, (2) the average amount of COVID-19 tests that come back "positive" over a seven-day period, and (3) the "health equity metric."[3] Exs. 9–10. The health equity metric requires a county to identify its "most disadvantaged neighborhoods"—an inquiry that takes into account voting participation, tree coverage, and retail density[4]—and ensure that the same thresholds for case counts and posivity rates are met in those specific neighborhoods before the county moves to the less restrictive tier. Ex. 13.

Applying these metrics, the Blueprint color-codes each tier as follows: Purple Tier (Widespread); Red Tier (Substantial); Orange Tier (Moderate); Yellow Tier (Minimal). Exs. 9–10. A county must remain in a tier for at least three weeks before it can advance to a less restrictive tier. *Id*. It must also meet the criteria for all three metrics of the next less-restrictive tier for two consecutive weeks immediately prior to advancement. *Id*. A county that fails to meet the metrics for its current tier for two consecutive weeks is sent back to the more restrictive tier. *Id*. The Blueprint determines for each tier whether various activities can occur indoors and/or outdoors, and at what capacities. Ex. 27. CDPH has also issued guidance documents providing detailed restrictions, requirements, and "checklists" for particular industries.[5] Ex. 46.

There is no "Green" tier in which a county may return to pre-pandemic operations. Nor is there any expiration date to the Blueprint's tier system. Newsom confirmed the Blueprint's permanency when he stated: "[W]e don't believe that there's a green light that says just go back to the way things were or back to the pre-pandemic mindset. Quite the contrary." Ex. 28.

---

[3] The case rate is adjusted based on testing volume per 100,000 population.
[4] About, The California Healthy Places Index, https://healthyplacesindex.org/about/.
[5] *See*, *e.g.*, Exs.14–15 (places of worship and cultural ceremonies); Exs. 16–20 (restaurants, wineries, and bars); Exs. 21–22 (hair salons and barbershops); Exs. 23–24 (personal care services); Exs. 25–26 (gyms and fitness centers).

Memorandum of Points & Authorities                    Case No. 5:20-cv-07108

1

2

3

4

5

6

7

8

9

**Gatherings Restrictions**.  CDPH has also issued changing guidance on gatherings. A "gathering" means "any event or convening that brings together people in a single room or single space at the same time." Ex. 30. On March 16, 2020, CDPH banned all indoor and outdoor gatherings "across the state of California until further guidance is released by the [CDPH]." *Id*. Six months later, CDPH "updated" this guidance, maintaining its statewide ban on gatherings "unless otherwise specified." Ex. 31. On October 9, 2020, CDPH banned indoor gatherings entirely and restricted outdoor gatherings to no more than three households in a two-hour period, provided that the venue space allows at least 6-feet in distance "in all directions—front-to-back and side-to-side" from others "at all times."Ex. 32.

10

11

12

13

14

15

16

17

CDPH supplements its various orders through its "Stay home Q&A" webpage, which reiterates that the public must comply with both state- and county-level orders. Ex. 29. The "Stay home Q&A" guidance permits outdoor "mass gatherings for faith-based services, cultural ceremonies, and protests," but does not permit these types of gatherings to ocurr indoors in counties assigned to the purple (widespread) tier. *Id*. These gatherings may occur indoors in the red, orange, and yellow tiers, subject to certain restrictions and attendance limits. *Id*. The Q&A does not define "faith-based services" or "cultural ceremonies." On October 22, 2020, CDPH clarified that other political activities are allowable to the same extent as "protests." *See* ECF No. 16 (stipulation).

18

**B.**     **Santa Clara County Restrictions**

19

20

21

22

On July 2, 2020, the Santa Clara County Public Health Officer issued an Order "Establishing Mandatory Risk Reduction Measures Applicable to All Activities and Sectors to Address the COVID-19 Pandemic." Ex. 33. The County subsequently issued several "Mandatory Directives," three of which are relevant here.

23

24

25

26

27

28

*Mandatory Directive 1:"Gatherings."* Santa Clara County issued its initial gatherings directive on July 8, 2020. Ex. 34. Since then, it has revised the directive at least seven times. Exs. 35–40. For over three months, the county banned all indoor gatherings, including "worship services, cultural ceremonies, protests, and political events." Ex. 38. Outdoor gatherings were limited to a maximum of 60 people. Ex. 39. On October 13, 2020, after the County moved from the red to the orange tier, the County revised its directive and now caps outdoor gatherings of any type at 200 people, even if the space can accommodate far more with appropriate social distancing. Ex. 40. The

5

County's October 13 revision "allowed" indoor gatherings authorized by the state to resume but capped such gatherings at 100 people or 25% of a facility's capacity, whichever is fewer. *Id.*

*Mandatory Directive 2: "Outdoor Dining, Wineries, and Outdoor Tasting Rooms."* This directive, issued on July 14, 2020, requires restaurants to separate outdoor "tables to ensure that at least 6 feet of distance . . . can easily be maintained," which "will generally require that the edge of each table be spaced at least 10 feet apart from the edge of the nearest table." Ex. 41.

*Mandatory Directive 3: "Personal Care Services Businesses."* This directive, which the Health Officer issued on July 14, 2020, prohibits any services on or near the face or neck, as these "require[ ] or would likely lead the client to remove or adjust a face covering." Ex. 43. The county updated this order on October 13, 2020, permitting these services but requiring workers performing these services to wear N95 masks and eye protection. Ex.44. However, N95 masks are virtually impossible to acquire. Mansour Decl. ¶¶ 11–12.

*     *     *

As a result of these various state and county restrictions (the "Orders"), indoor gatherings are prohibited to the extent they are not faith-based services, cultural ceremonies, or protests (which now includes political events), and outdoor gatherings that do not fall into these categories are limited to three households. Indoor dining at restaurants is limited to 25% capacity or 100 persons in Santa Clara County, whichever is less; salons that provide facials are effectively closed in the County; and fitness centers and gymns are limited by the Blueprint to a fraction of their normal capacity.

## II.     Plaintiffs Have Been and Will Continue to be Harmed by Defendants' Orders

**Free Speech Plaintiffs** - Plaintiff Ritesh Tandon would like to host outdoor gatherings to share his message about why he is running for the U.S. Congress and his ideas for how best to represent the 17th Congressional District. Before Newsom issued the first shutdown order, Tandon had generated most of his support by way of traditional campaigning, such as fundraisers, meet-the-candidate events, policy discussions, debates, and more. Tandon Decl. ¶¶ 5–6. All these activities grounded to a halt after Newsom issued his emergency declaration. *Id.* ¶ 6. For nearly seven months, Tandon has been unable to host in-person fundraisers or hold in-person political events. *Id.* Although theoretically Tandon can reach voters through online outreach, running advertisements on social media and elsewhere costs significant amounts of money, which he cannot raise because the Orders

6

1  have banned in-person gatherings. *Id.* ¶¶ 8–10. To make matters worse, social media platforms have

2  announced that they will not host political ads during the most important time in an election—one

3  week before the vote.[6] *Id.* ¶ 11. Tandon has therefore effectively been silenced while his opponent,

4  by virtue of his incumbency, can exploit free media coverage. *Id.* ¶ 12. Although CDPH's Guidance

5  now allows political events, the County continues to prohibit gatherings with more than 200 people.

6      Plaintiffs Terry and Carolyn Gannon have hosted a broad and diverse network of persons in

7  their home for over twelve years to discuss public policy. Gannon Decl. ¶ 2. At these in-home

8  assemblies, their group would propose topics to discuss, hear each other's views on the issues, probe

9  the evidentiary support for the ideas, debate the merits of the proposals, and then try and reach a

10  consensus on the best solution. *Id.* Since Defendants have banned in-person gatherings, however, the

11  Gannons have not been able to host any such in-person events. *Id.* ¶ 4.

12      Both Tandon and the Gannons could, if permitted, host in-person gatherings—either indoor

13  or outdoor—safely by social distancing their guests by more than six feet and requiring attendees to

14  wear masks. Tandon Decl. ¶ 15; Gannon Decl. ¶ 6. These assemblies, which would all be planned

15  and controlled one-off events with strict social distancing procedures, present a much smaller risk of

16  contagion than the weeks-long racial-justice protests Defendants have condoned—and even

17  cheered—despite the lack of social distancing.[7] Tandon Decl. ¶ 15; Gannon Decl. ¶ 6.

18      **Free Exercise Plaintiffs** - Pastor Jeremy Wong and Karen Busch want to host small, in-

19  person Bible studies in their homes as both have done regularly for over two years, which will

20  include theological discussions, collective prayer, and musical praise. Wong Decl. ¶¶ 2–3; Busch

21  Decl. ¶¶ 2–3. Defendants' orders have prohibited Wong and Busch from hosting such in-person

22  gatherings for many months, even though they could employ social distancing and other mitigation

23  measures deemed sufficient for other secular activities. Wong Decl. ¶¶ 4, 6; Busch Decl. ¶¶ 4, 6.

24      **Small Business Plaintiffs** - Connie Richards opened her business, Better Life Fitness

25  Academy ("BLFA"), four years ago. Richards Decl. ¶ 2. Defendants' Orders forced Richards to

26  close BLFA for several months. *Id.* ¶¶ 3–4. Although BLFA was eventually permitted to reopen in an

27

28  ────────────────

6 *See*, *e.g.*, Steven Overly, Facebook bans new political ads in the week before Election Day,
Politico (Sept. 3, 2020), available at https://tinyurl.com/y4nf7o6y.

7 *See*, *e.g.*, Eric Tang, Gavin Newsom asked to reconcile support for protests with new warnings on
gatherings, SF Gate (July 2, 2020), available at https://tinyurl.com/y5d3p4ly.

Memorandum of Points & Authorities           Case No. 5:20-cv-07108

extremely limited capacity, it was not enough to sustain Richards' business, and she has lost over 85% of her clients. *Id.* ¶¶ 3–6, 8.

Plaintiff Julie Evarkiou co-owns a salon called Wavelength. Evarkiou Decl. ¶ 2. Like many other businesses, Wavelength shut down soon after Newsom declared a state of emergency. *Id.* ¶ 4. Although Wavelength is now allowed to serve individual clients, it cannot host group events—such as wine tastings—which are critical marketing tools. *Id.* ¶¶ 3, 5. Evarkiou can operate Wavelength safely, including when hosting these events, following all safety protocols and guidelines from the State, County, the California State Board of Barbering Cosmetology, and the CDC. *Id.* ¶ 6.

Plaintiff Dhruv Khanna owns one of the oldest vineyards in California, Kirigin Cellars. Khanna Decl. ¶ 2. The vineyard produces small batch wines, but about one-third of Kirigin's revenues typically come from events such as wedding receptions and corporate gatherings. *Id.* ¶¶ 3–5, 7. After Newsom's emergency declaration, Kirigin Cellars was unable to host events for months. *Id.* ¶ 5. Under Defendants' current Orders, Kirigin cannot host outdoor gatherings involving more than three households, as the venue is not typically used for faith-based services, cultural ceremonies, or protests.[8] *Id.* As a result, more than 30 events have been cancelled in 2020, and Kirigin Cellars has been forced to reduce payroll by 30 percent. *Id.* ¶ 7.

Plaintiff Maya Mansour founded her business, The Original Facial Bar, in 2016. Mansour Decl. ¶ 2. The Original Facial Bar shut down on March 17, 2020, shortly after Newsom's emergency declaration, and Mansour was forced to lay off her entire staff of eleven. *Id.* ¶ 3. Until October 4, 2020, Defendants' Orders completely prevented Mansour from reopening her business. *Id.* ¶ 11. And though the County's newest guidance allows The Original Facial Bar to reopen, it has been impossible for Mansour to obtain the N95 masks the County requires to operate. *Id.* ¶ 12. If the County allowed her to use other masks—like KN95s—she would be able to open safely.

Plaintiff Frances Beaudet has co-owned Old City Hall Restaurant in historic downtown Gilroy since 2012. Beaudet Decl. ¶ 2. The restaurant seats up to 254 customers indoors and has approximately 25,000 square feet of indoor dining space. *Id.* Its outdoor patio seats up to 66 customers. *Id.* Due to Defendants' orders, Old City Hall Restaurant cannot utilize most of its indoor dining space, reducing its business by 60 percent compared to last year. *Id.* ¶ 3.

---

[8] *See* Exs. 29, 32.

### III.     Defendants' Restrictions Have No Scientific Justification

Governor Newsom justified his emergency declaration on the ground that the public health system could be overwhelmed absent drastic state intervention. Exs. 1, 45. However, the state's hospital system has never come close to exceeding its normal capacity. Bhatia Decl. ¶ 32. Even at their July peak—after most hospitals had dismantled the surge units they had set up in March and April—hospitalizations resulting from COVID-19 never exceeded 10% of total capacity.[9] And hospitalizations attributable to COVID-19 have plummeted from their mid-July highs, and are now at their lowest levels since early April. *Id.* The number of patients with COVID-19 in ICUs has dropped to its lowest level since late March. *Id.* And there are now more than 3,000 ICU beds available across the state. *Id.* Indeed, the state has never had fewer than 1,800 ICU beds available during the entirety of the pandemic. *Id.*

It is also now well-established that COVID-19 is not equally dangerous to all age groups. Young, healthy people have virtually zero risk of death from COVID-19. The CDC currently estimates that the infection fatality rate from COVID-19 is 0.003% for persons less than 19 years old; 0.02% for those between ages 20 and 49; 0.5% for those ages 50 to 69; and 5.4% for those 70 and above.[10] The CDC also reports that 94% of all deaths associated with COVID-19 involved victims with pre-existing underlying medical conditions—such as diabetes or heart disease.[11] The numbers in California are similar.[12]

In the past, including during the H1N1 pandemic, CDPH has focused on hospitalizations and deaths to track epidemics and determine whether state interventions are required.[13] But although California and the CDC are both tracking state hospitalizations and deaths from COVID-19, CDPH has inexplicably ignored hospitalizations and decided to use case counts and positivity rates to determine the tier level for each county. Defendants have given no explanation for their decision to base their onerous restrictions on case counts, or any scientific justification for the numbers chosen

---

[9] California Department of Public Health, *COVID-19: Hospitals*, https://tinyurl.com/y3r4otzv.

[10] Centers for Disease Control & Prevention, *COVID-19 Pandemic Planning Scenarios*, https://tinyurl.com/y8h2yqse.

[11] Centers for Disease Control & Prevention, *Weekly Updates by Select Demographic and Geographic Characteristics* (Oct. 14, 2020), https://tinyurl.com/y66dsnhj.

[12] *See* California Coronavirus, COVID-19 Statewide Update, https://update.covid19.ca.gov/.

[13] For example, in 2009, CDPH did not measure the severity of H1N1 using morbidity rates. *See* Cal. Dep't of Pub. Health, Influenza Surveillance Program, https://tinyurl.com/y2rzejvp.

Memorandum of Points & Authorities                    Case No. 5:20-cv-07108

for each tiers. *See* Bhattacharya Decl. ¶¶ 20–21. Case counts and positivity rates, which are not an appropriate measure of disease burden, have tracked poorly with hospitalizations and death because they are largely dependent on supply and demand for testing. Bhatia Decl. ¶¶ 41, 44, 47. Reliance on "case counts" also overstates the rate of community spread because California has not adopted random testing for COVID-19, focusing instead on symptomatic and high-risk populations. *See* Bhattacharya Decl. ¶ 27. Moreover, a large number of younger people are being tested and counted in the positive case-count numbers, even though they are much less vulnerable to severe complications and unlikely to burden the public health system. Bhatia Decl. ¶ 39. Beyond that, CDPH determines cases based on the amount of "positive" polymerase chain reaction ("PCR") tests. But PCR tests can yield "positive" results even for individuals with trace amounts of the virus in their bodies who are neither symptomatic nor infectious. *Id.* ¶ 38; Bhattacharya Decl. ¶¶ 28–30.[14]

It is feasible for the state to use more reliable measures of disease burden, such as laboratory-confirmed hospital cases. Bhatia Decl. ¶ 48. Since March 1, 2020, the CDC's COVID-NET program has monitored all COVID-19 associated hospitalizations in 98 counties in 13 states. *Id.* And all hospitals must report COVID-19 admissions to the US Department of Health and Human Services. *Id.* Yet the Blueprint entirely ignores hospitalization rates in setting policy.

Defendants' Orders also fail to balance the costs of public health policy with the benefits. No public-health rules are designed to eliminate all risk. Bhatia Decl. ¶ 15. Public-health scholars and professional associations have developed criteria for evaluating the ethics of public-health rules, which agree on fundamental principles of "target[ing] the intervention narrowly…, identify[ing] and balance[ing] the harms and burdens of interventions, and involv[ing]" the public "in a transparent process to gain socially informed consent." Bhatia Decl. ¶ 23. Defendants' Orders satisfy none of these well-established criteria. *Id.* ¶ 29; Bhattacharya Decl. ¶¶ 22–25. As health experts have explained, there are far less restrictive means available to mitigate risks from by the disease.[15]

---

[14] *See* T. Jefferson, et. al., *Viral cultures for COVID-19 infectivity assessment. Systematic review*, medRxiv (Sept. 29, 2020), https://tinyurl.com/y2h77zlw; *see also* Rachel Schraer, *Coronavirus: Tests 'could be picking up dead virus'*, BBC (Sept. 5, 2020), https://tinyurl.com/y6l3myyq; Daniel Payne, *Up to 90% of confirmed COVID-19 cases might not be contagious*, Just the News (Sept. 1, 2020), https://tinyurl.com/y33qzqo4.

[15] The Great Barrington Declaration, https://gbdeclaration.org/ (Oct.4, 2020). More than 10,900 medical and public health scientists and more than 30,000 medical practitioners have signed the declaration, which recommends allowing "those who are at minimal risk of death to live their lives

Memorandum of Points & Authorities                                        Case No. 5:20-cv-07108

Moreover, the majority of deaths have involved individuals in nursing homes and other long-term care facilities. Bhatia Decl. ¶¶ 76–78. The State could devote substantially more resources to protecting those vulnerable populations while leaving the less vulnerable free to go about their lives and run their businesses. *See id*. ¶¶ 75–89, 90–92. Defendants do not appear even to have considered these less restrictive alternatives. Critically, the State has not conducted any studies to determine how the SARS-CoV-2 virus is transmitted, or provided any evidence showing that the government's restrictions will prevent this transmission. *Id*. ¶¶ 51–53, 58. Instead, "both the County and State appear to be imposing restrictions based solely on their own professional judgment without any empirical basis." *Id.* ¶ 59.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As long as the plaintiff demonstrates the requisite likelihood of irreparable harm and shows that an injunction is in the public interest, a preliminary injunction can still issue so long as serious questions going to the merits are raised and the balance of hardships tips sharply in the plaintiff's favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

## ARGUMENT

### I.    Plaintiffs Have a Strong Likelihood of Success on the Merits

Defendants' various Orders infringe on core constitutional rights protected by the First and Fourteenth Amendments. Defendants have banned political and religious gatherings, prevented Plaintiffs from earning a living, and imposed irrational restrictions on Plaintiffs' businesses. These constitutional infringements cannot survive any meaningful review because the State has not even attempted to narrowly tailor its response to the asserted public health emergency. At minimum, Plaintiffs' constitutional challenges raise serious questions going to the merits.

---

normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk." *Id.* (https://gbdeclaration.org/view-signatures/).

Memorandum of Points & Authorities                                    Case No. 5:20-cv-07108

### A. Defendants' Orders Violate Plaintiffs' First and Fourteenth Amendment Rights to Free Speech and Assembly

**1.** The First Amendment, which protects, among other things, the freedom of speech, "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (citations omitted). After all, "[p]olitical speech" is the bedrock of our constitutional republic, "as it is the means by which citizens disseminate information, debate issues of public importance, and hold officials to account for their decisions in our democracy." *Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1111 (9th Cir. 2019) (NAGR); *accord Kaahumanu v. Hawaii*, 682 F.3d 789, 798 (9th Cir. 2012) ("[P]olitical speech is entitled to the fullest possible measure of constitutional protection.").

The First Amendment also provides significant protection to the right of assembly. "It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances." *Thomas v. Collins*, 323 U.S. 516, 530 (1945); *accord Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577–78 (1980) (plurality op.) ("The right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights …."). "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *Id.* (citation omitted). Indeed, "freedom of speech and a free press," along with "the right of peaceable assembly," were "considered by the Framers of our Constitution to lie at the foundation of a government based upon the consent of an informed citizenry—a government dedicated to the establishment of justice and the preservation of liberty." *Bates v. City of Little Rock*, 361 U.S. 516, 522–23 (1960). Thus, when freedom of speech is "exercised in conjunction" with the right of assembly, "our tradition [is] to allow . . . the narrowest range for [ ] restriction." *Thomas*, 323 U.S. at 530.

In keeping with this tradition, courts have long held that laws restricting political speech or discriminating on the basis of content are subject to strict scrutiny. *See, e.g., NAGR*, 933 F.3d at 1112; *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (same). While "less onerous" restrictions on political speech may be subject to a "lower level of scrutiny," laws that "burden political speech" are "subject to strict scrutiny," and must be "narrowly tailored to achieve" "a compelling [state] interest." *Id.* at 734–35 (citation omitted). Limitations that "reduce[ ]

1   the quantity of expression by restricting the number of issues discussed, the depth of their

2   exploration, and the size of the audience reached" impose such a burden and are therefore subject to

3   strict scrutiny. *NAGR*, 933 F.3d at 1112 (citation omitted, alteration in original); *see also Meyer v.*

4   *Grant*, 486 U.S. 414, 421–23 (1988); *Krislov v. Rednour*, 226 F.3d 851, 860 (7th Cir. 2000)

5   (limitation on petition circulators substantially burdened political speech by "preclud[ing] the

6   candidate from utilizing a large class of potential solicitors to convey his message"). For example,

7   this Court has held that California's prohibition on political parties' endorsement of candidates for

8   nonpartisan office "unquestionably impose[d] a direct and substantial burden on core political

9   speech" and thus was subject to strict scrutiny. *Cal. Dem. Party v. Lungren*, 919 F. Supp. 1397, 1400

10  (N.D. Cal. 1996).

11          Separately, "[c]ontent-based laws—those that target speech based on its communicative

12  content—are presumptively unconstitutional and may be justified only if the government proves that

13  they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576

14  U.S. 155, 163 (2015). "A law is content-based" if it "differentiates based on the content of speech on

15  its face.'" *LBAPN*, 574 F.3d at 1024 (citation omitted). A law that treats assemblies differently based

16  on each assembly's "function or purpose" is content-based and "subject to strict scrutiny." *See Reed*,

17  576 U.S. at 163–64.

18          To survive strict scrutiny, the government "must show that its regulation is necessary to serve

19  a compelling state interest" and that the regulation uses "the least restrictive means to further the

20  articulated interest." *LBAPN*, 574 F.3d at 1024 (citations omitted). A regulation may fail this

21  scrutiny if it is either underinclusive or overinclusive. *See IMDb.com Inc. v. Becerra*, 962 F.3d 1111,

22  1125–27 (9th Cir. 2020).[16]

23          **2.** Here, Defendants' Orders are subject to the "most exacting scrutiny" because they

24  substantially burden political speech and assembly by severely limiting Tandon's ability to campaign

25  _____

26  [16] An underinclusive regulation raises First Amendment concerns because "exemption[s] from an
    otherwise permissible regulation of speech may represent a governmental 'attempt to give one side
    of a debatable public question an advantage," or an attempt "to select the permissible subjects for

27  public debate and thereby to control … the search for political truth." *City of Ladue v. Gilleo*, 512
    U.S. 43, 51 (1994) (quotation marks and citations omitted). As to overinclusiveness, "the availability

28  of obvious less-restrictive alternatives renders a speech restriction overinclusive." *IMDb.com*, 962
    F.3d at 1125. Such regulations are not the "least restrictive means" to further the government's
    interests and therefore fail strict scrutiny. *Id.* at 1125–26.

13

for public office. *LBAPN*, 574 F.3d at 1024 (citation omitted). Although the State now exempts campaign events from the statewide Gathering Ban, the County currently limits indoor political gatherings to no more than 100 people (or 25 percent of capacity, whichever is less), and limits outdoor political gatherings to no more than 200 people, regardless of the size of the venue. Ex. 40. These restrictions hamper Tandon's ability to hold fundraising events, rallies, bus tours, meet-the-candidate events, and debates. In other words, they fundamentally undercut his ability to perform bread-and-butter political activities. *See Krislov*, 226 F.3d at 860 (limitation on candidate's petition circulators "substantially burden[ed]" political speech); *Cal. Dem. Party*, 919 F. Supp. at 1400 (prohibition on endorsements imposed "substantial burden" on political speech). The State's Orders, meanwhile, prevent the Gannons from hosting indoor gatherings at their home to discuss important matters of public policy because the State does not appear to consider them political events. Ex. 32. But "[t]he very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs." *Kaahumanu*, 682 F.3d at 798; *see also De Jonge*, 299 U.S. at 364 (citation omitted).[17]

**3.** The Orders fail strict scrutiny because they are overinclusive—there are obvious, less-restrictive alternatives to mitigate the spread of coronavirus than Defendants' onerous limits on Plaintiffs' First Amendment-protected activity. *See IMDb.com*, 962 F.3d at 1125. Indeed, the State and County employ these mitigation measures—ventilation, masks, social distancing, disinfectants, etc.—in countless other circumstances, including retail establishments, museums, zoos and aquariums, hotels, daycare centers, and countless other sectors where hundreds of people are in proximity to each other. Ex. 46. If these mitigation measures are sufficient in other circumstances, including where persons are gathered for extended periods of time, similar measures could be taken to allow persons to gather for political activities.

---

[17] The State's Orders are also content-based. That is because the State's Q&As—which the Governor has given binding legal effect—single out "political protests" (and campaign activities) for special treatment, exempting these types of gatherings from the three-household limit that apply to other gatherings, including the gatherings the Gannons seek to hold. Ex. 29. Even if a restriction appears content neutral, "when 'exceptions to the restriction on noncommercial speech are based on content, the restriction itself is based on content.'" *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998) (citation omitted). In short, by preventing the Gannons from gathering to engage in core political speech, while allowing "protests," cultural ceremonies, and faith-based services, the Orders discriminate on the basis of an assembly's "function or purpose." *Reed*, 576 U.S. at 163–64.

Memorandum of Points & Authorities                                    Case No. 5:20-cv-07108

1    More fundamentally, there are much less restrictive options available to advance the State's

2    compelling interest in preventing hospitalizations and deaths resulting from COVID-19. As

3    Plaintiffs' experts explain, the State could dramatically decrease the number of serious illnesses and

4    deaths from COVID-19 if they focused their attention on protecting the most vulnerable, including

5    those in nursing homes and long term care facilities, and those receiving in-home services. *See*

6    Bhattacharya Decl. ¶¶ 32, 35–38; Bhatia Decl. ¶¶ 81–89, 91–92. It does not appear that the State has

7    *even considered* targeting its restrictions more narrowly. *Id*. ¶ 91. The targeted solutions Dr. Bhatia

8    and Dr. Bhattacharya discuss would not require any substantial infringement on Plaintiffs' First

9    Amendment rights to speech and assembly. Because the State has opted for the *most* restrictive

10   regulations to achieve its goal, the Orders cannot survive the "exacting scrutiny" required for

11   content-based restrictions or laws that substantially burden political speech. *LBAPN*, 574 F.3d at

12   1024.[18]

13       **4.**   The Supreme Court's opinion in *Jacobson* does not alter this analysis. In *Jacobson*, the

14   Massachusetts Legislature passed a statute authorizing city boards of health to "require and enforce

15   the vaccination" of their residents if they deemed it necessary. *Id.* at 12. Pursuant to that statute, the

16   Cambridge board of health adopted a regulation requiring mandatory vaccinations for smallpox. *Id.*

17   Jacobson refused vaccination and challenged the regulation as a violation of, among other things, his

18   Fourteenth Amendment right to due process. *Id.* at 13–14. The Court rejected this challenge,

19   explaining that the State, under its police power, may impose restrictions on liberty "for the common

20   good," including "protect[ion]" of "a community . . . against an epidemic of disease." *Id.* at 27. The

21   Court explained that "under the pressure of great dangers," liberty may "be subjected to such

22

23   [18] Even if the Orders were content-neutral time, place, and manner restrictions on speech and
     assembly, and thus subject to intermediate scrutiny, they would violate the First Amendment. *See*
24   *LBAPN*, 574 F.3d at 1023. "The regulation 'need not be the least restrictive or least intrusive means
     of' achieving the government's goals, but it may not 'burden substantially more speech than is
25   necessary.'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 947
     (9th Cir. 2011) (citation omitted). Here, the Orders "burden substantially more speech than
26   necessary" because they are an overbroad, absolute ban on gatherings. *See Bd. of Airport Com'rs v.
     Jews for Jesus, Inc.*, 482 U.S. 569, 574–76 (1987). And, as explained above, the Defendants could
27   have achieved their goals by "employ[ing] various less restrictive alternatives" than an outright ban
     on First-Amendment activities. *See Comite de Jornaleros*, 657 F.3d at 948–51. Finally, the Orders
28   fail to "leave open ample alternative channels for communication" because remote communication is
     no substitute for in-person assemblies. *See De Jonge*, 299 U.S. at 364 (the right of assembly is
     "fundamental").

1   restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."
2   *Id.* at 29. The Court made clear, however, that when a health regulation "has no real or substantial
3   relation to [public health] or is, beyond all question, a plain, palpable invasion of rights secured by
4   the fundamental law," "it is the duty of the courts to so adjudge, and thereby give effect to the
5   Constitution." *Id.* at 31. Because the Court did not find these criteria met, the Court rejected the
6   plaintiff's due process challenge. *Id.*

7        *Jacobson* does not apply here for two reasons. *First*, while courts are willing to give
8   deference to government actors when in the throes of an emergency, eventually that deference must
9   end. "[A] public health emergency does not give Governors and other public officials *carte blanche*
10  to disregard the Constitution for as long as the medical problem persists. *See Roberts*, 958 F.3d at
11  415 ("While the law may take periodic naps during a pandemic, we will not let it sleep through
12  one."). "As more medical and scientific evidence becomes available, and as States have time to craft
13  policies in light of that evidence, courts should expect policies that more carefully account for
14  constitutional rights." *Calvary Chapel*, 140 S. Ct. at 2605 (Alito, J., dissenting from denial of
15  application for injunctive relief); *see also Capitol Hill Baptist Church v. Bowser*, 2020 WL 5995126,
16  at *7 (D.D.C. Oct. 9, 2020) ("when a crisis stops being temporary, and as days and weeks turn to
17  months and years, the slack in the leash eventually runs out"). Courts "have a duty to defend the
18  Constitution, and even a public health emergency does not absolve [them] of that responsibility." *Id.*
19  at 2604 (Alito, J., dissenting); *see also id.* at 2614–15 (Kavanaugh, J., dissenting); *see also* Lindsay
20  F. Wiley and Stephen I. Vladeck*, Coronavirus, Civil Liberties, and the Courts: The Case Against
21  "Suspending" Judicial Review*, 133 Harv. L. Rev. F. 179, 183–84 (2020) (describing the
22  "importance of an independent judiciary in a crisis – 'as perhaps the only institution that is in any
23  structural position to push back against potential local, state, or federal political branches.'").

24       Indeed, abdication of the courts' constitutional duty in the face of an emergency, real or
25  imagined, has led to some of the most infamous cases in the history of this Nation. Most egregiously,
26  in *Korematsu v. United States*, 323 U.S. 214 (1944), *abrogated by Trump v. Hawaii*, 138 S. Ct. 2392
27  (2018), the Court deferred to the federal government's assertion of emergency and upheld the
28  internment of thousands of Japanese Americans. "The court of history has rejected th[e]se
    jurisprudential mistakes and cautions [courts] against an unduly deferential judicial approach[.]"

16

*Calvary Chapel*, 140 S. Ct. at 2615 (Kavanaugh, J., dissenting). "The Constitution of the United States is a law for rulers and people, equally in war and peace, and covers with the shield of its protection all classes of men, at all times, and *under all circumstances*." *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2, 76 (1866) (emphasis added). It is the duty of the courts to ensure that the fundamental rights secured by our constitution are not reduced, by the declaration of an "emergency," to mere "ink on parchment." *Cty. of Butler v. Wolf*, 2020 WL 5510690, at *10 (W.D. Pa. Sep. 14, 2020).[19]

It has now been more than seven months since Governor Newsom first declared a state of emergency for the coronavirus, and there is no indication that the emergency will ever end. On the contrary, Governor Newsom has indicated that he does not think we can ever return to the old "normal," and the Blueprint does not even have a "green" tier where all restrictions are terminated. Ex. 28. Thus, "[t]he problem is no longer one of exigency." *Cavalry Chapel*, 140 S. Ct. at 2605 (Alito, J., dissenting). Instead, the State and County's current orders reflect "considered yet discriminatory treatment" of various activities, including those squarely and vigorously protected by the Constitution. *See id.* Continued deference to these actions is therefore inappropriate, and this court should instead apply ordinary constitutional principles to Defendants' Orders. *See County of Butler*, 2020 WL 5510690, at *10; *see also Capitol Hill Baptist Church*, 2020 WL 5995126, at *7.

*Second*, "*Jacobson* must be read in context," as a "substantive due process challenge to a local ordinance requiring residents to be vaccinated for small pox." *Calvary Chapel*, 140 S. Ct. at 2608 (Alito, J., dissenting). *Jacobson* did not involve a First Amendment challenge to "statewide measures of indefinite duration" and thus should not govern the result here. *See id.* Indeed, history has shown the dangers of extending *Jacobson*'s principle beyond its narrow facts. In *Buck v. Bell*, 274 U.S. 200 (1927), the court held that "[t]he principle" in *Jacobson* "that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes." 274 U.S. at 207. The Court thus upheld the forced sterilization of those the government deemed a blight, a decision that has been

---

[19] The Supreme Court's denial of an application for injunctive relief in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020), is not to the contrary. As Judge O'Scannlain recently explained, that decision "was unaccompanied by any opinion of the Court and thus is precedential only as to the 'precise issues presented and necessarily decided.'" *Harvest Rock Church, Inc. v. Newsom*, -- F.3d – 2020 WL 5835219, at *2 (9th Cir. Oct. 1, 2020) (O'Scannlain, J., dissenting) (noting that the "Supreme Court considered whether to issue a writ of injunction under the All Writs Act, … a more demanding standard" than the standard applicable to preliminary injunctions).

Memorandum of Points & Authorities                    Case No. 5:20-cv-07108

justifiably denounced. *See generally,* Edward L. Rubin*, The Supreme Court in Context: Conceptual, Pragmatic, and Institutional*, 69 Vand. L. Rev. 1115, 1122–35 (2016). *Korematsu* again provides valuable warning. There, the Court followed the precedent set in *Hirabayashi v. United States*, 320 U.S. 81 (1943), which upheld an executive order that imposed a curfew on people of Japanese ancestry. *See Korematsu*, 323 U.S. at 217–19. The *Korematsu* court recognized that confinement in an internment camp was a "far greater deprivation" than a curfew, but nevertheless held that the "principles" announced in *Hirabayashi* compelled the Court to uphold the internment order. 323 U.S. at 218. As Justice Jackson recognized in dissent, once a judicial opinion rationalizes a deprivation of liberty, "the principle then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need. Every repetition imbeds that principle more deeply in our law and thinking and expands it to new purposes." *Id.* at 246 (Jackson, J., dissenting). Here, extending the principle announced in *Jacobson* beyond its specific context would allow the government to use public health as a justification for vastly more oppressive restrictions on individual liberty than the vaccination law upheld in *Jacobson*.

In short, *Jacobson* does not control this case, and the Court should apply ordinary standards of constitutional scrutiny, which the Orders unequivocally fail

## B. Defendants' Orders Violate Plaintiffs' First and Fourteenth Amendment Rights to Free Exercise and Assembly

The First Amendment's Free Exercise Clause instructs: "Congress shall make no law … prohibiting the free exercise" of religion. U.S. Const. amend. I. Although the Supreme Court has held that neutral laws of general applicability may burden religious practices even without the support of a compelling governmental interest, *see Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 881–83 (1990), it has recognized that if a law burdening religious conduct is not both neutral and generally applicable, it must satisfy strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 534 (1993).

A law fails general applicability if it meets three conditions: (1) it burdens a category of religiously motivated conduct, (2) it exempts a substantial category of conduct that is not religiously motivated, and (3) the exempted conduct undermines the purposes of the law to at least the same degree as the religiously-motivated conduct. *Id.* at 543–46. Each of those elements is met here.

18

1       1. <u>The Orders Substantially Burden Religious Conduct</u>

2       The Orders' blanket prohibition on indoor gatherings, and three-household limit on outdoor

3  gatherings, burden Pastor Wong and Karen Busch's free exercise rights by preventing them from

4  engaging in religious activities central to their faiths. Over the last three years, Pastor Wong, has

5  hosted 8 to 10 members of his congregation in his home for weekly worship as part of his ministry,

6  including "Biblical studies, theological discussions, collective prayer, and musical praise." Wong

7  Decl. ¶¶2–3. Likewise, Busch has hosted 12-person, bi-weekly Bible studies in her home over the

8  last two years, including "faith-based discussions and collective prayer." Busch Decl. ¶¶2–3.

9  Because their homes are not "places of worship," and because the State does not consider these

10  gatherings to be "faith-based services," Plaintiffs cannot gather indoors, and any outdoor gatherings

11  are now limited to three households. Exs. 32–39. Defendants' Orders thus force a stark choice:

12  Plaintiffs must cease engaging in religious conduct at the center of their faith, or commit "a

13  misdemeanor punishable by fine, imprisonment, or both." Exs. 2–3 (invoking Cal. Gov't Code

14  § 8665 for noncompliance). See *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546

15  U.S. 418, 428–32 (2006) (orders that prohibit religious gatherings, enforced by threats of

16  prosecution, amount to a significant burden on religious conduct).

17       Internet and telephone access do not mitigate the burden on Pastor Wong and Busch's

18  religious practice. Not every member of Plaintiffs' community has access to such technology. *See*

19  Busch Decl. ¶5. And even if they did, in-person religious assembly is indispensable to Plaintiffs'

20  Christian faith, Wong Decl. ¶5, Busch Decl. ¶5, and it is not for this Court to "[j]udg[e] the centrality

21  of different religious practices." *Smith*, 494 U.S. at 887. Because Defendants' Orders prohibit time-

22  honored in-home religious gatherings, they significantly burden religious conduct.

23       2. <u>The Orders Exempt and Favor a Substantial Amount of Secular Conduct</u>

24       "The question of general applicability addresses whether a law treats religious observers

25  unequally." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020) (citing *Lukumi*, 508

26  U.S. at 542). If the justification for an exemption "devalues religious reasons for [conduct] by

27  judging them to be of lesser import than nonreligious reasons," then "religious practice is being

28  singled out for discriminatory treatment." *Lukumi*, 508 U.S. at 537–38.

Memorandum of Points & Authorities          Case No. 5:20-cv-07108

1     Defendants allow numerous activities to take place that pose the same (or greater) risks as the

2     Bible studies Pastor Wong and Busch wish to conduct. For example, Defendants allow professional

3     sports, music, film and TV production, laundromats, and hotels to operate. Ex. 46. Defendants thus

4     treat small religious gatherings as of "lesser import" than these secular gatherings. *Lukumi*, 508 U.S.

5     at 537. The Orders also exempt "mass gatherings for faith-based services, cultural ceremonies, and

6     protests." Ex. 29. Conversely, small prayer groups and Bible studies held in the privacy of a home

7     remain prohibited. The First Amendment prohibits the state from favoring large established churches

8     and formal religious gatherings while disfavoring small, informal religious gatherings in the privacy

9     of a home.

10         3.   The Exempted Secular Conduct Inflicts Identical or Increased Health Risks.

11     Defendants' Orders fail the general applicability requirement not merely because they allow

12     secular versions of the religious conduct they prohibit, but because the multitude of exempted

13     conduct impacts Defendants' declared goals in the same way. In *Lukumi*, the Court concluded that

14     the challenged ordinances failed the general applicability standard because they were

15     "underinclusive for [their asserted] ends" and "[t]he underinclusion [was] substantial, not

16     inconsequential." *Id*. at 543. Then-Judge Gorsuch put *Lukumi's* general applicability standard this

17     way: "A law's underinclusiveness—its failure to cover significant tracts of conduct implicating the

18     law's animating and putatively compelling interest—can raise with it the inference that the

19     government's claimed interest isn't actually so compelling after all." *Yellowbear v. Lampert*, 741

20     F.3d 48, 60 (10th Cir. 2014).

21     Like *Lukumi*, Defendants' Orders "fail to prohibit nonreligious conduct that endangers"

22     Defendants' professed interests "in a similar or greater degree." *Lukumi*, 508 U.S. at 543. The Orders

23     purport to mitigate the spread of COVID-19. Yet the risks of contagion are just as high—and almost

24     certainly higher—at a protest, a football game, or a large church gathering as they are at small

25     religious gatherings in a home. That Defendants' Orders apply similar restrictions on other indoor

26     secular activities, like lectures and music concerts, is beside the point. What matters is

27     "underinclusiveness" across a broad range of conduct, and whether the government "fail[s] to

28     prohibit" a "substantial" amount of "nonreligious conduct." *Lukumi*, 508 U.S. at 543. "At some

     point, an exception-ridden policy takes on the appearance and reality of a system of individualized

Memorandum of Points & Authorities                    Case No. 5:20-cv-07108

exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) (citing cases). Defendants' Orders allow a substantial amount of nonreligious conduct posing equal and higher risks of contagion. As a result, the Orders are not generally applicable and thus are subject to strict scrutiny.[20]

### 4. Defendants' Orders Cannot Survive Strict Scrutiny

Even assuming Defendants' asserted interests are compelling, the Orders are not narrowly tailored to further them. Defendants' myriad exemptions for secular assembly highlight the lack of narrow tailoring. Like *Lukumi*, Defendants' "proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree." 508 U.S. at 546; *see supra* I.B.2–3. Plaintiffs do not seek an absolute exemption from Defendants' health and hygiene guidelines. Rather, they intend to follow those guidelines and incorporate them into their private group worship. Wong Decl. ¶6; Busch Decl. ¶6. Defendants' Orders thus place substantially more burdens on religious gatherings than needed to achieve their stated health purpose.

### C. Defendants' Orders Violate The Due Process and Equal Protection Clauses of The Fourteenth Amendment

The substantive component of the Due Process Clause protects the right to earn a living. *Truax v. Raich*, 239 U.S. 33, 38 (1915); *see also Schware v. Bd. of Bar Exam'rs of the State of N.M.*, 353 U.S. 232, 238–39 (1957).[21] The Equal Protection Clause, meanwhile, prohibits the state from enforcing discriminatory regulations without at least a rational basis. Although "a government need not provide a perfectly logical solution to regulatory problems, it cannot hope to survive *rational* basis review by resorting to irrationality." *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008). The policy "must find some footing in the realities of the subject addressed by legislation." *Heller v.*

---

[20] The restrictions are also subject to strict scrutiny because in addition to burdening religious exercise, they infringe on other First Amendment Rights, including the right to speech and peaceable assembly. *See supra* I.A. "In such 'hybrid' cases, the law or action must survive strict scrutiny." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) (citation omitted).
[21] This right includes the "freedom … to engage in any of the common occupations of life." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *see also Sagana v. Tenorio*, 384 F.3d 731, 742 (9th Cir. 2004) ("Restrictions on selecting and pursuing work are recognized by the Fourteenth Amendment's Due Process Clause.").

Memorandum of Points & Authorities                    Case No. 5:20-cv-07108

*Doe by Doe*, 509 U.S. 312, 321 (1993). Plaintiffs may "rebut the facts underlying defendants' asserted rationale for a classification, to show that the challenged classification could not reasonably be viewed to further the asserted purpose." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 590–91 (9th Cir. 2008). "[V]ague, undifferentiated fears" do not provide a rational basis for "what would otherwise be an equal protection violation." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 449 (1985).

Here, Defendants' Orders violate both due process and equal protection because they irrationally deprive Plaintiffs of their ability to run their businesses and earn a living and irrationally discriminate against Plaintiffs. For example, Defendants have unlawfully deprived Mansour of her right to earn a living by prohibiting her from practicing her chosen professions for a prolonged, indefinite duration. Mansour Decl. ¶¶3–14; *see Conn v. Gabbert*, 526 U.S. 286, 292 (1999) (recognizing "due process right to choose one's field of private employment"); *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972) (the right to earn a living is infringed upon when the state has "foreclosed [one's] freedom to take advantage of other employment opportunities"). The Orders are not based on any metrics related to Mansour's qualifications to safely practice her profession. The Orders thus unconstitutionally violate Mansour's ability to earn a living.

The Orders also irrationally treat Plaintiffs Richards, Evarkiou, Mansour, Khanna, and Beaudet (and their businesses) differently than other similarly situated individuals and businesses. Plaintiffs' businesses are required to adhere to significant restrictions or close entirely when they are just as capable, if not more so, of implementing social distancing measures applicable to other businesses not subject to as stringent regulations. Richards Decl. ¶¶ 3–7; Evarkiou Decl. ¶¶ 4, 6; Mansour Decl. ¶¶ 3, 5–8, 11–12; Khanna Decl. ¶¶ 5–6; Beaudet Decl. ¶¶ 3, 5. Doctors' and dentists' offices, for example, are permitted to perform cosmetic treatments and oral cleanings that require the removal of face coverings and entail close proximity between staff and patients. Exs. 47–48. There is no rational basis for treating Mansour's facial salon differently from a dermatologist's office that performs the same elective skincare treatments, or for permitting a hotel to hold an outdoor Bar Mitzvah but prohibiting Khanna from hosting an outdoor wedding reception that involves appropriate social distancing. More fundamentally, the Orders treat Plaintiffs differently because they reside in the wrong county. An iddentical business in Sierra County or Humboldt County—both

22

of which are in the yellow tier—would not face the same onerous restrictions.

These arbitrary distinctions and deprivations of liberty are not based on any rational interpretation of public health metrics or scientific studies. The Blueprint's core metrics, the number of new daily cases and the percentage of positive tests, are based exclusively on unreliable and misleading PCR test results. Bhattacharya Decl. ¶ 26. First, the populations taking PCR tests are not randomly sampled. The people being tested, who are typically symptomatic or frontline workers, are more likely to test positive than the community at large. *Id.* ¶ 27. Second, PCR testing policies vary by county, making it impossible to uniformly assess community health. Bhatia Decl. ¶ 43. If a county has a widespread testing policy inclusive of asymptomatic individuals, that county will necessarily have a lower positivity rate than if it tested only those people experiencing COVID-19 symptoms. Third, PCR tests are a crude indicator of viral prevalence and do not reflect the rate of community spread. PCR tests lead to a substantial number of false positives. Bhattacharya Decl. ¶ 28. The PCR test is only designed to register the presence of viral material and does not determine whether someone is contagious. *Id.* People who were never contagious or who have not been contagious for weeks can test positive. *Id.* Because the metrics Defendants are using to determine each county's "tier" have little relationship to the state of community spread or any public health risk, the restrictions imposed on Plaintiffs' businesses are not rationally related to Defendants' asserted interest in protecting the health system from being overwhelmed.

The Orders also irrationally assume that COVID-19 poses the same risk to all populations. The infection fatality rate varies dramatically depending on age and comorbidities, and "[a] county that has a small proportion of its population who are vulnerable to mortality from infection could more safely resume normal activity without excess mortality risk than a county with a larger vulnerable proportion." Bhattacharya Decl. ¶ 32. The elderly and those with multiple chronic health conditions are significantly more likely to be hospitalized and die from COVID-19 than the population at large. Bhatia Decl. ¶ 74. The CDC recently estimated that more than 99.5% of people under the age of 69 survive after contracting COVID-19. Bhattacharya Decl. ¶ 36. The survivability rate is even higher among younger populations. *Id.* In contrast, nationwide, 80% of people who have died from COVID-19 were age 65 or older. Bhatia Decl. ¶ 76. Despite this plain disparity,

Memorandum of Points & Authorities                                  Case No. 5:20-cv-07108

Defendants are imposing harsh restrictions on Plaintiffs' businesses without regard to the risk those activities pose to vulnerable populations.

In California, 37 percent of COVID-19-related deaths occurred in long-term care facilities for elderly and disabled adults. Bhatia Decl. ¶ 76. Defendants' Orders closing restaurants and skincare salons have, at best, an indirect effect on this population and require few preventative measures that actually protect vulnerable individuals. *Id.* ¶ 82. California did not require asymptomatic healthcare workers in long-term care facilities to take COVID-19 tests until September 12, 2020, still does not require asymptomatic home health aides to be routinely tested, and allows long-term care facilities to comply with a far more lenient protocol than the federally mandated protocol for Centers for Medicare and Medicaid-licensed facilities. *Id.* ¶ 88. It is irrational to ignore risk variations when Defendants could implement policies that allow Plaintiffs' businesses to reopen safely and protect the people most vulnerable to COVID-19.

## II.     Plaintiffs Face Irreparable Harm Absent Immediate Injunctive Relief

"[I]rreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Az. Dream Act Coalition v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). The deprivation of a constitutionally protected right such as those protected by the Fourteenth Amendment's Equal Protection and Due Process Clauses inexorably creates irreparable harm. See *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

## III.     The Remaining Factors Weigh in Favor of Granting Injunctive Relief

Where the government is the opposing party, balancing of the harm and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Thus, the Court asks whether any significant "public consequences" would result from issuing the preliminary injunction. *Winter*, 555 U.S. at 24. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). This is especially true in the case of fundamental First Amendment rights to speech and assembly in the time immediately preceding a major election. *See Citizens United*, 558 U.S. at 339. Moreover, the government's restrictions are imposing social, financial, and physical harm on the public. *See* Bhatia Decl. ¶¶ 95–

24

Memorandum of Points & Authorities                                    Case No. 5:20-cv-07108

96, 99–100. Evidence suggests that the harsh lockdown measures imposed by Defendants have had and will continue to have "severe adverse health impacts," such as anxiety, depression, hunger, negative impacts on children's cognitive and emotional development, substance abuse, and suicide. Bhatia Decl. ¶ 95.

Meanwhile, there is no evidence that permitting individuals to gather and run their businesses using disease-mitigation measures would cause an increase in severe cases of COVID-19. First, the State has provided absolutely no scientific evidence that its metrics and tiered system are correlated to reducing hospitalizations and deaths from COVID-19—the original stated goal of the emergency declaration. *See* Bhattacharya Decl. ¶¶ 20–21; Bhatia Decl. ¶¶ 34–36. Nor has the State pointed to any evidence that its specific restrictions on certain businesses and gatherings are necessary or effective in reducing the threat of severe disease. *See* Bhatia Decl. ¶¶ 29, 50–59. The State's hospitals have never come close to capacity, *see id.* ¶ 32, and in several San Francisco Bay Area counties, peak hospitalizations for COVID-19 in those under the age of 65 occurred *before* the Governor's stay-at-home order even had time to influence infection rates, indicating that factors other than California's restrictions have been influencing infection transmission and disease burden. *Id.* ¶¶ 61-62. And strikingly, Defendants are failing to protect those most vulnerable to COVID-19, as hospitalization rates among the elderly have been steadily *increasing* since July. *Id.* ¶¶ 79–80. In short, the State has misdirected its efforts in addressing the danger posed by COVID-19. Even CDPH recognizes that gatherings can take place and businesses can run in ways that reduce the risk of spreading disease, including through the use of social distancing, facial coverings, frequent hand washing, and sanitization. Exs. 29, 46. A preliminary injunction is in the public interest.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Preliminary Injunction and enjoin Defendants from further violating Plaintiffs' constitutional rights.

Respectfully submitted,

Date: October 22, 2020                    EIMER STAHL LLP

By:   /s/ Robert Dunn
Robert Dunn
Ryan J. Walsh (*pro hac vice* pending)
John D. Tripoli

John K. Adams (*pro hac vice* pending)
Amy C. Miller (*pro hac vice* pending)

Attorneys for Plaintiffs

Memorandum of Points & Authorities                    Case No. 5:20-cv-07108

# CERTIFICATE OF SERVICE

I certify that on October 22, 2020, pursuant to an agreement of the parties, I served a copy of

the following documents by electronic mail on counsel for Defendants at the addresses listed below.

**(1) Notice of Motion and Motion for Preliminary Injunction**

**(2) Memorandum of Points & Authorities in Support of Motion for Preliminary Injunction**

**(3) Declaration of Robert E. Dunn and Exhibits Attached Thereto**

**(4) Declaration of Dr. Jayanta Bhattacharya**

**(5) Declaration of Dr. Rajiv Bhatia**

**(6) Declaration of Connie Richards**

**(7) Declaration of Dhruv Khanna**

**(8) Declaration of Frances Beaudet**

**(9) Declaration of Jeremy Wong**

**(10)      Declaration of Julie Evarkiou**

**(11)      Declaration of Karen Busch**

**(12)      Declaration of Maya Mansour**

**(13)      Declaration of Ritesh Tandon**

**(14)      Declaration of Terry Gannon**

**(15)      Proposed Order Granting Motion for Preliminary Injunction**

Dated: October 22, 2020                                       By: */s/ Robert E. Dunn*
                                                                          Robert E. Dunn
                                                                          *Attorney for Plaintiffs*


Lara Haddad
Deputy Attorney General
Government Law Section
California Department of Justice
Tel: 213.269.6250
Fax: 213.897.5775

27

Email: Lara.Haddad@doj.ca.gov
*Attorney for State Defendants*

Jason M. Bussey
Deputy County Counsel
Office of the County Counsel, County of Santa Clara
70 West Hedding Street, East Wing, 9th Floor
San Jose, CA 95110
Tel: 408.299.5964
Fax: 408.292.7240
Email: Jason.bussey@cco.sccgov.org
*Attorney for County Defendants*

Robin M. Wall
Deputy County Counsel
Office of the County Counsel, County of Santa Clara
70 West Hedding Street, East Wing, 9th Floor
San Jose, CA 95110
Tel: 408.299.9033
Fax: 408.292.7240
Email: robin.wall@cco.sccgov.org
*Attorney for County Defendants*

Memorandum of Points & Authorities                    Case No. 5:20-cv-07108