United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

RITESH TANDON, et al.

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 20-CV-07108-LHK

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 18

Plaintiffs Ritesh Tandon, Terry and Carolyn Gannon, Jeremy Wong, Karen Busch, Maya Mansour, Dhruv Khanna, Frances Beaudet, Julie Evarkiou, and Connie Richards (collectively, "Plaintiffs") sue Defendants Gavin Newsom, the Governor of California; Xavier Becerra, the Attorney General of California; Sandra Shewry, the Acting State Director of the California Department of Public Health; Erica S. Pan, Acting State Public Health Officer of the California; Jeffrey V. Smith, County Executive of Santa Clara County; and Sara H. Cody, Health Officer and Public Health Director of Santa Clara County (collectively, "Defendants"). Plaintiffs bring five claims challenging Defendants' COVID-19 restrictions: (1) violation of the right to free speech and assembly protected by the First and Fourteenth Amendments; (2) violation of the right to free

1

exercise and assembly protected by the First and Fourteenth Amendments; (3) violation of the right to earn a living under the Due Process Clause of the Fourteenth Amendment; (4) violation of the Equal Protection Clause of the Fourteenth Amendment; and (5) violation of the prohibition on unconstitutionally vague criminal laws.

Before the Court is Plaintiffs' motion for a preliminary injunction. Plaintiffs argue that they are likely to succeed on the merits of their first four claims, they are likely to face irreparable harm absent an injunction, and the public interest favors an injunction. Having considered the parties' submissions and oral arguments, the relevant law, and the record in this case, the Court DENIES Plaintiffs' motion for a preliminary injunction.

# I. BACKGROUND

## A. The COVID-19 Pandemic

### 1. The Emergence and Spread of COVID-19

In December of 2019, the novel coronavirus SARS-CoV-2 emerged in the Chinese city of Wuhan. Watt Decl. Exh. 3. That coronavirus spread rapidly worldwide, causing a disease known as Coronavirus Disease 2019 ("COVID-19"). Watt Decl. Exh. 12. On February 7, 2020, about two months after COVID-19 had first been detected in China, Patricia Dowd, a 57-year-old woman living in Santa Clara County, died of COVID-19, becoming the first known COVID-19 death in the United States. Cody Decl. ¶ 10.

There have been 104 million confirmed cases of COVID-19 and 2.2 million deaths from COVID-19 worldwide as of February 3, 2021. *See WHO Coronavirus Disease (COVID-19) Dashboard*, World Health Organization, *available at* https://covid19.who.int/.[1] In the United

---

[1] The Court takes judicial notice of the most recently reported numbers of COVID-19 infections and deaths. The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts take judicial notice of information found on government agency websites, such as the number of COVID-19

States, as of February 3, 2021, there have been 26 million confirmed cases of COVID-19 and 445,000 deaths; both are the highest numbers of any nation in the world. *See COVID Data Tracker*, Centers for Disease Control and Prevention, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home [hereinafter "*CDC COVID Data Tracker*"]. The United States is projected to face a death toll as high as the number of Americans that were killed in battle in World War II. Rutherford Decl. ¶ 26. Public health experts have stated that the pandemic is the worst in at least one hundred years. *Id.* ¶¶ 26, 42; Cody Decl. ¶ 71.

Since the pandemic began, the United States has experienced three waves of COVID-19. Currently, the country is in its third wave, the worst wave yet by far. Rutherford Decl. ¶ 109. In recent weeks, case counts and deaths have repeatedly shattered records. On January 8, 2021, more than 314,000 confirmed cases were reported in the United States, a record number. *See CDC COVID Data Tracker*.

California ("the State") has been particularly affected by the pandemic. As of February 3, 2021, there have been 3.2 million confirmed cases of COVID-19, the highest number of any state in the country, and more than 41,000 deaths, the second most of any state in the country. *See CDC COVID Data Tracker*; *Tracking COVID-19 in California*, California for All, *available at* https://covid19.ca.gov/state-dashboard/. In Santa Clara County, as of February 3, 2021, there have been 102,836 confirmed COVID-19 cases, and 1,433 people have died from COVID-19. Johns Hopkins University, *COVID-19 Status Report*, *available at* https://bao.arcgis.com/covid-19/jhu/county/06085.html.

---

infections and deaths. *See Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, at *5–6 (N.D. Cal. Sept. 9, 2008) (citing circuit and district court cases). However, to the extent any facts are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of matters of public record . . . . But a court may not take judicial notice of a fact that is subject to reasonable dispute.") (internal quotation marks omitted), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

3

United States District Court
Northern District of California

United States District Court
Northern District of California

California has been particularly impacted during the current wave of the pandemic, when cases and deaths have repeatedly shattered records. From November 16, 2020 to December 16, 2020, the number of new cases per day jumped from 9,890 to 53,711. *See CDC COVID Data Tracker.* Deaths have spiked as well. Prior to the current wave, the record number of deaths per day was 219 on August 1, 2020. *Id.* However, during the current wave, the record number of deaths per day was 764 on January 22, 2021, or almost four times the previous record. *Id.*

The current wave of the pandemic has also strained hospital capacity. In recent weeks, the State and various counties, including Santa Clara County, had 0 percent remaining ICU capacity. *See About COVID-19 Restrictions*, California For All, https://covid19.ca.gov/stay-home-except-for-essential-needs/ (last accessed January 19, 2021); COVID-19 Hospitalizations Dashboard, County of Santa Clara Emergency Operations Center, *available at* https://www.sccgov.org/sites/covid19/Pages/dashboard-hospitals.aspx. As a result of the current wave, Los Angeles County recently released a memorandum directing that patients not be transported if they go into cardiac arrest and cannot be revived in the field. *See EMS Transport of Patients in Traumatic and Nontraumatic Cardiac Arrest*, *available at* http://file.lacounty.gov/SDSInter/dhs/1100458_Directive_6revTransportofTraumaticandNontraumaticCardiacArrest.pdf.

As of February 3, 2021, Santa Clara County, which has a population of 1.9 million, has 5 percent remaining ICU capacity, which corresponds to just 16 ICU beds. COVID-19 Hospitalizations Dashboard, County of Santa Clara Emergency Operations Center, *available at* https://www.sccgov.org/sites/covid19/Pages/dashboard-hospitals.aspx; Cody Decl. ¶ 5.

### 2. How COVID-19 Spreads

COVID-19 is highly contagious. Lipsitch Decl. ¶ 20. It has a reproduction rate of 2 to 6, meaning that, if uncontrolled, each person with COVID-19 spreads it to between two and six others. *Id.* This reproduction rate causes the number of COVID-19 infections to multiply

4

exponentially. *Id.* If a virus has a reproduction rate of more than one, the epidemic will grow, and disease and death in the population will increase. Stoto Decl. ¶¶ 10, 12; Watt Decl. ¶ 26.

COVID-19 is transmitted when an individual is exposed to a sufficient dose of the virus to overcome the body's defenses. Watt Decl. ¶ 33. COVID-19 is primarily spread through respiratory droplets from an infected person's nose or mouth. Rutherford Decl. ¶¶ 28–33, Watt Decl. ¶¶ 25–32. Although transmission by contact with an object on which the virus is present is believed to be possible, it is rare. Rutherford Decl. ¶ 31; Watt Decl. ¶ 29.

Instead, individuals are likely to be exposed to a sufficient dose of the virus to be infected when they are in close proximity with an infected person for an extended period of time, which permits viral droplets or particles to move from the infected person to others. Watt Decl. ¶¶ 33, 37–44; Rutherford Decl. ¶ 74. The higher the dose of the virus to which someone is exposed, the more likely they are to become seriously ill. Rutherford Decl. ¶ 34.

COVID-19 can be spread by individuals exhibiting no symptoms. About 40 percent of those who are infected are asymptomatic, but asymptomatic people can still spread the virus. Cody Decl. ¶ 9; Rutherford Decl. ¶ 28; Watt Decl. ¶¶ 30–31; Reingold Decl. ¶ 23. Furthermore, even individuals who develop symptoms are believed to be most contagious the day before they develop symptoms. Watt Decl. ¶ 32.

Because COVID-19 can be spread by individuals who are asymptomatic or presymptomatic, it is difficult to control. Watt Decl. ¶ 32. Many people who are infected are not aware that they are sick, so they do not take the appropriate precautions, such as isolating themselves at home. Rutherford Decl. ¶ 28; Watt Decl. ¶ 32. In addition, people who are healthy are often not able to determine by mere observation whether others they are with are sick. Watt Decl. ¶ 39.

Individuals are likely to be exposed to a sufficient dose of the virus to be infected when they are in close proximity with an infected person for an extended period of time, which permits

viral droplets or particles to move from the infected person to others. Watt Decl. ¶¶ 33, 37–44. Accordingly, gatherings, which bring individuals from different households together for an extended period of time, are particularly risky settings for the transmission of COVID-19. *Id.*; Rutherford Decl. ¶¶ 60, 76–77; Cody Decl. ¶¶ 34–35.

The more time that a non-infected person spends in close proximity to an infected person, the higher the likelihood that viral particles will move from the infected person to the non-infected person. Watt Decl. ¶¶ 33, 37–44. For this reason, the risk of COVID-19 transmission increases with the duration of the gathering. Rutherford Decl. ¶ 78; Watt Decl. ¶ 43.

The higher the number of households that gather together, the higher potential there is for the virus to spread. Watt Decl. ¶ 42; Rutherford Decl. ¶ 77. This is because having a larger gathering increases the number of people who can be infected, and those people can then infect others. Watt Decl. ¶ 42. In addition, having a larger gathering increases the likelihood that a person who is infected with COVID-19 is present. *Id.*; Cody Decl. ¶ 34. Furthermore, the likelihood that an infected person is present is increased further where a gathering takes place in a county in which there is a high prevalence of infection. *Id.*; Rutherford Decl. ¶ 81; Stoto Decl. ¶¶ 10, 18.

Indoor gatherings are particularly dangerous because in an indoor environment with limited ventilation, the virus disperses less easily and can remain in the air for a long period of time, which allows it to accumulate into doses large enough to overcome the immune system. Watt Decl. ¶ 44; Rutherford Decl. ¶¶ 60, 76–77; Reingold Decl. ¶ 20; Cody Decl. ¶ 29. One study found that the likelihood of transmitting COVID-19 was 18.7 times greater in a closed environment than in an open environment. Watt Decl. ¶ 44. Accordingly, the CDC advises that activities are safer when they are held in outdoor spaces. Cody Decl. ¶ 31. However, even outdoor gatherings carry a risk that the virus will be transmitted, especially when individuals are in close proximity for an extended period. Rutherford Decl. ¶ 77.

6

United States District Court
Northern District of California

Singing, chanting, shouting, loud talking, and sustained conversations present particularly high risks of infection because they involve vocalization, which increases the number of droplets or particles that emit from an infected individual and the distance those droplets or particles can travel. Rutherford Decl. ¶¶ 29, 79; Reingold Decl. ¶¶ 20–22; Cody Decl. ¶ 35. Although droplets will normally fall to the ground within six feet, droplets can travel double that length, or twelve feet, if a person is singing or speaking loudly. Rutherford Decl. ¶ 29. For these reasons, after a choir rehearsal in Washington attended by 61 people, 32 people were confirmed COVID-19 cases, 20 people were probable COVID-19 cases, 3 people were hospitalized, and 2 people died. Reingold Decl. ¶ 22; Cody Decl. ¶ 36.

Wearing face coverings and maintaining at least six feet of physical distance diminish the risk of infection. Watt Decl. ¶¶ 38, 45–46, 48. However, a significant risk of infection remains, particularly when people get together for extended periods and in environments with limited ventilation, such as indoors. *Id.*; Rutherford Decl. ¶¶ 60, 76–77, 84. Accordingly, wearing a face covering and physical distance are measures that should be taken in addition to, not instead of, refraining from lengthy interactions. Rutherford Decl. ¶ 60; Watt Decl. ¶ 50.

In sum, because the virus spreads when droplets or particles move from an infected person to a non-infected person, gatherings are particularly likely to lead to viral spread. Gatherings are especially likely to lead to the spread of COVID-19 when: (1) the duration of time that the gathering is held increases; (2) the number of people and households gathering increases; (3) the rate of COVID-19 in the community increases; (4) the gathering is held indoors; and (5) the gathering involves vocalization, such as loud speaking or singing. Although wearing a face covering and physical distancing diminish the risk of spreading COVID-19, a significant risk of infection remains, especially when gatherings are held indoors.

Because of the dangers of gatherings, at least 23 of 30 California counties experiencing increases in their COVID-19 cases identified gatherings as a cause of the rise in cases. Watt Decl.

¶ 41. In Sacramento, 71 cases of COVID-19 were linked to a church that held large indoor services and smaller services in private homes. Cody Decl. ¶ 37. In Maine, an indoor wedding attended by 62 people resulted in more than 180 infections, including among people living at a long-term healthcare facility and at a jail. *Id*. Eight people who did not attend the wedding died. *Id*. In Michigan, 187 infections were connected to an indoor bar and restaurant with a live DJ and an open dance floor. *Id*. Of the total cases traced back to the restaurant, 144 were people who had been to the venue, and 43 were family members, friends, and other contacts who had not. *Id*.

When California has put restrictions on gatherings into place, there has been a decrease in cases. *Id*. ¶¶ 62, 93. The County has also seen a decrease in cases when gatherings have been restricted. Cody Decl. ¶ 19. For example, when the County first issued a shelter-in-place order, the case count was doubling every five days. *Id*. By contrast, after the County implemented its order, the case count was doubling every three and a half months. *Id*. The County estimates that its shelter in place orders prevented 80 percent of the infections that would have occurred. *Id*. ¶ 20. One study estimates that without the stay at home orders at the outset of the pandemic, ten times as many people would have become infected with COVID-19. Maldonado Decl. ¶ 15.

### 3.  The Effects of COVID-19

COVID-19 results in a wide range of symptoms, from none at all to severe illness and death. Watt Decl. ¶ 21. COVID-19 can cause pneumonia, respiratory failure, other organ failure, cardiovascular events, strokes, seizures, and death. Rutherford Decl. ¶ 21; Watt Decl. ¶ 22; Reingold Decl. ¶ 14.

The risk of severe illness from COVID-19 increases steadily with age. Watt Decl. ¶ 22; Reingold Decl. ¶ 15.[2] However, many younger people have become seriously ill and died from

---

[2] The CDC previously stated that those in specific age thresholds were more at risk for severe illness. Watt Decl. ¶ 22. However, the CDC now warns that the risk of severe illness increases steadily as a person ages, and it is not only those over 65 who are most at risk. *Id*.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

COVID-19. About twenty percent of those who have died of COVID-19 in the United States have been younger than 65 years old. Lipsitch Decl. ¶ 28. In addition, nearly two thousand people who have died of COVID-19 were younger than 30 years old as of February 3, 2021. *See CDC COVID Data Tracker.*

Indeed, people of any age with underlying conditions and pregnant women are at increased risk of severe illness from COVID-19. *Id.*; Rutherford Decl. ¶ 99. Underlying conditions that increase the risk of serious illness include cancer, chronic kidney disease, chronic obstructive pulmonary disease, heart conditions, immunocompromised state, obesity, severe obesity, pregnancy, sickle cell disease, smoking, and type 2 diabetes mellitus. Reingold Decl. ¶ 15. Underlying conditions that might increase the risk of serious illness include asthma (moderate to severe), cerebrovascular disease, cystic fibrosis, hypertension or high blood pressure, immunocompromised state, neurologic conditions, liver disease, being overweight, pulmonary fibrosis, thalassemia, and type 1 diabetes mellitus. *Id.*

The CDC has found that approximately six in ten Americans have been diagnosed with a subset of the COVID-19 underlying conditions. Specifically, six in ten Americans have been diagnosed with at least one of the following: heart disease, cancer, chronic lung disease, stroke, Alzheimer's disease, diabetes, or chronic kidney disease. Reingold Decl. ¶ 17. Moreover, four in ten Americans have been diagnosed with more than one of these conditions. *Id.* These conditions are more common in communities of color and low-income communities. Lipsitch Decl. ¶ 28.

Approximately 15 percent of COVID-19 patients require hospitalization. Rutherford Decl. ¶ 22. Although a minority of COVID-19 patients require hospitalization, a high number of overall infections results in a high number of hospitalizations. Lipsitch Decl. ¶ 17. As a result of the number of patients who require hospitalization, COVID-19 outbreaks have created a public health crisis of the highest magnitude. Rutherford Decl. ¶ 26; Reingold Decl. ¶ 13. The hospital system is so full that it cannot provide appropriate treatment for people who have COVID-19 or otherwise

9

United States District Court
Northern District of California

treatable conditions. Rutherford Decl. ¶ 26.

Even individuals who are not hospitalized can face serious and long-term effects from COVID-19, including cardiovascular, neurologic, renal, and respiratory damage, psychiatric effects, and loss of limbs from blood clotting. Cody Decl. ¶ 7; Han Decl. ¶ 20; Watt Decl. ¶ 23; Rutherford Decl. ¶¶ 23–25, 97. For example, the National Collegiate Athletic Association found that college football players who had recovered from asymptomatic or mildly symptomatic COVID-19 infections had a high rate of myocarditis, which can lead to cardiac arrest with exertion. Rutherford Decl. ¶ 25. Much remains unknown about the effects of a COVID-19 infection, as it typically takes years for scientists to fully analyze a new virus. Rutherford Decl. ¶ 16; Watt Decl. ¶ 18.

There is currently no cure or generally effective treatment for COVID-19. Rutherford Decl. ¶ 38; Watt Decl. ¶ 24. Patients who have trouble breathing can receive breathing and blood oxygenation assistance. *Id*. However, when it is not possible to administer sufficient oxygen through an external device, patients must be intubated and provided breathing assistance using a ventilator. *Id*. Although the treatments have improved since the beginning of the pandemic, there are still many deaths even with the improved treatments. Rutherford Decl. ¶ 40.

Although the first COVID-19 vaccines were approved on December 11, 2020 and December 18, 2020, access to the vaccines remains limited in most communities to health care workers and older adults. In the meantime, prior to the widespread availability of the vaccine, the strategies recommended by the vast consensus of public health experts include stay at home orders, physical distancing requirements, and limitations on gatherings. Rutherford Decl. ¶ 50; Stoto Decl. ¶ 15; Watt Decl. ¶¶ 51–52; Reingold Decl. ¶ 27; Cody Decl. ¶ 75; Maldonado Decl. ¶¶ 13, 18.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

**B. The State's and the County's Response to COVID-19**

    **1. The State's Response**

Since the start of the pandemic, the State's restrictions have constantly evolved based on the scientific understanding of how COVID-19 spreads, the level of spread of COVID-19 in the State, and the extent to which the State's hospitals and ICUs lacked capacity.

On March 4, 2020, Governor Newsom proclaimed a State of Emergency in California. Haddad Decl. Exh. 6. [3] Two weeks later, as the first wave of COVID-19 was spreading, Governor Newsom issued Executive Order N-33-20, the Stay at Home Order, which required "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." Haddad Decl. Exh. 7.

On April 28, 2020, as the first wave of infections came to an end, Governor Newsom announced a "Resilience Roadmap," which outlined four stages for reopening: (1) safety and preparation; (2) reopening of lower-risk workplaces and other spaces; (3) reopening of higher-risk workplaces and other spaces; and (4) ending the Stay at Home Order. Haddad Decl. Exh. 9.

During the summer of 2020, there was a second, and bigger, wave of COVID-19 infections and deaths. Watt Decl. ¶ 66. On July 13, 2020, the State tightened restrictions, ordering closures of bars, pubs, brewpubs, breweries, restaurants, wineries, tasting rooms, family entertainment centers, movie theaters, zoos, museums, and cardrooms. Haddad Decl. Exh. 10 at 5–6; Watt Decl. ¶¶ 74–75. In counties that had heightened infection rates, the State also ordered the closure of indoor operations of houses of worship, offices for non-critical infrastructure sectors, personal care services, hair salons, barbershops, gyms, fitness centers, and malls. *Id.* at 6. As a result of these restrictions, the infection rate decreased significantly. Watt Decl. ¶ 76.

---

[3] The parties include the State and the County restrictions at issue in this case as exhibits to their declarations. The Court cites to these restrictions throughout the order by citing to the exhibits.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

On August 28, 2020, the Governor announced the Blueprint for a Safer Economy ("the Blueprint"), which is an umbrella designation for the COVID-related restrictions enacted by the State. Haddad Decl., Exh. 11. Some of the Blueprint's restrictions are being challenged by Plaintiffs in this case.

The Blueprint is a framework that prescribes restrictions based on the risk tier of the county. *Id.* Counties are assigned to the widespread tier, the substantial tier, the moderate tier, and the minimal tier. *Id.* Counties are assigned to a tier based on: (1) the average number of cases per 100,000 residents over a seven-day period; (2) the average percentage of COVID tests that come back positive over a seven-day period; and (3) the health equity metric, which looks at case counts and positivity rates in the County's most disadvantaged neighborhoods, as measured by voting participation, tree coverage, and retail density. *Id.*; Watt Decl. ¶ 76; Kurtz Decl. ¶¶ 17, 22–24.

The Blueprint's restrictions differ based on the tier the county is in. In assigning activities to each tier, the State considered eight objective factors, which are associated with the likelihood that a given activity will result in the spread of COVID-19: (1) the ability to accommodate face covering wearing at all times; (2) the ability to physically distance between individuals of different households; (3) the ability to limit the number of people per square foot; (4) the ability to limit the duration of exposure; (5) the ability to limit the amount of mixing of people from different households; (6) the ability to limit the amount of physical interactions; (7) the ability to optimize ventilation; and (8) the ability to limit activities that are known to increase the possibility of viral spread, such as singing, shouting, and heavy breathing. Kurtz Decl. ¶ 20.

The Blueprint assigns activities to tiers as follows. Counties in the widespread tier are subject to the most severe restrictions. Haddad Decl. Exh. 12. No indoor gatherings are permitted, and outdoor gatherings are limited to three households maximum. *Id.* Restaurants, wineries, cardrooms, gyms, museums, zoos, movie theaters, and family entertainment centers can operate outdoors only. *Id.* Retail and shopping centers can operate at a maximum of 25 percent capacity.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

*Id*. Houses of worship also can operate outdoors only. In addition, on November 21, 2020, the State added a curfew for counties in the widespread tier, who must stop "non-essential" activities between 10 p.m. and 5 a.m.

In the substantial tier, gatherings are "strongly discouraged" but permitted indoors with up to three households. *Id*. Shopping centers can operate at a maximum of 50 percent capacity. *Id*. Museums and zoos can operate at a maximum of 25 percent capacity. *Id*. Restaurants and movie theaters can operate indoors at a maximum of 25 percent capacity or 100 people, whichever is fewer. *Id*. Gyms can operate at a maximum of 10 percent capacity. *Id*. Houses of worship can operate indoors at a maximum of 25 percent capacity. *Id*.

In the moderate tier, gatherings are "strongly discouraged" but permitted indoors with up to three households. *Id*. Shopping centers can operate, but they must close their common areas and reduce the capacity of their food courts. *Id*. Museums and zoos can operate at a maximum of 50 percent capacity. *Id*. Restaurants and movie theaters can operate indoors at a maximum of 50 percent capacity or 200 people, whichever is fewer. *Id*. Gyms, cardrooms, and wineries can operate at a maximum of 25 percent capacity. *Id*. Houses of worship can operate indoors at a maximum of 50 percent capacity. *Id*.

The Blueprint originally set attendance limits for houses of worship in the substantial tier at either 25 percent capacity or 100 people, whichever is fewer, and for houses of worship in the moderate tier at either 50 percent capacity or 200 people, whichever is fewer. Haddad Decl. Exh. 12. However, the fixed 100 and 200 person attendance limits were enjoined by the Ninth Circuit on January 22, 2021. *See South Bay United Pentecostal Church v. Newsom*, --- F.3d ---, 2021 WL 222814, at *17–*18.[4]

---

[4] The appellants in *South Bay* have asked the United States Supreme Court for an emergency writ of injunction. *See* Emergency Application for Writ of Injunction Relief Requested before Sunday January 31, 2021, No. 20-746 (U.S. filed Jan. 25, 2021). That application is pending.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

In every tier, the Blueprint allows modified operation of critical infrastructure sectors, including healthcare, emergency services, the food and agriculture supply chain, the energy sector, water and wastewater management, transportation, communications and information technology, critical manufacturing, financial services, chemical and hazardous materials, defense, and industrial, commercial, residential, and sheltering facilities and services. *Id.*

On top of the Blueprint, the State's Department of Public Health issued guidance on gatherings on October 9, 2020. Dunn Decl. Exh. 32. The State banned indoor gatherings and limited outdoor gatherings to no more than three households in a two hour period, provided that the venue permitted at least six feet of distance and people wore face coverings. *Id.*; Watt Decl. ¶ 81.

On November 13, 2020, the State updated its ban on gatherings. Dunn Reply Decl. Exh. 4. In the widespread tier, indoor gatherings were banned and outdoor gatherings were limited to no more than three households. *Id.*

Beginning in November, a third, and bigger, wave of COVID-19 infections and deaths started. On December 3, 2020, the State issued a new Regional Stay at Home Order, which created five regions in the State and added additional restrictions if the region's ICU capacity dropped below 15 percent. Dunn Reply Decl. Exh. 7. The Regional Stay at Home Order required "[a]ll individuals living in the Region [to] stay home or at their place of residence except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure." *Id.* Accordingly, under the Regional Stay at Home Order, all gatherings were banned. *Id.* However, outdoor worship and outdoor political expression were permitted. *Id.*

On December 4, 2020, several Bay Area counties, including Santa Clara County, adopted the Regional Stay at Home Order's restrictions even though the counties had not yet met the criteria set by the State. Dunn Reply Decl. Exh. 8. The restrictions went into effect in Santa Clara County on December 6, 2020 at 10:00 p.m. *Id.* On December 15, 2020, the Bay Area region's ICU

14

capacity dropped below 15 percent, making the Regional Stay at Home Order mandatory in Santa

Clara County. On January 25, 2021, the State ended the Regional Stay at Home Order. ECF No.

61 Exh. 1. However, the State's Blueprint restrictions remain in place.

### 2. The County's Response

Like the State's restrictions, the County's restrictions have been modified as the scientific

understanding of COVID-19 has progressed, as the spread of COVID-19 in the County has

changed, and as the County's hospital and ICU capacity has changed.

Following the State's declaration of a State of Emergency, on March 16, 2020, the County

issued a shelter-in-place order directing all individuals to stay at their place of residence except to

perform limited essential activities. Cody Decl. ¶¶ 11, 13. All businesses, except certain essential

businesses, were directed to cease operations, except certain minimum basic operations. *Id.* ¶ 13.

All gatherings of any number were prohibited, except with members of an individual's own

household. *Id.*

On March 31, 2020, the County issued an updated shelter-in-place order that extended

through May 3, 2020. *Id.* ¶ 15. The Order included: (1) mandatory social distancing requirements,

(2) additional restrictions on essential businesses requiring them to limit the number of people in

the business and disinfect high touch surfaces; and (3) a prohibition on the use of playgrounds,

dog parks, and public recreational areas. *Id.* ¶ 17.

On April 29, 2020, the County issued a revised shelter-in-place order that extended most

shelter-in-place restrictions through May 31, 2020. *Id.* ¶ 22. Then, on May 18, 2020, the County

issued a revised shelter-in-place order that extended most of the restrictions. *Id.* ¶ 23. However,

based on the progress the County had made in slowing the spread of COVID-19, this order

allowed a limited number of businesses and activities to resume operations with safety precautions

in place. *Id.* ¶ 24.

On June 1, 2020, the County amended the May order. Based on the progress the County

Case No. 20-CV-07108-LHK

ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

and the Bay Area had made in slowing the spread of COVID-19, this amendment allowed additional businesses and activities to resume operations and allowed certain outdoor activities to resume with restrictions. *Id*. ¶ 27.

On July 2, 2020, the County issued a new order. *Id*. ¶ 38. Based on the County's increased capacity to implement widespread testing and contain the virus, the County transitioned from a shelter-in-place order to a longer-term harm reduction model. *Id*. ¶ 39. The order allowed most activity, travel, and business operations to resume with significant limitations to reduce the spread of the virus. *Id*. ¶ 40. Indoor and outdoor gatherings were allowed, but with face covering requirements and attendance limits. *Id*. ¶ 42.

Following the July 2 order, the County issued the three orders being challenged in this case: (1) the Mandatory Directive for Gatherings; (2) the Mandatory Directive for Personal Care Services Businesses; and (3) the Mandatory Directive for Outdoor Dining, Wineries, Bars, and Smoking Lounges ("Mandatory Directive for Outdoor Dining").

On July 8, 2020, after COVID-19 cases in the County rose, the County issued a Mandatory Directive for Gatherings, which prohibited indoor gatherings regardless of size and allowed outdoor gatherings of up to 60 people with face coverings and physical distancing. *Id*. ¶ 43. On July 14, 2020, the County issued three directives:

- an Updated Mandatory Directive for Gatherings, which limited indoor and outdoor gatherings,

- a Mandatory Directive for Personal Care Services Businesses, which prohibited any personal services on the face or neck because the client could not wear a face covering, and

- a Mandatory Directive for Outdoor Dining, which prohibited indoor dining and required restaurants to situate tables such that tables were at least 10 feet apart.

Dunn Decl. Exh. 40, 42, 44.

On September 5, 2020, the County revised the Mandatory Directive for Gatherings by

16

United States District Court
Northern District of California

relaxing some of its restrictions on outdoor gatherings. Cody Decl. ¶ 52. On October 4, 2020, the County revised the Mandatory Directive for Outdoor Dining, Wineries, Bars, and Smoking Lounges by broadening the definition of an outdoor facility to include those that have at least 50 percent of the perimeter open to the outdoors if covered, and 25 percent if uncovered. *Id*. ¶ 53. On October 4, 2020, the County also updated the Personal Care Services Directive, which permitted personal services on the face or neck as long as the provider of the service wore an N95 mask. On October 5, 2020, the County issued a revised risk reduction order, which superseded the July 2 order. *Id*. ¶ 57.

On October 13, 2020, the County modified the Mandatory Directive for Gatherings. Bussey Decl. Exh. B. For gatherings that were permitted by the State, the County limited indoor gatherings to a maximum of 100 people, while outdoor gatherings were limited to a maximum of 200 people as long as they could maintain social distancing. *Id*. On November 16, 2020, the County modified the Mandatory Directive for Gatherings. Bussey Decl. Exh. A. Unlike the October 13, 2020 version of the Mandatory Directive for Gatherings, the November 16, 2020 version prohibited indoor gatherings while maintaining the 200 person limit on outdoor gatherings. *Id*.

On October 13, 2020, the County also modified the Mandatory Directive for Outdoor Dining by broadening the definition of an outdoor facility to include those that were completely uncovered, like a courtyard, and by allowing indoor dining at the limits permitted by the Blueprint. Cody Decl. ¶ 62. On November 17, 2020, the County modified the Mandatory Directive for Outdoor Dining by prohibiting indoor dining and indoor wine tasting. *Id*. ¶ 66.

On December 4, 2020, the County adopted the State's Regional Stay at Home Order even though the County had not yet met the criteria set by the State. Dunn Reply Decl. Exh. 8. On December 15, 2020, the Regional Stay at Home order became mandatory in the County. On January 25, 2021, the State ended the Regional Stay at Home Order. ECF No. 61 Exh. 1.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

However, the State's Blueprint restrictions and the County's restrictions remain in place. On January 25, 2021, the County issued a modified Mandatory Directive for Gatherings. ECF No. 61 Exh. 3. Like the November 16, 2020 version of the Mandatory Direction, the current Mandatory Directive for Gatherings prohibits indoor gatherings. *Id*. However, the County continues to permit outdoor gatherings with an attendance limit of 200 people. *Id*.

### 3.  Efforts Targeted at Vulnerable Populations

In addition to these community-wide restrictions, the State and the County have also taken measures that are targeted towards protecting populations that are especially vulnerable to severe illness from COVID-19, including the elderly and residents of long-term care facilities.

In January 2020, about a month after COVID-19 was first detected and before any COVID-19 cases had been detected in the State, the State began issuing guidelines and directives that required long-term care facilities to undertake precautions. Steinecker Decl. ¶ 12. These precautions have included routine testing, screening residents, limiting visitations, enhanced sanitation, and mask wearing requirements. Steinecker Decl. ¶¶ 19–24; Tovmasian Decl. ¶¶ 12–16, 24.[5]

Beginning in March 2020, the State has required licensed residential care facilities for the elderly and adult residential facilities to take measures that prevent the spread of COVID-19, including: (1) screening residents and staff for COVID-19 symptoms every day; (2) excluding employees who display symptoms of COVID-19; (3) cleaning and disinfecting high-touch surfaces; (4) requiring employees and residents to wash their hands upon entering the facility; (5) limiting entry only to individuals who need entry for prevention, containment, and mitigation

---

[5] The declaration of Lilit Tovmasian addresses the State's policies for licensed residential care facilities for the elderly and adult residential facilities, which are considered non-medical facilities. Tovmasian Decl. ¶ 3. By contrast, the declaration of Heidi Steinecker addresses the State's policies for skilled nursing facilities, which are considered medical facilities. Steinecker Decl. ¶ 10.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

measures; (6) requiring staff to wear face coverings at all times and remind residents that they are required to wear face coverings as much as practically possible; and (7) requiring training of staff on prevention and control measures. Tovmasian Decl. ¶¶ 12–16, 24.

The State also requires facilities to engage in testing practices. Tovmasian Decl. ¶¶ 18–21, Steinecker Decl. ¶ 15, 19. Facilities are required to test new residents prior to moving into the facility, current residents who were treated off-site, new staff prior to starting, and current staff after returning from a leave of absence. *Id*. ¶ 18. Facilities with a COVID-19 case must retest all residents and staff every 14 days until no new cases are identified in two sequential rounds of testing. *Id*. ¶ 20. Facilities without a COVID-19 case must conduct surveillance testing of 10 percent of all staff every 14 days and testing of residents who display symptoms or have been exposed to someone who has tested positive. *Id*. ¶ 19. If a resident or staff member tests positive, they are isolated and anyone who may have been exposed to them is quarantined. Tovmasian Decl. ¶ 21.

The County has also taken steps to protect vulnerable populations, including targeted outreach to distribute personal protective equipment, establishment of more testing locations in vulnerable communities, and partnerships with community-based organizations. Garcia Decl. ¶ 14. In addition, the County has taken measures to prevent the spread of COVID-19 inside long-term care facilities, including implementing regular staff and resident testing, providing infection control protocols, and visiting facilities to make recommendations on how best to implement infection control. Han Decl. ¶ 9. The County has also taken steps to prevent the spread of COVID-19 inside jails, including implementing regular testing, providing personal protective equipment, contact tracing, and reducing the jail population. *Id*. ¶ 10. Finally, the County has implemented measures to prevent spread inside homeless shelters by housing homeless individuals in motels and finding permanent housing for formerly homeless residents and making regular testing available. *Id*. ¶ 11.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

**C.  Procedural History**

On October 13, 2020, Plaintiffs Ritesh Tandon, Terry and Carolyn Gannon, Jeremy Wong, Karen Busch, Maya Mansour, Dhruv Khanna, Frances Beaudet, Julie Evarkiou, and Connie Richards brought suit against Defendants Gavin Newsom, the Governor of California; Xavier Becerra, the Attorney General of California; Sandra Shewry, the Acting State Director of the California Department of Public Health; Erica S. Pan, Acting State Public Health Officer of the California; Jeffrey V. Smith, County Executive of Santa Clara County; and Sara H. Cody, Health Officer and Public Health Director of Santa Clara County. ECF No. 1.

Plaintiffs' Complaint alleged five claims: (1) violation of the right to free speech and assembly protected by the First and Fourteenth Amendments; (2) violation of the right to free exercise and assembly protected by the First and Fourteenth Amendments; (3) violation of the right to earn a living under the Due Process Clause of the Fourteenth Amendment; (4) violation of the Equal Protection Clause of the Fourteenth Amendment; and (5) violation of the prohibition on unconstitutionally vague criminal laws. ECF No. 1 ¶¶ 122–160. Plaintiffs sought declaratory and injunctive relief. ECF No. 1.

On October 22, 2020, Plaintiffs filed a motion for a preliminary injunction. ECF No. 18 ("Mot."). On November 18, 2020, County Defendants and State Defendants each filed an opposition to Plaintiffs' motion for a preliminary injunction. ECF No. 28 ("County Opp'n"); ECF No. 30 ("State Opp'n").

On November 25, 2020, the United States Supreme Court stayed New York's COVID-related restrictions on houses of worship in *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020). The Court requested that Plaintiffs address the United States Supreme Court's decision in their reply and Defendants address the decision in a supplemental brief. ECF No. 38. On December 7, 2020, Plaintiffs filed a reply. ECF No. 39 ("Reply"). On December 11, 2020, Defendants filed a supplemental brief addressing the United States Supreme Court's decision. ECF No. 40 ("Supp. Brief"). On December 17, 2020, the Court held a hearing on Plaintiffs'

20

motion for a preliminary injunction. ECF No. 46.

On December 21, 2020, State Defendants filed a statement of recent decision in *Harvest Rock Church v. Newsom*, Case No. 20-cv-06414-JGB (C.D. Cal. Dec. 21, 2020), and in *South Bay United Pentecostal Church v. Newsom*, Case No. 20-cv-00865-BAS (S.D. Cal. Dec. 21, 2020). ECF No. 47. On December 23, 2020, State Defendants filed a statement of recent decision in *Disbar Corporation d/b/a 58 Degrees & Holding Co. v. Newsom*, Case No. 20-cv-02473 (E.D. Cal. Dec. 22, 2020), and in *Mitchell v. Newsom*, Case No. 20-cv-08709 (C.D. Cal. Dec. 23, 2020). ECF No. 53. On December 28, 2020, Plaintiffs filed a statement of recent decision in *Agudath Israel of America v. Cuomo*, Case No. 20-3572 (2d. Cir. Dec. 28, 2020). ECF No. 54. On December 31, 2020, State Defendants filed a statement of recent decision in *Gish v. Newsom*, Case Nos. 20-55455, 20-56324 (9th Cir. Dec. 23, 2020), and *South Bay United Pentecostal Church v. Newsom*, Case No. 20-56358 (9th Cir. Dec. 24, 2020). ECF No. 58. On December 31, 2020, Plaintiffs filed a statement of recent decision in *Monclova Christian Academy v. Toledo-Lucas County Health Department*, No. 20-4300 (6th Cir. Dec. 31, 2020). ECF No. 59. On January 29, 2021, County Defendants filed a statement of recent decision in *South Bay United Pentecostal Church v. Newsom*, No. 20-56358 (9th Cir. Jan. 22, 2021); *Harvest Rock Church v. Newsom*, No. 20-56357 (9th Cir. Jan. 25, 2021); and *Gateway City Church v. Newsom*, No. 20-cv-08241-EJD (N.D. Cal. Jan. 29, 2021).

On January 28, 2021, Plaintiffs filed a motion to supplement the record with, or take judicial notice of, four recent documents: (1) a January 25, 2021 order issued by the State of California, lifting the Regional Stay at Home Order; (2) a January 25, 2021 order issued by the County, confirming that the Regional Stay at Home Order is no longer in effect; (3) a January 25, 2021 revised directive for gatherings issued by the County; and (4) a January 13, 2021 report issued by the World Health Organization, addressing the use of PCR tests. ECF No. 61. On February 1, 2021, Defendants filed a joint opposition in part. ECF No. 63. Defendants did not

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

object to the Court taking judicial notice of the January 25, 2021 documents, but objected to the Court taking judicial notice of the January 13, 2021 report. *Id.*

The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Public records are proper subjects of judicial notice. *See, e.g.*, *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007). However, to the extent any facts in documents subject to judicial notice are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee*, 250 F.3d at 689. The Court GRANTS Plaintiff's motion to take judicial notice of the January 25, 2021 documents because these documents are public records that are proper subjects of judicial notice. However, the Court DENIES Plaintiff's motion to take judicial notice of the January 13, 2021 report because courts are not permitted to take judicial notice of the truth of the contents of a document. *Hadley v. Kellogg Sales Company*, 273 F. Supp. 3d 1052, 1061 (N.D. Cal. 2017). Finally, the Court DENIES Plaintiff's motion to supplement the record because if Plaintiffs are permitted to supplement the record, Defendants would also have to be accorded an equal opportunity to add evidence on additional developments. Because the COVID-19 pandemic is rapidly evolving, the process of submitting additional evidence must end.

## II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As the parties seeking the injunction, Plaintiffs bear the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"

*Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## III.  DISCUSSION

Plaintiffs' motion for preliminary injunction requests that this Court enjoin the following State and County restrictions:

**Business Plaintiffs**

- Maya Mansour ("Mansour"), the owner of a skincare bar, seeks to enjoin the County's Personal Care Services Directive, which requires her to equip her staff with N95 masks, on the grounds that it violates her rights under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

- Dhruv Khanna ("Khanna"), the owner of a winery business, seeks to enjoin the State's Blueprint, which limits outdoor gatherings to three households, and the County's Mandatory Directive for Gatherings, which limits outdoor gatherings not prohibited by the State to 200 people, on the grounds that it violates his rights under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

- Frances Beaudet ("Beaudet"), a restaurant owner, seeks to enjoin the County's Mandatory Directive for Outdoor Dining, which prohibits her from seating diners indoors, on the grounds that it violates her rights under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

- Julie Evarkiou ("Evarkiou"), a salon owner, seeks to enjoin the State's Blueprint, which limits the capacity of her salon, prohibits indoor gatherings, and limits outdoor gatherings to three households, on the grounds that it violates her rights under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

- Connie Richards ("Richards"), the former owner of a fitness center, seeks to enjoin the State's Blueprint, which limits the capacity of her fitness center and prohibits its operation indoors, on the grounds that it violates her rights under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

**Free Speech Plaintiffs**

- Ritesh Tandon ("Tandon"), a congressional candidate in 2020 who intends to run in 2022, seeks to enjoin the County's Mandatory Directive for Gatherings, which prohibits him from holding indoor political events with more than 100 people or outdoor political events with more than 200 people, on the grounds that it violates his free speech and assembly rights under the First and Fourteenth Amendments.

- Terry and Carolyn Gannon ("the Gannons"), who hold gatherings at their home to discuss matters of public policy, seek to enjoin the State's Blueprint, which prohibits indoor gatherings and limits outdoor gatherings to three households, on the grounds that it violates their free speech and assembly rights under the First and Fourteenth Amendments.

**Free Exercise Plaintiffs**

- Pastor Jeremy Wong ("Wong") and Karen Busch ("Busch"), each of whom hold Bible studies, theological discussions, collective prayer, and musical prayer at their homes, seek to enjoin the State's Blueprint, which prohibits indoor gatherings and limits outdoor gatherings to three households, on the grounds that it violates their free exercise and assembly rights under the First and Fourteenth Amendments.

Mot. at ii–iii.

The Court first briefly describes the restrictions at issue. Then, the Court analyzes each preliminary injunction factor in turn: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.[6]

---

[6] Under Ninth Circuit precedent, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *accord Short v. Brown*, 893 F.3d 671675 (9th Cir. 2018) (holding that these factors are "on a sliding scale"). Thus, "when the balance of hardships tips sharply in the plaintiff's favor, the

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## A.  The Restrictions at Issue

Plaintiffs' motion requires the Court to address five restrictions: (1) the State's Blueprint; (2) the State's guidance on gatherings; (3) the County's Mandatory Directive for Gatherings, which applies to certain gatherings not banned by the State; (4) the County's Personal Care Services Directive; and (5) the County's Outdoor Dining Directive. Each of these restrictions has been updated several times, including during the course of this litigation. In the Background section above, *supra* Section I-B, the Court described these updates in detail. Below, the Court briefly highlights the restrictions at issue in the instant motion.

The State's Blueprint, which the California Department of Public Health issued on August 28, 2020, is a framework for the State's COVID-19 related restrictions that prescribes restrictions based on the tier in which the county is located. Haddad Decl. Exh. 12. At the most severe or widespread tier, the Blueprint prohibits indoor private gatherings of individuals outside the immediate household and restricts outdoor private gatherings to three households. *Id*. Similarly, the State's guidance on private gatherings, which the California Department of Health updated on November 13, 2020, prohibits indoor gatherings of individuals outside the immediate household and restricts outdoor private gatherings to three households in the widespread tier. Dunn Reply Decl. Exh. 4 (stating that "[g]atherings that include more than 3 households are prohibited" and "gatherings must be outdoors for counties in the [widespread] tier"). Thus, the Court refers to the Blueprint's restrictions on gatherings at the widespread tier and the State's guidance on gatherings at the widespread tier as "the State's private gatherings restrictions."

Importantly, the State permits unlimited attendance at outdoor worship services, outdoor

---

plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135). In this case, the Court concludes that the balance of hardships does not tip sharply in Plaintiffs' favor. *See* Section III-C, *infra* (analyzing the balance of the hardships and the public interest, which merge when the government is a party). Accordingly, the Court does not consider whether Plaintiffs have demonstrated serious questions going to the merits.

Case No. 20-CV-07108-LHK

ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

political events, and outdoor cultural ceremonies like funerals and weddings. As the Ninth Circuit found in *South Bay*, outdoor worship services are particularly viable in year-round warm climates like California's. *Id*. ("Given the obvious climatic differences between San Diego in the winter and say, New York, the . . . allowance for outdoor services is much more than 'lip service' to the demands of the First Amendment."). The State's Blueprint also allows indoor worship services in the substantial, moderate, and minimal tiers. Specifically, at the substantial tier, the State allows indoor services at 25 percent capacity. *South Bay*, 2021 WL 222814, at *17–*18. At the moderate and minimal tiers, the State allows indoor services at 50 percent capacity. *Id*. The County imposes the same limits for the same tiers.

Santa Clara County's Mandatory Directive for Gatherings prohibits all indoor gatherings of individuals outside the immediate household when the County is in the Blueprint's widespread tier. Bussey Decl. Exh. A. However, the County's Mandatory Directive for Gatherings limits outdoor worship services, outdoor political events, and outdoor cultural ceremonies like funerals and weddings to 200 people regardless of the County's Blueprint tier. Bussey Decl. Exh. A, Exh. G (stating that "[o]utdoor gatherings may not exceed 200 people under any circumstances"). In addition, the County "requires that . . . gatherings take place in an area large enough to allow for social distancing of all attendees." Cody Decl. ¶ 61. Thus, the County's Mandatory Directive for Gatherings applies to gatherings not regulated by the State's private gatherings restrictions.[7] The

---

[7] When Plaintiffs filed the instant motion, Plaintiffs challenged the County's 100 person limit on indoor gatherings and 200 person limit on outdoor gatherings. Mot. at ii. However, on November 16, 2020, before Defendants filed their opposition to the instant motion, the County released an updated Mandatory Directive for Gatherings that prohibited indoor gatherings when the County is in the widespread tier, but did not change the 200 person limit on outdoor gatherings. Bussey Decl. Exh. A (stating that "all indoor gatherings are currently prohibited"); Exh. G (stating that "[o]utdoor gatherings may not exceed 200 people under any circumstances"). Regardless of whether Plaintiffs challenge the County's 100 person limit or the County's prohibition on indoor gatherings in the widespread tier, the Court's analysis is the same.

26

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

Court refers to the County's Mandatory Directive for Gatherings as "the County's private gatherings restrictions."

The County's Personal Care Services Directive applies to services that "involve close, often physical contact between service providers and clients." Bussey Decl. Exh. H. The Personal Care Services Directive requires workers to wear N95 masks when "the client cannot wear a face covering." *Id.* The County's Mandatory Directive for Outdoor Dining prohibits indoor dining and requires that outdoor tables be spaced at least ten feet apart. Bussey Decl. Exh. I.

Finally, the Court notes that Plaintiffs' free exercise claims do not challenge restrictions on houses of worship. *See* Tr. of Dec. 17, 2020 Hearing at 21:15–19, ECF No. 60 (The Court: "Are any of these plaintiffs houses of worship, or alleging restrictions on houses of worship? It seems like it's more focused on private gatherings that have religious purposes, like Bible studies in the home." Plaintiffs' Counsel: "I think that's right, Your Honor."). Instead, Plaintiffs challenge restrictions on private gatherings inside and outside their homes. Specifically, Plaintiffs Jeremy Wong and Karen Busch seek to enjoin the restrictions insofar as they (1) ban indoor religious gatherings at their homes, including Bible studies, theological discussions, collective prayer, and musical prayer; and (2) limit outdoor religious gatherings at their homes to three households." Mot. at iii (emphasis added). Thus, the instant motion is distinct from other lawsuits that have challenged restrictions on attendance at houses of worship. *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (enjoining 10- to 25-person cap on services at houses of worship); *S. Bay United Pentecostal Church v. Newsom*, No. 20-56358, 2021 WL 222814, at *17–*18 (9th Cir. Jan. 22, 2021) (enjoining 100- to 200-person cap on same); *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1231 (9th Cir. 2020) (enjoining 50-person cap on same); *Harvest Rock Church, Inc. v. Newsom*, No. 20-56357, 2021 WL 235640, at *2–*3 (9th Cir. Jan. 25, 2021) (O'Scannlain, J., specially concurring) (collecting cases).

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

**B.  Plaintiffs are not likely to succeed on the merits of their claims.**

Plaintiffs move for a preliminary injunction on four of their five claims: (1) violation of the Fourteenth Amendment's substantive due process right to earn a living; (2) violation of the Fourteenth Amendment's Equal Protection Clause; (3) violation of the First Amendment's right to free speech and assembly; and (4) violation of the First Amendment's right to free exercise and assembly. The Court discusses Plaintiffs' likelihood of success on the merits of each of these claims.

**1.  Plaintiffs are not likely to succeed on the merits of their Due Process claims.**

Plaintiffs Mansour, Khanna, Beaudet, Evarkiou, and Richards are business owners who argue that the State's and County's COVID-related restrictions on their businesses violate their rights to make a living under the Due Process Clause of the Fourteenth Amendment. Specifically, Mansour, who runs a facial bar, challenges the County's Personal Care Services Directive. Mot. at ii. Khanna, who owns a winery, challenges the State's and the County's private gatherings restrictions. *Id.* Beaudet, who owns a restaurant, challenges the County's Mandatory Directive for Outdoor Dining. *Id.* Evarkiou, the owner of a hair salon, challenges the State's private gatherings restrictions and the Blueprint's restrictions on hair salons. *Id.* Richards, a former gym owner, challenges the Blueprint's restrictions on gyms. *Id.*

Plaintiffs contend that the State's and County's COVID-related restrictions on their businesses violate their right to earn a living, as protected by the substantive component of the Due Process Clause. Mot. at 21. "The substantive component of the Due Process Clause forbids the government from depriving a person of life, liberty, or property in such a way that . . . interferes with rights implicit in the concept of ordered liberty." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007) (quotation omitted).

However, as Plaintiffs concede, the right to earn a living is not a fundamental liberty interest that has been traditionally protected by the substantive component of the Due Process Clause. As the Ninth Circuit has explained, "[s]ubstantive due process has . . . been largely

28

confined to protecting fundamental liberty interests such as marriage, procreation, contraception, family relationships, child rearing, education and a person's bodily integrity, which are 'deeply rooted in this Nation's history and tradition.'" *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)). Neither the United States Supreme Court nor the Ninth Circuit "has []ever held that the right to pursue work is a fundamental right." *Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004). Rather, the Ninth Circuit has held that the right to pursue one's profession is not a fundamental right protected by the Due Process Clause. *See Franceschi*, 887 F.3d at 937.

Because no fundamental right is at issue here, judicial review is "narrow." *Sagana*, 384 F.3d at 743. The Court "do[es] not require that the government's action actually advance its stated purposes, but merely look[s] to see whether the government *could* have had a legitimate reason for acting as it did." *Id.* (quoting *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 66 (9th Cir. 1994) (emphasis in original)).

When a state exercises its police powers to enact emergency health measures, courts will uphold them unless (1) the measures have no real or substantial relation to public health, or (2) the measures are "beyond all question" a "plain, palpable invasion of rights secured by [ ] fundamental law." *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 37 (1905).

Plaintiffs contend that *Jacobson* does not apply to this case for two reasons. First, Plaintiffs argue that *Jacobson* does not apply because the public health emergency has lasted for several months. Mot. at 16–17. However, Plaintiffs have not cited a single case that states that *Jacobson* does not apply if a public health emergency lasts for several months. Indeed, many courts have applied *Jacobson* to COVID-related restrictions despite the length of the pandemic. *See, e.g.*, *Big Tyme Investments, LLC v. Edwards*, --- F.3d ---, 2021 WL 118628, at *6 (5th Cir. 2021) (January 13, 2021 opinion, rejecting the plaintiffs' argument that the district court erred in applying *Jacobson*); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) ("[T]he district

29

court appropriately looked to *Jacobson* for guidance, and so do we."); *Delaney v. Baker*, --- F. Supp. 3d ---, 2021 WL 42340, at *11 (D. Mass. 2021) (January 6, 2021 opinion applying *Jacobson*). Second, Plaintiffs argue that *Jacobson* does not apply because *Jacobson* arose in the context of substantive due process, whereas this case raises First Amendment claims as well. Mot. at 17. However, the Court only applies *Jacobson* in the context of Plaintiffs' substantive due process claim. Therefore, the Court continues with its *Jacobson* analysis.

As United States Supreme Court Chief Justice Roberts wrote last year, "[w]hen [public] officials 'undertake to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id*. (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).

Every court to have addressed the issue of whether COVID-related restrictions violated substantive due process rights has concluded that the plaintiffs were not likely to succeed on the merits of their substantive due process claims. *See Slidewaters LLC v. Washington Dep't of Labor & Industries*, 2020 WL 3130295, at *4 (E.D. Wash. June 12, 2020) (concluding that water park was not likely to succeed on the merits of its substantive due process claims); *Best Supplement Guide, LLC v. Newsom*, 2020 WL 2615022, at *6 (E.D. Cal. May 22, 2020) (concluding that gym owners were not likely to succeed on the merits of substantive due process claims); *Open Our Oregon v. Brown*, 2020 WL 2542861, at *2 (D. Ore. May 19, 2020) (collecting cases and explaining that businesses' motion for a preliminary injunction should be denied because "[a]t this stage, this Court is inclined to side with the chorus of other federal courts in pointing to *Jacobson* [*v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905)] and rejecting similar constitutional claims brought by Plaintiffs challenging similar COVID-19 restrictions in other states"). Plaintiffs

30

United States District Court
Northern District of California

do not cite a single case holding otherwise.

The Court comes to the same conclusion as the other courts. Below, the Court analyzes the two elements that the United States Supreme Court set forth in *Jacobson*: (1) whether the measures bear a real or substantial relation to public health, and (2) whether the measures are "beyond all question" a "plain, palpable invasion of rights secured by [ ] fundamental law." *Jacobson*, 197 U.S. at 30.

### a. The State's and the County's restrictions bear a real and substantial relation to public health.

As to the first *Jacobson* element, the restrictions on Defendants' businesses bear a real and substantial relation to public health. Every court has also concluded that COVID-19 related restrictions bear a real and substantial relation to public health, and Plaintiffs do not cite a single case holding otherwise. *See, e.g.*, *Bimber's Delwood, Inc. v. James*, --- F. Supp. 3d ---, 2020 WL 6158612, at *9 –*10 (W.D.N.Y. Oct. 21, 2020) (concluding that the plaintiffs could not show that New York's COVID-19 related restrictions on businesses, including bars and restaurants, did not bear a real or substantial relation to public health); *Altman v. County of Santa Clara*, 464 F. Supp. 3d 1106, 1124 (N.D. Cal. 2020) (explaining that the Court "easily concludes" that a shelter in place order bears a real and substantial relationship to the public health goals of reducing COVID-19 transmission and preserving health care resources).

This Court comes to the same conclusion as the other courts. Specifically, the Court finds that (1) the State's Blueprint; (2) the State's private gatherings restrictions; (3) the County's private gatherings restrictions; (4) the County's Personal Care Services Directive; and (5) the County's Mandatory Directive for Outdoor Dining bear a real and substantial relation to public health. The Court discusses each in turn below. Before doing so, the Court notes that the Background Section I-A-2, *supra*, describes at great length the ways in which COVID-19 is spread. Below the Court just highlights a few examples for each set of restrictions.

First, the State's Blueprint bears a real and substantial relation to public health. In

31

designing the Blueprint and coming up with restrictions for each tier, the State considered

eight objective risk criteria related to the spread of COVID-19: (1) the ability to accommodate

face covering wearing at all times; (2) the ability to physically distance between individuals of

different households; (3) the ability to limit the number of people per square foot; (4) the ability to

limit the duration of exposure; (5) the ability to limit the amount of mixing of people from

different households; (6) the ability to limit the amount of physical interactions; (7) the ability to

optimize ventilation; and (8) the ability to limit activities that are known to increase the possibility

of viral spread, such as singing, shouting, and heavy breathing. Kurtz Decl. ¶ 20. Because the

State has sorted activities based on the risk that they result in the spread of COVID-19, the State's

restrictions bear a real and substantial relation to public health, including the interests of slowing

the spread of COVID-19, protecting high-risk individuals.

Second, the State's and the County's private gatherings restrictions bear a real and

substantial relation to public health. The State and the County limit gatherings because gatherings

bring people from different households together for an extended period of time and thus are a main

source of COVID-19 spread. Watt Decl. ¶¶ 33, 37–44. The State and the County impose stricter

limits on indoor gatherings because indoor gatherings are much more likely to spread COVID-19

than outdoor gatherings. Haddad Decl. Exh. 12 (prohibiting indoor gatherings but allowing indoor

gatherings in the widespread tier); Bussey Decl. Exhs. A, G (prohibiting indoor gatherings but

permitting outdoor gatherings of up to 200 people). Furthermore, the State's private gatherings

restrictions are more stringent in counties with higher rates of transmission, where gatherings are

more likely to include someone who has COVID-19. *See* Haddad Decl. Exh. 12 (State Blueprint,

prohibiting indoor gatherings in the widespread tier and permitting indoor gatherings of three

households in the substantial tier).

Third, the Personal Care Services Directive bears a substantial relation to slowing the

spread of COVID-19 because of the unique dangers that personal care services can play in the

32

spread of COVID-19. COVID-19 is much more likely to be spread when persons are in close proximity for an extended period of time, such as during the time a personal care service is performed. Watt Decl. ¶¶ 33, 37–44. Furthermore, personal care services often take place inside, where COVID-19 transmission is much more likely to occur. Watt Decl. ¶ 44; Rutherford Decl. ¶¶ 60, 76–77; Reingold Decl. ¶ 20; Cody Decl. ¶ 29. In addition, the personal care services implicated do not permit the client to wear a face covering, and face coverings help to avoid the transmission of COVID-19. Watt Decl. ¶¶ 38, 45–46, 48. Thus, it is rational for the County to impose additional restrictions on personal care services, including requiring workers to wear N-95 masks. Dunn Decl. Exh. 42. The County might reasonably require workers to wear more protective masks because clients cannot wear masks at all during the services, which puts workers at a significantly higher risk of contracting COVID-19. *See* Bhatia Reply Decl. ¶ 65 (explaining that workers bear the burden of infection risk in workplace settings).

Fourth, the Mandatory Directive for Outdoor Dining bears a substantial relation to slowing the spread of COVID-19 because of the unique dangers of indoor dining in spreading COVID-19. COVID-19 is much more likely to be spread inside than outside. Watt Decl. ¶ 44; Rutherford Decl. ¶¶ 60, 76–77; Reingold Decl. ¶ 20; Cody Decl. ¶ 29. Furthermore, COVID-19 is much more likely to be spread when persons are in close proximity for an extended period of time, such as during a meal. Watt Decl. ¶¶ 33, 37–44. In addition, while dining, people cannot wear face coverings, which help to avoid the transmission of COVID-19. *Id.* ¶¶ 38, 45–46, 48. Given these circumstances, the County may legitimately require that dining only take place outdoors and that tables be spaced 10 feet away from each other. Dunn Decl. Exh. 44. Thus, the State's and the County's restrictions at issue bear a real and substantial relation to public health and satisfy the first *Jacobson* element. *Jacobson*, 197 U.S. at 30 (explaining that courts should uphold emergency public health restrictions unless they do not bear a "real or substantial relation" to public health).

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

**b. The State's and County's restrictions are not a plain, palpable invasion of rights secured by fundamental law.**

As to the second *Jacobson* element, Plaintiffs have not shown that the State's and County's restrictions are "beyond all question" a "plain, palpable invasion of rights secured by [ ] fundamental law." *Id*. Every court considering challenges to COVID-related restrictions has similarly concluded that the restrictions are not a plain, palpable invasion of rights secured by fundamental law. *See, e.g.*, *Bimber's Delwood, Inc.*, 2020 WL 6158612, at *13 (concluding that the plaintiffs could not show that New York's COVID-related restrictions on businesses, including bars and restaurants, were a plain, palpable invasion of rights secured by fundamental law); *Altman*, 464 F. Supp. 3d at 1124 (concluding that county's shelter in place order did not effect a plain, palpable invasion of the plaintiffs' Second Amendment rights). Plaintiffs do not cite a single case to the contrary.

The Court comes to the same conclusion here. As explained above, the right to earn a living is not a fundamental liberty interest that has been traditionally protected by the substantive component of the Due Process Clause. *See Franceschi*, 887 F.3d at 937; *Sagana*, 384 F.3d at 743. Thus, the State's and County's restrictions are not a "plain, palpable invasion of rights *secured by . . . fundamental law*." *Jacobson*, 197 U.S. at 30 (emphasis added). Because Plaintiffs have not satisfied both elements of *Jacobson*, Plaintiffs have not shown that they are likely to succeed on their substantive due process claims.

**2. Plaintiffs are not likely to succeed on the merits of their Equal Protection claims.**

Plaintiffs Mansour, Khanna, Beaudet, Evarkiou, and Richards also argue that the COVID-related restrictions on their businesses violate their rights under the Equal Protection Clause of the Fourteenth Amendment.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*

34

United States District Court
Northern District of California

1  *Living Ctr.*, 473 U.S. 432, 439 (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

2         The United States Supreme Court has held that business owners are not a suspect class. *See*

3  *Williamson v. Lee Optical*, 348 U.S. 483, 489, 491 (1955) (concluding that a regulation on

4  opticians would be subject to rational basis review). For this reason, other courts considering

5  Equal Protection challenges to COVID-related restrictions brought by business owners have

6  concluded that no suspect class is implicated. *See, e.g.*, *League of Independent Fitness Facilities &*

7  *Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 128 (6th Cir. 2020) (applying rational basis review to

8  an Equal Protection challenge brought by fitness center owners); *Six v. Newsom*, 462 F. Supp. 3d

9  1060, 1072 (C.D. Cal. 2020) (concluding that "California's essential/non-essential [business]

10  distinction does not disadvantage a suspect class"). Not surprisingly, Plaintiffs concede that

11  Plaintiffs are not members of a suspect class pursuant to United States Supreme Court and Ninth

12  Circuit precedent. *See* Mot. at 21 (stating that rational basis review applies).[8]

13         Because Plaintiffs are not part of a suspect class, the Court must apply rational basis

14  review and determine whether the restrictions are rationally related to a legitimate government

15  interest. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("In cases . . . involving

16  rational basis review, a state actor's classification comports with the Equal Protection Clause so

17  long as it is 'rationally related to a legitimate state interest'") (quotation omitted). "[R]ational-

18  basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness,

19  or logic of legislative choices.'" *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (quoting *FCC v.*

20

21  _____

22  [8] In their reply brief, Plaintiffs argue that the restrictions should be subject to "rational basis 'with

23  a bite'" because the State's and County's regulations have resulted in the closure or restriction of
hundreds of thousands of businesses. Reply at 15. However, Plaintiffs do not cite to, and the Court

24  has not found, United States Supreme Court or Ninth Circuit precedent holding that rational basis

25  "with a bite" would apply in these circumstances. Moreover, even if the Court considers the
restrictions under the rational basis "with a bite" standard, the Court would still uphold the

26  restrictions because they are supported by ample scientific evidence regarding the ways in which
COVID-19 spreads.

27                                                                              35

28

*Beach Comms., Inc.*, 508 U.S. 307, 313 (1993)). Accordingly, regulations "must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 320. The "burden is on [Plaintiffs] to negat[e] every conceivable basis which might support [the classification]." *Id.* (quotation omitted). Thus, courts must uphold the classification as long as it "find[s] some footing in the realities of the subject addressed by legislation." *Id.* at 321.

Under these deferential standards, every court considering Equal Protection challenges brought by business owners to COVID-related restrictions has upheld the restrictions, and Plaintiffs do not cite a single case to the contrary. *See, e.g.*, *Big Tyme Investments, LLC v. Edwards*, --- F.3d ---, 2021 WL 118628, at *6 (5th Cir. 2021) (rejecting Equal Protection challenge brought by bar owners to COVID-related restriction prohibiting consumption of alcohol at bars); *League of Independent Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 128 (6th Cir. 2020) (rejecting an Equal Protection challenge brought by fitness center owners to COVID-related restrictions closing their fitness centers).

The Court comes to the same conclusion in the instant case for two reasons. First, there are multiple compelling government interests at stake. Second, the State's and County's restrictions are rationally related to those government interests.

As to the multiple compelling government interests, the Supreme Court, the Ninth Circuit, and even Plaintiffs agree on this point. The Supreme Court has held that "stemming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese*, 141 S. Ct. at 67. The Ninth Circuit has concluded that the State has compelling interests "in reducing community spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of its healthcare system as a result of increased hospitalizations." *South Bay*, 2021 WL 222814, at *10.

Moreover, Plaintiffs concede that the State has a strong interest in preventing hospitals

from being overwhelmed. *See* Mot. at 1 ("Governor Newsom was correct to focus on the risk that hospitals would be overrun"), 15 (acknowledging "the compelling interest in preventing hospitalizations and deaths resulting from COVID-19"). Even one of Plaintiffs' experts, Dr. Bhattacharya, concedes that restrictions might be justified "where hospital overcrowding is predicted to occur" because overcrowding and "the unavailability of sufficient medical personnel" "might induce avoidable mortality." Bhattacharya Reply Decl. ¶ 15.

Thus, the State and the County have compelling interests in slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system. These compelling government interests are far greater than the legitimate government interest required for the rational basis review that the Court must undertake here.

The Court must now consider whether the restrictions applicable to Plaintiffs' businesses are rationally related to these compelling government interests. Plaintiffs present four arguments as to why the restrictions applicable to their businesses are irrational. First, Plaintiffs contend that they are just as capable of implementing social distancing measures as other businesses not subject to as stringent regulations. Second, Plaintiffs argue that they should not be treated more harshly because of the county in which they are located. Third, Plaintiffs contend that the State's restrictions are irrational because they base restrictions on PCR tests. Finally, Plaintiffs argue that it is irrational to impose restrictions on the whole population when only a subset is vulnerable to severe illness from COVID-19. The Court addresses each of these arguments in turn.

### a. It is rational for the State and the County to distinguish between businesses.

First, Plaintiffs argue that Plaintiffs are "just as capable, if not more so, of implementing social distancing measures applicable to other businesses not subject to as stringent regulations." Mot. at 22. For example, Mansour argues that her facial salon should not face harsher restrictions than a doctor's or dentist's office. *Id.* However, as the County points out, there are many legitimate reasons that the County might reasonably expect medical offices to be better trained in

United States District Court
Northern District of California

preventing the spread of disease than non-medical offices. Cody Decl. ¶¶ 55–56. In general, the State's and the County's distinctions between different kinds of businesses are rational because the State and the County have carefully tailored their restrictions to the risks attendant to each business. *See* Section III-B-1-a, *supra* (explaining that the State's and the County's private gatherings restrictions, Personal Care Services Directive and Mandatory Directive for Outdoor Dining bear a substantial relation to the public health interest of slowing the spread of COVID-19, protecting high-risk individuals, and preventing the overwhelming of hospitals).

**b.  It is rational for the State and the County to distinguish between counties.**

Plaintiffs argue that their businesses should not be treated more harshly because of the county in which they are located. Mot. at 22. However, it is rational for the State to restrict activities based on the prevalence of the coronavirus in a particular county. If a gathering takes place in a county where there is a high prevalence of infection, the likelihood of coming into contact with someone who is infected and able to spread COVID-19 is increased. Watt Decl. ¶ 42; Rutherford Decl. ¶ 81; Stoto Decl. ¶¶ 10, 18. Accordingly, restricting activities based on the prevalence of the coronavirus in a particular county is not irrational.

**c.  It is rational for the State to rely on PCR tests.**

Plaintiffs outline three reasons that it is irrational for the State's restrictions to be based on PCR tests. Mot. at 23–24. First, PCR tests are taken from a portion of the population that is more likely to test positive, including people who have been referred to testing, people who are experiencing symptoms, and people who are essential workers. Bhattacharya Decl. ¶ 27. Second, PCR tests result in a high number of false positives. *Id*. ¶¶ 28–30. Third, PCR tests do not detect risk variations between people testing positive who are likely to face mortality and people testing positive who are not. *Id*. ¶ 32; Bhatia Decl. ¶ 37. Plaintiffs thus contend that the State should use hospitalization rates, not PCR tests, in determining whether to loosen or tighten restrictions. Bhatia Decl. ¶¶ 47–49.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

However, Plaintiffs are incorrect in three respects. First, even Plaintiffs' expert concedes that PCR tests are the gold standard for measuring the presence of infection in the community. Bhattacharya Reply Decl. ¶ 7. Although PCR tests will not capture spread as accurately as they would if they were given to the entire population, they do an adequate job in assessing disease spread and determining whether to tighten or loosen restrictions. *Id.* ¶ 105; Stoto Decl. ¶¶ 19, 22; Lipsitch Decl. ¶¶ 38–39. In addition, California has a wider testing program than other states, which makes the prevalence rate more reliable. Rutherford Decl. ¶ 105; Lipsitch Decl. ¶ 35. The County of Santa Clara also has a robust testing program with broader community access and greater testing capacity than other communities. Reingold Decl. ¶ 30; Lipsitch Decl. ¶ 35.

Second, although Plaintiffs argue that the State should use hospitalization rates, hospitalization rates suffer from several downfalls. Indeed, hospitalization rates lag infections in the community by several weeks. Rutherford Decl. ¶ 55; Stoto Decl. ¶ 23; Lipsitch Decl. ¶ 44; Maldonado Decl. ¶¶ 25–26. Thus, hospitalization rates show spread from several weeks ago, not recent spread. *Id.* In addition, hospitalization rates have often underestimated the severity of the pandemic. For instance, hospitalization rates can be lower at times when hospital capacity is strained and many patients who would otherwise be hospitalized are not being taken to the hospital. Stoto Decl. ¶ 23. As the Ninth Circuit recently explained in *South Bay*, "paramedics in Los Angeles County have been instructed to conserve oxygen in treating patients and not to bring patients to the hospital who have little chance of survival." 2021 WL 222814, at *4. Similarly, hospitalization rates do not capture the spread of the virus outside of hospitals. The spread of the virus outside of hospitals is a public health issue because patients who are not hospitalized with COVID-19 can face long-term effects. Cody Decl. ¶ 7; Han Decl. ¶ 20; Watt Decl. ¶ 23; Rutherford Decl. ¶¶ 23–25, 97. Undoubtedly, there are limits to any criteria that might be used, including PCR tests. However, the Court merely concludes that the State did not act irrationally in choosing to use PCR tests given the problems with using hospitalization rates.

39

United States District Court
Northern District of California

Third, although Plaintiffs' experts argue that PCR tests are flawed because they do not detect risk variations between people testing positive who are likely to face mortality and people testing positive who are not, COVID-19 is dangerous to all populations. In the next section, the Court discusses extensively how vulnerable populations live and work with non-vulnerable populations. *See* Section III-A-2-d, *infra*. Thus, detecting COVID-19 cases among non-vulnerable people is important to protecting vulnerable populations. Accordingly, it is not irrational for the State to focus on PCR tests.

### d.  It is rational for the State to place restrictions on the general population, not just the vulnerable.

Plaintiffs argue that the State's and County's strategies are irrational because they have not tried to focus on vulnerable populations, such as the elderly. One of Plaintiffs' medical experts, Dr. Bhattacharya, is one of three scientists who drafted the Great Barrington Declaration, which proposes that COVID-19 be allowed to spread among young, healthy people while governments focus on preventing vulnerable people from getting it. Bhattacharya Reply Decl. ¶ 31; Lipsitch Decl. ¶ 15. Plaintiffs' other expert, Dr. Bhatia, who signed the Great Barrington Declaration, proposes that the State and the County should focus exclusively on vulnerable populations. Bhatia Decl. ¶¶ 73–84.[9]

However, Plaintiffs' argument suffers from three flaws. First, the State and the County

---

[9] As the State and the County stress, the vast majority of public health experts embrace restrictions on gatherings. Although Plaintiffs' experts do not, this does not mean that the State's and County's restrictions are irrational. In fact, in *Jacobson*, where mandatory vaccination for smallpox was at issue, the United States Supreme Court acknowledged that "some physicians of great skill and repute[] do not believe that vaccination is preventive of smallpox." *Jacobson*, 197 U.S. at 34. However, the Court nevertheless rejected the plaintiff's challenge and noted that "most members of the medical profession" disagreed with these physicians about the importance of vaccination. *Id*. at 34–35. "The possibility that the belief may be wrong . . . is not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases." *Id*. at 35. The same is true here.

40

Case No. 20-CV-07108-LHK

ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

have already put in place measures to protect the vulnerable. Second, it is rational for the State and the County to place restrictions on the entire population because even individuals who are not specifically vulnerable to COVID-19 can become seriously ill and die from the virus. Finally, it is rational for the State and the County to place restrictions on the entire population because vulnerable individuals have extensive contact with non-vulnerable individuals in long-term care facilities, multigenerational homes, and workplaces. The Court addresses each of these issues in turn.

First, the State and the County have already put extensive measures into place to protect vulnerable people, including the measures recommended by Plaintiffs' experts. Plaintiffs' experts recommend: (1) site infection control and prevention practices; (2) routine health care worker screenings; (3) prohibiting staff from coming to work sick; (4) outbreak response; (5) training; (6) monitoring; and (7) testing asymptomatic health care workers. Bhatia Decl. ¶¶ 88–89. The State's and County's long-term care facilities already implement these measures and others to slow the spread of COVID-19.

The State has issued guidelines and directives that required long-term care facilities to undertake precautions, including (1) cleaning and disinfecting high-touch surfaces; (2) screening residents for COVID-19 symptoms every day; (3) excluding employees who display symptoms of COVID-19; (4) requiring employees and residents to wash their hands upon entering the facility; (5) limit entry only to individuals who need entry for prevention, containment, and mitigation measures; (6) requiring staff to wear face coverings at all times and remind residents that they are required to wear face coverings as much as practically possible; and (7) requiring training of staff on prevention and control measures. Tovmasian Decl. ¶¶ 12–16, 24; Steinecker Decl. ¶¶ 10, 19–24. The State also requires facilities to engage in testing, including surveillance testing even if they do not currently have a positive COVID-19 case. Tovmasian Decl. ¶¶ 18–21, Steinecker Decl. ¶ 15, 19. The County has also taken targeted measures to protect vulnerable populations.

41

Those measures include implementing regular staff testing in long-term care facilities, providing infection control protocols, and visiting facilities to make recommendations on how best to implement infection control. Han Decl. ¶ 9; Garcia Decl. ¶ 14.

Second, it is rational for the State and the County to place restrictions on the entire population because many non-vulnerable people die or become seriously ill after being infected with COVID-19. About twenty percent of those who have died of COVID-19 in the United States have been younger than 65 years old. Lipsitch Decl. ¶ 28. In addition, nearly two thousand people who have died of COVID-19 are younger than 30 years old. *See CDC COVID Tracker*.

Additionally, Dr. Bhattacharya's declaration, which focuses on mortality, ignores the serious long-term effects that plague many non-vulnerable people who have recovered from COVID-19. Bhattacharya Decl. ¶¶ 32–39. Young people are at risk for serious and long-term effects from COVID-19, including cardiovascular, neurologic, renal, and respiratory damage, psychiatric effects, and loss of limbs from blood clotting. Cody Decl. ¶ 7; Han Decl. ¶ 20; Watt Decl. ¶ 23; Rutherford Decl. ¶¶ 23–25, 97. For example, college football players who had recovered from asymptomatic or mildly symptomatic COVID-19 infections were found to have a high rate of myocarditis, which can lead to cardiac arrest with exertion. Rutherford Decl. ¶ 25.

In addition, many young people have underlying conditions. As discussed above, *supra* Section I-A-3, chronic medical conditions are largely a subset of COVID-19 underlying conditions. Yet, approximately six in ten Americans have been diagnosed with at least one chronic medical condition, and four in ten have been diagnosed with more than one chronic medical condition. Reingold Decl. ¶ 17. Moreover, in Latino and African-American communities, a higher percentage of residents have diabetes, which make them more susceptible to becoming severely ill from COVID-19. Garcia Decl. ¶ 13. Simultaneously, a lower percentage of Latino and African-American community members have healthcare coverage, meaning that they are less able to get care if infected with COVID-19. *Id*.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Third, it is rational for the State and the County to place restrictions on the entire population because vulnerable people have extensive contact with non-vulnerable individuals in long-term care facilities, multigenerational homes, and essential workplaces. The Court addresses each of these settings in turn.

Looking at care facilities, vulnerable people who live in care facilities are in close contact on a regular basis with the staff, who live in the community. Rutherford Decl. ¶ 116; Stoto Decl. ¶ 35. Thus, higher levels of community spread can lead to spread in care facilities. Rutherford Decl. ¶ 116; Han Decl. ¶ 14. Accordingly, a recent report showed that COVID-19 cases in nursing homes have tracked the community spread of COVID-19 since September of 2020. Lipsitch Decl. ¶ 26. For example, in La Crosse, Wisconsin, researchers were able to trace COVID-19 clusters at two nursing homes, which caused two deaths, back to gatherings and parties at three local universities. Cody Decl. ¶ 37.

In addition, many vulnerable people live in multigenerational households. Garcia Decl. ¶ 8; Lipsitch Decl. ¶ 25. According to one study, 20 percent of Americans live in a multigenerational home. Maldonado Decl. ¶ 21. Vulnerable people are especially likely to live or work with less vulnerable people in communities of color, immigrant communities, and low-income communities. Garcia Decl. ¶ 8. In these communities, people often live in crowded homes, making it difficult for them to isolate from other household members. *Id*. As Plaintiffs' expert acknowledges, older people living with working-age adults have a higher risk of COVID-19 than older people living with other older people. Bhattacharya Reply Decl. ¶ 54. Because older people live and work with younger people, COVID-19 cases in older people track with COVID-19 cases in younger people. Rutherford Decl. ¶ 96.

Plaintiffs' expert suggests that vulnerable people who live in multigenerational households could temporarily live in another setting, such as empty hotel rooms that have been provided for homeless populations. Bhattacharya Reply Decl. ¶ 54. However, even where the County has

43

offered to provide separate housing or other support for vulnerable individuals who live with other household members, many factors lead them to be uncomfortable or unwilling to accept it. For example, some vulnerable individuals distrust the government, while others are unwilling to separate from their family members, for whom they might provide childcare and other support. Garcia Decl. ¶ 12. For example, many older people are the primary caregivers for their grandchildren. Maldonado Decl. ¶ 17.

Furthermore, many vulnerable people also work at essential jobs, increasing their potential exposure to COVID-19. Garcia Decl. ¶¶ 9–10. Even those who are vulnerable are often themselves breadwinners in their family, which means that they have to work outside the home to support their families. *Id*. ¶ 13. This is especially true in communities of color and low-income communities. *Id*. ¶ 13.

Plaintiffs' expert also suggests that older people who work could be permitted to work from home. Bhattacharya Reply Decl. ¶ 53. However, this proposal ignores the reality that many older people work in essential jobs, where working from home is not possible. Garcia Decl. ¶¶ 9–10. Although Plaintiffs' expert proposes that those who cannot work from home be able to take a funded 3 to 6 month sabbatical, Plaintiffs' expert does not address the distrust of the government and unwillingness to accept help that persists, particularly in communities of color and low-income communities that have more essential workers. Garcia Decl. ¶ 12.

In sum, because of the numerous connections between the vulnerable and other members of the community, COVID-19 spread in the community results in COVID-19 spread among the vulnerable. For these reasons, the vast majority of public health experts reject an approach that would focus solely on vulnerable populations without limiting spread in the community. Stoto Decl. ¶ 14; Lipsitch Decl. ¶ 15; Maldonado Decl. ¶ 20. A strategy that solely focused on vulnerable people without addressing community spread would result in increased COVID-19 spread, hospitalizations, and deaths. Lipsitch Decl. ¶ 24; Rutherford Decl. ¶¶ 115–117. For

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

example, in Maine, an indoor wedding attended by 62 people resulted in more than 180 infections, including among people living at a long-term healthcare facility and at a jail. Cody Decl. ¶ 37. Eight people who did not attend the wedding died. *Id*. In Michigan, 187 infections were connected to an indoor bar and restaurant with a live DJ and an open dance floor. *Id*. Of the total cases traced back to the restaurant, 144 were people who had been to the venue and 43 were family members, friends, and other contacts who had not. *Id*.

The downfalls of a targeted strategy can be seen in the example of Sweden. Sweden tried to implement an approach targeted towards the elderly and nursing homes, and as a result, seven percent of residents in nursing homes in Stockholm died. Lipsitch Decl. ¶ 27; Rutherford Decl. ¶¶ 115–117. Thus, Sweden is now implementing policies directed at slowing community spread. Lipsitch Decl. ¶ 27.

Because Plaintiffs have not met the high bar of demonstrating that the State's and County's restrictions are irrational, Plaintiffs have not shown that they are likely to succeed on the merits of their Equal Protection claims.

### 3. Plaintiffs are not likely to succeed on the merits of their free speech and assembly claims.

Plaintiffs Tandon and the Gannons argue that the State's and the County's private gatherings restrictions violate their First and Fourteenth Amendment rights to free speech and assembly. As explained above in Section III-A, *supra*, the State prohibits indoor gatherings and limits private outdoor gatherings to three households or fewer. However, the State's private gatherings restrictions do not apply to the political campaign events Tandon wishes to hold. Accordingly, Tandon's gatherings are limited only by the County's private gatherings restrictions, which prohibit indoor gatherings[10] and limit outdoor gatherings to 200 people. Bussey Decl. Exhs.

---

[10] In the instant motion, Tandon challenged the County's 100 person limit on indoor gatherings. Mot. at ii; *see supra* footnote 7. However, before Defendants filed their opposition to the instant

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

A, G.

The Court first considers whether Tandon's claims are moot now that the 2020 election has passed. After concluding that Tandon's claims are not moot, the Court analyzes the merits of Plaintiffs' free speech claims. As Plaintiffs note, "[t]he right of peaceable assembly is a right cognate to th[at] of free speech." Mot. at 12 (quoting *De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937)); *accord Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 972 n.16 (7th Cir. 2000) ("We evaluate free speech and free assembly claims under the same analysis."). Indeed, Plaintiffs' freedom of assembly argument cites freedom of speech cases. Mot. at 12–18 (citing, *e.g.*, *Reed*, 576 U.S. 155). Thus, the Court's analysis of Plaintiffs' free speech claims applies equally to Plaintiffs' free assembly claims.

### a. Tandon's free speech and assembly claims are not moot.

The State and the County argue that Tandon's claims are moot because the 2020 election has passed. State Opp'n at 7–8; County Opp'n at 8–9. The Court disagrees because Tandon has expressed his intent to run in 2022, and Tandon has stated that he needs to meet with advisors, donors, and constituents to support his 2022 campaign in the coming months, while the State and the County restrictions are likely to remain in effect.

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). "An 'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). "A case becomes moot 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003) (quoting *Clark v. City of Lakewood*, 259 F.3d 996, 1011 (9th Cir. 2001)).

---

motion, the County updated its restrictions to prohibit all indoor gatherings. Bussey Decl. Exh. A (stating that "all indoor gatherings are currently prohibited").

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

However, there is an exception to the mootness doctrine if a case is "capable of repetition, yet evading review." *Lewis*, 494 U.S. at 481. Under this exception, cases for prospective relief can go forward "despite abatement of the underlying injury . . . where the following two circumstances [are] simultaneously present: '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Id.* (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam)).

The Court concludes that these two circumstances are met in this case. First, Tandon's challenge is a "controversy evading review" because the 2020 election was too short to be fully litigated before it ended. *Wolfson v. Brammer*, 616 F.3d 1045, 1054 (9th Cir. 2010). "Election cases often fall within this exception, because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits." *Porter*, 319 F.3d at 490 (concluding that an election challenge was a controversy evading review); *see also Wolfson*, 616 F.3d at 1054 (same); *Joyner v. Mofford*, 706 F.2d 1523, 1527 (9th Cir. 1983) (same).

"To satisfy the second requirement, that the action is capable of repetition, [a candidate] must establish a reasonable expectation that he will be subjected to the same action or injury again." *Wolfson*, 616 F.3d at 1054. A candidate can meet this requirement even after the election has passed where the candidate "has subsequently announced an intent to seek office in a future election." *Id.* at 1055; *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 736 (2008) (concluding that a challenge to self-financing rules was capable of repetition yet evading review where the election had passed but the candidate subsequently announced an intent to self-finance another bid for a House seat).

The County argues that Tandon's claims are moot because Tandon has not expressed an intent to seek office in a future election. County Opp'n at 8. However, in a sworn declaration, Tandon states that he is "planning for another Congressional run in 2022." Tandon Reply Decl. ¶¶

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

5–6. Thus, Tandon "has subsequently announced an intent to seek office in a future election," which means that he can establish a reasonable expectation that he will be subject to the same action or injury again. *Wolfson*, 616 F.3d at 1055.

The County argues that the likelihood that Tandon will face the same action or injury again is "remote and speculative" because it is unclear what level of community transmission of COVID-19, and what restrictions on gatherings, will exist leading up to the 2022 election. County Opp'n at 9. However, Tandon states in his declaration that he will need to meet with advisors, donors, and constituents in the coming months, while the restrictions remain in place. Tandon Reply Decl. ¶¶ 5–6. Thus, the Court concludes that Tandon's claim is not moot and proceeds to consider the free exercise and free speech claims on the merits.

> **b.** **Plaintiffs are not likely to succeed on the merits of their free speech and assembly claims.**

The First Amendment, incorporated against the states by the Fourteenth Amendment, prohibits states "from enacting laws 'abridging the freedom of speech, . . . or the right of the people peaceably to assemble.'" *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1020–21 (9th Cir. 2009) (quoting U.S. Const. amend. I). Under the First Amendment, "certain types of speech enjoy special status." *Id.* at 1021. In particular, "[p]olitical speech is core First Amendment speech, critical to the functioning of our democratic system," so it "'rest[s] on the highest rung of the hierarchy of First Amendment values.'" *Id.* (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

To evaluate a free speech claim, the Court must first decide whether a law restricting speech is content based or content neutral. *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017). "Content-based laws," which are "those that target speech based on its communicative content," must satisfy strict scrutiny, meaning that "the government [must] prove[] that they are narrowly tailored to serve compelling government interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In addition, laws must satisfy strict scrutiny if they are facially

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

content neutral, but "cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). However, if "a law does not 'suppress[] expression out of concern for its likely communicative impact,'" the law must only satisfy intermediate scrutiny. *Recycle for Change*, 856 F.3d at 669–70 (quoting *United States v. Swisher*, 811 F.3d 299, 314 (9th Cir. 2016) (en banc)).

Accordingly, for the reasons discussed below, the Court reaches the following conclusions. First, the State's and the County's private gatherings restrictions are content neutral. Second, because the State's and the County's private gatherings restrictions are content neutral, the Court applies intermediate scrutiny and concludes that the restrictions satisfy intermediate scrutiny. Finally, in the alternative, even assuming that the State's and the County's private gatherings restrictions are not content neutral, the Court applies strict scrutiny and concludes that these restrictions satisfy strict scrutiny.

### i.  The State's and the County's private gatherings restrictions are content neutral.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. "The 'crucial first step' in determining whether a law is content based is to 'consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Recycle for Change*, 856 F.3d at 670 (quoting *Reed*, 576 U.S. at 163). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Reed*, 576 U.S. at 163. Where a restriction "does not, on its face, discriminate on the basis of content," the restriction is content neutral. *Recycle for Change*, 856 F.3d at 670. Accordingly, "blanket bans applicable to all speakers are content neutral." *Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1295 & n.5 (9th Cir. 2015).

49

United States District Court
Northern District of California

Courts have concluded that the State's COVID-related restrictions are blanket bans that are thus content neutral. In *Givens v. Newsom*, an individual who wished to protest and a congressional candidate who wished to hold a rally sought permits for in-person gatherings at the State Capitol. 459 F. Supp. 3d 1302, 1308 (E.D. Cal. 2020), *appeal dismissed*, --- F. App'x ---, 2020 WL 7090826 (9th Cir.). However, their permits were denied due to the State's COVID-related restrictions on mass gatherings. *Id.* The individual and the congressional candidate sought a temporary restraining order and argued that the restrictions violated their First Amendment rights. *Id.* at 1307, 1309. The district court rejected their application for a temporary restraining order and concluded that "[t]he State's order, and the resulting moratorium on permits, are, beyond question, content-neutral." *Id.* at 1312. The district court emphasized the fact that the "temporary moratorium on all permits for in-person gatherings applies to all applicants." *Id.* (emphasis omitted). The same reasoning applies to the gatherings restrictions here.

The Gannons challenge the State's private gatherings restrictions. In counties at the most severe or widespread tier, these restrictions prohibit indoor private gatherings of individuals outside the immediate household and restrict outdoor private gatherings to three households. *See supra* Section III-A; Haddad Decl. Exh. 12; Dunn Reply Decl. Exh. 4. Specifically, the State defines gatherings as "social situations that bring together people from different households at the same time in a single space or place." *Id*. The State's private gatherings restrictions are content neutral because they apply to all gatherings regardless of the speech to be shared at that gathering. *Recycle for Change*, 856 F.3d at 670 ("Here, the Ordinance is content neutral because it does not, on its face, discriminate on the basis of content . . . ."). Indeed, the State's private gatherings restrictions are blanket bans on all gatherings, and blanket bans are content neutral. *Santa Monica Nativity Scenes Comm.*, 784 F.3d at 1295 & n.5 (holding that "blanket bans applicable to all speakers are content neutral").

Tandon challenges the County's private gatherings restrictions. As discussed in Section

50

United States District Court
Northern District of California

III-A above, the County's private gatherings restrictions: (1) prohibit indoor gatherings, which are also banned by the State's private gatherings restrictions; (2) limit all outdoor gatherings to 200 people; (3) and require that the outdoor space must be large enough to permit attendees to maintain six feet of distance. *Id*. Thus, regardless of the County's Blueprint tier, the County limits to 200 outdoor gatherings that are "an event, assembly, meeting, or convening that brings together multiple people from separate households in a single space, indoors or outdoors, at the same time and in a coordinated fashion—like a wedding, banquet, conference, religious service, festival, fair, party, performance, movie theater operation, barbecue, protest, or picnic." Bussey Decl. Exhs. A, G. The State's private gatherings restrictions do not regulate these gatherings. These County restrictions apply regardless of the purpose of the gathering. *Id*. The County's private gatherings restrictions are thus akin to blanket bans applicable to all speakers, which are content neutral. *Santa Monica Nativity Scenes Comm.*, 784 F.3d at 1295 & n.5 (holding that "blanket bans applicable to all speakers are content neutral."). Accordingly, the restrictions challenged by Tandon are also content neutral.

Plaintiffs argue that the State's and the County's private gatherings restrictions are not content neutral because their gatherings are being treated more harshly than other activities. Reply at 7. Plaintiffs assert that, while their indoor gatherings are prohibited, "the State and County have allowed people to gather indoors at airports, shopping centers, retail stores, hair salons, tattoo parlors, body art venues, piercing stores, pet grooming outlets, and more, so long as those present can maintain six feet of distance." *Id*. For example, Plaintiffs point out that Tandon could get a tattoo indoors, but could not gather indoors with his supporters for a political event. *Id*.

Plaintiffs' argument is unpersuasive for two reasons. First, the Ninth Circuit has recently rejected a similar argument. Second, the Court's independent review confirms that the commercial activities to which Plaintiffs point are distinct from Plaintiffs' private gatherings.

In *South Bay*, the Ninth Circuit concluded that the socially distanced commercial activities

United States District Court
Northern District of California

to which Plaintiffs point had a lower risk of spreading COVID-19 than gatherings. Specifically, the Ninth Circuit's decision upheld the Blueprint's restrictions on houses of worship, which prohibit indoor worship services in counties in the widespread tier, and concluded that the Blueprint's restrictions were narrowly tailored to slow the spread of COVID-19, protect high-risk individuals from infection, and prevent the overwhelming of the healthcare system. 2021 WL 222814, at *12–*14. The plaintiffs argued that the State's restrictions were not narrowly tailored because the State permitted numerous non-religious activities, including grocery and retail shopping and personal care services. *Id.* at *11.

Rejecting the plaintiffs' argument, the Ninth Circuit concluded that worship services were distinct from, and more likely to spread COVID-19 than, socially distanced commercial activities. The Ninth Circuit explained that, in commercial settings, "patrons typically have the intention of getting in and out of grocery and retail stores as quickly as possible." *Id.* at *12. By contrast, "the very purpose of a worship service is to congregate as a community." *Id.* The Ninth Circuit also explained that ventilation was better in some commercial settings such as grocery stores, which are equipped with high-functioning air conditioning systems that increase air flow. *Id.* Finally, the Ninth Circuit emphasized the plethora of mandatory industry regulations aimed at preventing the spread of COVID-19 that applied to the grocery, retail, personal care services, and film industries, among others. *Id.* at *12–*14. These restrictions included use of plexiglass, frequent disinfection of commonly used surfaces, and frequent testing of workers, including in the film industry. *Id.*

In the instant case, the Court also concludes that the socially distanced commercial activities cited by Plaintiffs are different in kind from Plaintiffs' gatherings. Indeed, "evidence suggests that gatherings may pose a higher risk of transmission than other kinds of activities that remain subject to different restrictions." Cody Decl. ¶ 59. Plaintiffs' gatherings are markedly more risky in at least six different ways: (1) people are together for a longer time; (2) singing, chanting,

shouting, loud talking, and sustained conversations are more likely to occur; (3) ventilation is poorer; (4) masking and social distancing are less likely; (5) private gatherings are not required to implement safety measures mandated by health and safety codes and industry regulations; and (6) large numbers of people may be in the same place at the same time. The Court addresses each distinction in turn.

First, people at Plaintiffs' gatherings are together for a longer time. In commercial environments, such as retail and grocery stores, "when people from different households are together in a grocery store, they are together for a shorter duration of time as compared to attendees at a coordinated gathering where attendees linger." Cody Decl. ¶ 59. Further, grocery shoppers may be less likely to be in close proximity to other shoppers, as opposed to attendees at a gathering who have social connections to one another. *See also South Bay*, 2021 WL 222814, at *12 (explaining that grocery stores are distinct from house of worship services because "patrons typically have the intention of getting in and out of grocery and retail stores as quickly as possible."). Thus, the risk of transmission is generally less in a setting with brief contact between individuals as compared to a setting such as a gathering that promotes sustained contact. The risk of transmission "increases with the duration of the gathering, whether it takes place indoors or outdoors." Rutherford Decl. ¶ 78. The main mechanism for COVID-19 transmission is an infected person exposing others to virus-containing droplets or aerosols. *Id.* ¶ 79.

Second, unlike people in commercial gatherings, people at Plaintiffs' gatherings often have social connections to one another and are coming together for the purposes of being together. Cody Decl. ¶ 59; Rutherford Decl. ¶ 82. At Plaintiffs' gatherings, people are likely to be in extended conversations. Rutherford Decl. ¶ 82. "Even sustained conversations between individuals, when they are in close proximity in indoor spaces, or in outdoor spaces in which social distance is not maintained, carry increase risk of transmission." Rutherford Decl. ¶ 79. In some environments—such as a Bible study or political event—people might even sing or chant.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

By contrast, singing, chanting, shouting, and loud talking are uncommon in commercial environments, like grocery and retail stores. Singing, chanting, shouting, and loud talking are more likely to spread COVID-19 because they produce more viral droplets and particles—and project those droplets further. Rutherford Decl. ¶¶ 29, 79; Reingold Decl. ¶¶ 20–22; Cody Decl. ¶ 35. For instance, Plaintiffs propose Bible study groups and gatherings to debate policy issues—gatherings which "involve groups of unrelated individuals from different households or 'bubbles' coming together for the purpose of being together and engaging in extended conversation and interaction in close proximity to one another." Rutherford Decl. ¶ 82.

Third, ventilation tends to be poorer at Plaintiffs' gatherings. "There is in particular heightened transmission risk from indoor gatherings taking place in buildings that have poor air circulation, such as in private homes." Rutherford Decl. ¶ 76. By contrast, some commercial activities take place in large spaces. Others include systems that increase ventilation. For example, "grocery stores are 'almost always' equipped with high-functioning air conditioning systems that increase ventilation and air flow." *South Bay*, 2021 WL 222814, at *12. Others take place outdoors. *See* Dunn Decl. Exh. 23 (stating that some personal care services are permitted to take place outdoors). In environments with better ventilation, the virus disperses more easily, preventing it from accumulating into doses large enough to overcome the immune system. Watt Decl. ¶ 44; Rutherford Decl. ¶¶ 60, 76–77; Reingold Decl. ¶ 20; Cody Decl. ¶ 29. Ventilation is important even where people properly wear face coverings. "The increased risk of transmission resulting from vocalization and other activities involving increased exhalation force that are commonly engaged in during gatherings *is reduced but not eliminated* where all of the participants wear face coverings." Rutherford Decl. ¶ 80 (emphasis added).

Fourth, masking and social distancing are less likely at Plaintiffs' gatherings than in commercial settings. Under the State's restrictions, commercial environments require masking and social distancing, a requirement that can be enforced by commercial workers. *See* Haddad Decl.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Exh. 9. On the other hand, at Plaintiffs' gatherings, it is "uncertain whether participants in these gatherings would maintain social distancing and face coverings during the entirety of the gatherings." Rutherford Decl. ¶ 84. Indeed, many gathering spaces in the home—such as kitchen tables and living rooms—do not provide six feet of distance between persons. "[T]he closer the proximity between individuals who gather, and the longer they are in close proximity, the more opportunity there is for the virus to be transmitted via droplets or aerosolized particles containing the virus." Rutherford Decl. ¶ 74.

Fifth, Plaintiffs' gatherings are not part of a regulated industry. By contrast, commercial retail environments are subject to mandatory industry guidance, which include creation of a COVID-19 prevention plan, cleaning and disinfecting of frequently used surfaces, and screening of workers. Haddad Decl. Exh. 9; Dunn Decl. Exhs. 17–27; *see also South Bay*, 2021 WL 222814, at *12 (explaining that commercial activities were distinct from worship services because they included "plexiglass at checkout, frequent disinfection of commonly used surfaces such as shopping carts, and the closure of any areas that encourage congregating"). Personal care services are also subject to mandatory industry guidance. Dunn Decl. Exhs. 23, 24, 42. For example, workers must wear a secondary barrier, like goggles or a face shield, in addition to a mask, when providing services on clients who cannot wear a mask. *Id.* As to filming, "this sector is *more strictly* regulated than many others." *South Bay*, 2021 WL 222814, at *13 (emphasis in original). For example, "filming in the state resumed only after the studios and unions reached an agreement concerning safety guidelines." *Id.* That agreement requires tri-weekly testing. *Id.* In addition, there are special protocols for makeup, hair styling, costumes, and props. *Id.* These restrictions lower the risk that COVID-19 will be spread. Moreover, the State can enforce industry guidance, including by imposing a misdemeanor conviction, $1,000 fine, and six months imprisonment. *See* Dunn Decl. Exhs. 2, 3 (referencing Cal. Gov't Code § 8665); Cal. Gov't Code § 8665.

Sixth, Plaintiffs' gatherings can involve many more people than commercial interactions.

55

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Some commercial settings, such as personal care services, involve only "small numbers of individuals interacting." *Id.* The more people who are together, the more likely it is that COVID-19 will be spread. Watt Decl. ¶ 42; Rutherford Decl. ¶ 77.

Accordingly, the State's and the County's private gatherings restrictions are content neutral and need only satisfy intermediate scrutiny. *Recycle for Change*, 856 F.3d at 669–70 (applying intermediate scrutiny to a content neutral regulation). The Court next considers whether the State's and the County's private gatherings restrictions satisfy intermediate scrutiny.

### ii. The State's and County's content neutral restrictions satisfy intermediate scrutiny.

Under intermediate scrutiny, a regulation is justified "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Wilson v. Lynch*, 835 F.3d 1083, 1096 (9th Cir. 2016) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). The Court addresses each element in turn.

### (a) The State's and County's restrictions are within the constitutional power of the government.

The State's and the County's private gatherings restrictions are within the constitutional power of the government. A restriction is within the government's constitutional powers if the government can constitutionally regulate the subject in question. *Wilson*, 835 F.3d at 1096; *United States v. Tomsha-Miguel*, 766 F.3d 1041, 1048 (9th Cir. 2014). Plaintiffs do not argue that the State or the County is prohibited from regulating private gatherings. Accordingly, the Court concludes that the State's and the County's private gatherings restrictions are within the constitutional power of the government.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

**(b) The State's and County's restrictions further the compelling interests of slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system.**

The State's and the County's private gatherings restrictions are directed to slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system. As discussed above, *supra* Section III-B-2, the Court concludes that these are compelling government interests.

**(c) Slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system are unrelated to the suppression of free expression.**

Slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system are unrelated to the suppression of free expression. As explained above, the State's and the County's private gatherings restrictions are blanket bans applicable to all gatherings. *See* Section III-B-3-b-i, *supra*. Thus, the State's and the County's private gatherings restrictions do not prevent the expression of any particular message or viewpoint. Accordingly, the Court concludes that the compelling government interests at issue here are unrelated to the suppression of free expression. *Tomsha-Miguel*, 766 F.3d at 1048 (9th Cir. 2014) (concluding that a statute was unrelated to the suppression of free expression because the statute "does not prevent the expression of any particular message or viewpoint") (quotation omitted).

**(d) The incidental restriction on speech and assembly is no greater than is essential to slow the spread of COVID-19, protect high-risk individuals from infection, and prevent the overwhelming of the healthcare system.**

Finally, the Court considers whether the State's and the County's private gatherings restrictions are "no greater than is essential to the furtherance of" the compelling government interests at stake here. *Wilson*, 835 F.3d at 1096 (quotation omitted). In the context of content neutral laws, a regulation need "not [be]. . . the least restrictive or least intrusive means" of achieving the governmental interest. *Ward*, 491 U.S. at 798. Rather, the regulation must

57

United States District Court
Northern District of California

"promote[ ] a substantial government interest that would be achieved less effectively absent the regulation . . . . [and] the means chosen [must] not [be] substantially broader than necessary to achieve the government's interest." *Id.* at 799–800.

The Court concludes that the State's and the County's private gatherings restrictions are no greater than is essential to slow the spread of COVID-19, protect high-risk individuals, and prevent the overwhelming of the healthcare system for the following three reasons. First, the Ninth Circuit has held that some of the State's restrictions are narrowly tailored in the context of strict scrutiny, a higher standard than the intermediate scrutiny at issue here. Second, the Court's independent review of the State's and the County's private gatherings restrictions confirms they promote compelling government interests that would be achieved less effectively absent the restrictions. Finally, the State's and the County's private gatherings restrictions are not substantially broader than necessary to achieve the compelling government interests at issue here.

First, in *South Bay*, the Ninth Circuit concluded that some of the State's restrictions were narrowly tailored to achieve the compelling government interests of slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the healthcare system from being overwhelmed. *South Bay*, 2021 WL 222814, at *10–*14.[11] The Ninth Circuit analyzed the State's restrictions on houses of worship in the widespread tier, which prohibit indoor worship services, but permit outdoor worship services with no limit on attendance. *Id.* at *8.[12] The Ninth Circuit explained that these restrictions were narrowly tailored to slow the spread of COVID-19

---

[11] Following the Ninth Circuit's opinion in South Bay, the Ninth Circuit decided *Harvest Rock Church v. Newsom*, which followed *South Bay*. 2021 WL 235640, at *1 (9th Cir. 2021).

[12] At the time of the Ninth Circuit's opinion in *South Bay*, the Regional Stay at Home Order remained in effect. However, the Ninth Circuit considered not only the restrictions in the Regional Stay at Home Order but also the restrictions in the Blueprint. *South Bay*, 2021 WL 222814, at 8 n.20 ("Because the State considered the same neutral risk criterial in formulating both the Regional Stay at Home Order and the Blueprint . . . we consider the framework as a whole.").

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

because the State had used objective factors to evaluate the risk that COVID-19 would be spread by specific activities, including services at houses of worship. *Id.* at *10–*11. The State's analysis had concluded that services at houses of worship were more likely to spread COVID-19 than other activities, such as grocery shopping, retail shopping, and personal care services. *Id.* at *11–*14. Accordingly, the Ninth Circuit concluded that some of the Blueprint's restrictions satisfied the narrow tailoring requirement in the context of strict scrutiny, a higher threshold than the narrow tailoring requirement in the context of intermediate scrutiny. *See Ward*, 491 U.S. at 798. Thus, if the Ninth Circuit held that the Blueprint's restrictions satisfied strict scrutiny, certainly the restrictions would satisfy the lower intermediate scrutiny.

Second, the State's and the County's private gatherings restrictions promote the compelling government interests of slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system, which would be achieved less effectively absent the restrictions. Indeed, gatherings are especially likely to result in the spread of COVID-19. Watt Decl. ¶¶ 42–44, Rutherford Decl. ¶¶ 60, 76–77; Cody Decl. ¶¶ 34–35. Gatherings are particularly risky because COVID-19 is often spread when individuals are in close proximity with an infected person for an extended period of time, which allows a sufficient dose of viral droplets or particles to move from an infected person to others. Rutherford Decl. ¶ 31; Watt Decl. ¶¶ 29, 33. The risk for gatherings, especially indoor gatherings, remains high even when attendees socially distance, wear face coverings, and use sanitizer. Watt Decl. ¶ 44, Rutherford Decl. ¶¶ 60, 75–77. COVID-19 is 18.7 times more likely to be transmitted in a closed environment than in an open-air environment. Watt Decl. ¶ 44. Summarizing the risks of indoor private gatherings, Dr. George Rutherford, Professor of Epidemiology and Biostatistics at the U.C. San Francisco School of Medicine, explains:

> As discussed, the proposed indoor gatherings would have a substantial risk of transmission, including because of the heightened risks involved in gatherings that bring together individuals from

> different households who are not regularly in contact with each other, gatherings that take place indoors, the likely close proximity of the individuals engaged in the activity, and the interaction and vocalization between individuals in close proximity to one another that would be expected at a gathering of this nature.

Rutherford Decl. ¶ 83.

Therefore, the consensus of public health experts is that limits on gatherings are essential to slow the spread of COVID-19. Rutherford Decl. ¶ 50; Stoto Decl. ¶ 15; Watt Decl. ¶¶ 51–52; Reingold Decl. ¶ 27; Cody Decl. ¶ 75; Maldonado Decl. ¶¶ 13, 18. Because of the unique dangers of gatherings in spreading COVID-19, slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system would be achieved less effectively without the State's and County's restrictions.

Third, the State's and the County's private gatherings restrictions are not substantially broader than necessary to achieve the compelling government interests in slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system for the following three reasons.

One, the State's and the County's private gatherings restrictions limit attendance. Haddad Decl. Exh. 12 (State Blueprint, limiting gatherings in counties in the widespread tier to three households outdoors); ECF No. 61 Exh. 3 (County's restrictions, limiting gatherings to 200 people outdoors). Limits on attendance are necessary because the bigger a gathering is, the more risk there is that COVID-19 will be spread. Watt Decl. ¶ 42. A bigger gathering increases the risk of spreading COVID-19 because it increases the number of people who can be infected and the likelihood that an infected person is present. *Id*.

Two, the State's and the County's private gatherings restrictions are significantly more restrictive of indoor gatherings than of outdoor gatherings. *See* Haddad Decl. Exh. 12 (State Blueprint, prohibiting indoor gatherings but allowing outdoor gatherings in counties in the widespread tier); ECF No. 61 Exh. 3 (County's restrictions, prohibiting indoor gatherings and

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

permitting outdoor gatherings of 200 people or fewer). This distinction is aligned with the way that COVID-19 spreads. One study found that the likelihood of transmitting COVID-19 was 18.7 times greater in a closed environment than in an open-air environment. Watt Decl. ¶ 44. COVID-19 is more easily spread indoors because the virus disperses less easily indoors and can remain in the air for a longer period of time, which allows it to accumulate into large enough doses to infect people. Watt Decl. ¶ 44; Rutherford Decl. ¶¶ 60, 76–77; Reingold Decl. ¶ 20; Cody Decl. ¶ 29. Accordingly, the CDC advises that activities are safer when they are held in outdoor spaces. Cody Decl. ¶ 31. Following this guidance, the State and the County allow outdoor activities that are banned indoors. For instance, singing, chanting, and shouting—activities that generate droplets and aerosols—are allowed outdoors if participants wear face coverings and socially distance by at least six feet. Watt Decl. ¶ 81.

Three, the State's private gatherings restrictions are more restrictive of gatherings in counties with greater spread of COVID-19. *See* Haddad Decl. Exh. 12 (State Blueprint, permitting only outdoor gatherings with three households in the widespread tier and indoor gatherings with three households in the substantial tier). This tiered system recognizes that the more people are infected in a county, the more likely a gathering in that county has an infected person present. Rutherford Decl. ¶ 81. The tiered system thus imposes stricter restrictions in higher risk counties. By the same token, the tiered system minimizes restrictions in counties with lower prevalence of infection.

Thus, the Court concludes that the State's and County's private gatherings restrictions are no greater than are essential to slow the spread of COVID-19, protect high-risk individuals from infection, and prevent the overwhelming of the healthcare system. In sum, although the State's and the County's private gatherings restrictions are significant, the restrictions are being imposed to address the worst public health crisis in one hundred years, and "'narrow' in the context of a public health crisis is necessarily wider than usual." *Givens*, 459 F. Supp. 3d at 1313 (concluding

61

that California's ban on gatherings was a content neutral restriction that survived intermediate scrutiny). Thus, the Court concludes that the State's and the County's private gatherings restrictions satisfy intermediate scrutiny.

### iii. Even assuming that the State's and the County's private gatherings restrictions are content based, they are narrowly tailored to serve a compelling government interest.

Even assuming that the State's and the County's private gatherings restrictions are content based, they nevertheless are constitutional because they are narrowly tailored to serve a compelling government interest and thus satisfy strict scrutiny. *Reed*, 576 U.S. at 163. The Court first considers whether the restrictions serve a compelling government interest then discusses whether the restrictions are narrowly tailored.

### (a) Slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system are compelling government interests.

As discussed above, *supra* Section III-B-2, the Court concludes that the State and the County have compelling government interests in slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system.

### (b) The State's and the County's private gatherings restrictions are narrowly tailored.

The State's and the County's private gatherings restrictions are narrowly tailored to slow the spread of COVID-19, protect high-risk individuals, and prevent the overwhelming of hospitals for three reasons. First, both the Ninth Circuit and other district courts have held that some of the Blueprint's restrictions are narrowly tailored. Second, the Court's independent review of the State's and County's restrictions confirms they are narrowly tailored. Third, Plaintiffs' proposed alternatives to the State's and the County's private gatherings restrictions are insufficient to halt the spread of COVID-19.

First, on January 22, 2021, the Ninth Circuit concluded that the Blueprint's restrictions on houses of worship in the widespread tier, which prohibit indoor worship services but permit

62

United States District Court
Northern District of California

outdoor worship services with no limit on attendance, were narrowly tailored to achieve the compelling government interests of slowing the spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of the healthcare system. *South Bay*, 2021 WL 222814, at *8, *10–*14.[13] The Ninth Circuit explained that these restrictions are narrowly tailored because the State used objective factors to evaluate the risk that COVID-19 would be spread by specific activities, including services at houses of worship. *Id.* at *10–*11. The State's analysis concluded that services at houses of worship were more likely to spread COVID-19 than other activities, such as grocery shopping, retail shopping, and personal care services. *Id.* at *11–*14.

Other district courts analyzing the same restrictions have also concluded that they are narrowly tailored to achieve the compelling government interest of slowing the spread of COVID-19. *See Harvest Rock Church v. Newsom*, Case No. EDCV 20-6414-JGB, 2020 WL 7639584, at *9 (C.D. Cal. Dec. 21, 2020), *aff'd in part and rev'd in part*, --- F.3d ---, 2021 WL 235640 (9th Cir. 2021) ("California's Blueprint is . . . painstakingly tailored to address the risks of [COVID-19] transmission specifically"); *South Bay*, Case No. 20-CV-00865-BAS-AHG, 2020 WL 7488974, at *9 (S.D. Cal. Dec. 21, 2020), *aff'd*, --- F.3d ---, 2021 WL 222814 (9th Cir. 2021) (concluding that "California did exactly what the narrow tailoring requirement mandates—that is, California has carefully designed the different exemptions to match its goal of reducing community spread").

In the instant case, the Court similarly concludes that the State's and the County's private gatherings restrictions are narrowly tailored to reduce community spread, protect high-risk individuals, and prevent the healthcare system from being overwhelmed. As the Ninth Circuit emphasized, the State public health officials who were designing the Blueprint considered eight

---

[13] Following the Ninth Circuit's opinion in South Bay, the Ninth Circuit decided *Harvest Rock Church v. Newsom*, which followed *South Bay*. 2021 WL 235640, at *1 (9th Cir. 2021).

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

objective risk criteria related to the spread of COVID-19: (1) the ability to accommodate face covering wearing at all times; (2) the ability to physically distance between individuals of different households; (3) the ability to limit the number of people per square foot; (4) the ability to limit the duration of exposure; (5) the ability to limit the amount of mixing of people from different households; (6) the ability to limit the amount of physical interactions; (7) the ability to optimize ventilation; and (8) the ability to limit activities that are known to increase the possibility of viral spread, such as singing, shouting, and heavy breathing. Kurtz Decl. ¶ 20.

Here, Plaintiffs propose private gatherings. Applying these objective factors, private gatherings are very risky for the spread of COVID-19. All eight of these factors show that private gatherings greatly risk the spread of COVID-19. At private gatherings, people often do not use face coverings (Factor 1). Nor do people maintain physical distancing (Factor 2) or limit the number of people per square foot (Factor 3). The time spent in close proximity to others is longer than in public settings (Factor 4), allowing a sufficient dose of viral droplets or particles to move from one person to others. Watt Decl. ¶¶ 42–44; Rutherford Decl. ¶¶ 60, 76–77; Cody Decl. ¶¶ 34–35. People from different households mix (Factor 5) and physically interact (Factor 6). Ventilation is limited indoors (Factor 7). Watt Decl. ¶ 44; Rutherford Decl. ¶¶ 60, 76–77; Reingold Decl. ¶ 20; Cody Decl. ¶ 29. Activities such as shouting can be involved, especially in gatherings like the political rallies that Tandon wishes to hold (Factor 8). Even where face coverings and strict physical distancing are used, indoor gatherings involve six of the other eight factors that correspond to a higher risk of spreading COVID-19, and outdoor gatherings involve five of the other eight factors. Thus, as the vast consensus of public health experts believes, gatherings must be limited in order to slow the spread of COVID-19. Rutherford Decl. ¶ 50; Stoto Decl. ¶ 15; Watt Decl. ¶¶ 51–52; Reingold Decl. ¶ 27; Cody Decl. ¶ 75; Maldonado Decl. ¶¶ 13, 18.

Second, as discussed above, the Court's independent review of the State's and the

64

United States District Court
Northern District of California

County's private gatherings restrictions confirms that the restrictions are narrowly tailored for three reasons: (1) they limit attendance at gatherings; (2) they place stricter limits on indoor gatherings than outdoor gatherings; and (3) the State's restrictions place stricter limits on gatherings in counties where COVID-19 is more prevalent. *See* Section III-B-3-b-iii-(d), *supra*.

Finally, Plaintiffs' two less restrictive alternatives are insufficient to reduce community spread, protect high risk individuals, and prevent the healthcare system from being overwhelmed. Plaintiffs first propose focusing on vulnerable populations, but the Court has already explained why that would be insufficient to meet the compelling government interests at stake. *See* Section III-B-2-d, *supra*. Plaintiffs also propose indoor gatherings with face coverings and physical distancing. However, as the Court explained more fully in Section III-B-3-b-i, *supra*, even when people wear face coverings and physically distance, a significant risk of infection remains, particularly when people get together for extended periods and in environments with limited ventilation, such as indoors. Watt Decl. ¶¶ 38, 45–46, 48; Rutherford Decl. ¶¶ 60, 76–77, 84.

Moreover, the State's and County's experience bears out the importance of not only wearing a face covering and social distancing but also limiting gatherings. At least 23 of 30 California counties experiencing increases in their COVID-19 cases identified gatherings as a cause of the rise in cases. Watt Decl. ¶ 41. By contrast, when the State has put restrictions on private gatherings into place, there has been a decrease in cases. *Id*. ¶¶ 62, 93. The County has also seen a decrease in cases when gatherings have been restricted. Cody Decl. ¶ 19. Accordingly, the State's and County's restrictions are the least restrictive alternative that will reduce community spread, protect high risk individuals, and prevent the healthcare system from being overwhelmed.

Three recent United States Supreme Court and the Ninth Circuit decisions did not address the restrictions at issue in the instant motion. Instead, those decisions struck down the imposition, without consideration of capacity limits, of small attendance limits on large houses of worship. By contrast, Plaintiffs in the instant case do not challenge restrictions on houses of worship. *See* Tr. of

65

United States District Court
Northern District of California

Dec. 17, 2020 Hearing at 21:15–19, ECF No. 60 (The Court: "Are any of these plaintiffs houses of worship, or alleging restrictions on houses of worship? It seems like it's more focused on private gatherings that have religious purposes, like Bible studies in the home." Plaintiffs' Counsel: "I think that's right, Your Honor."). Instead of restrictions on houses of worship, Plaintiffs challenge restrictions on private gatherings, including gatherings at private homes. Private homes are significantly smaller and less ventilated spaces than the large houses of worship at issue in those three cases, which the Court now addresses.

In *Roman Catholic Diocese v. Cuomo*, the United States Supreme Court analyzed whether New York's COVID-related restrictions on houses of worship violated the free exercise of religion. 141 S. Ct. at 66. The restrictions at issue used a color-coded tiered system to assess coronavirus risk and limited attendance at services to 10 people in "red" zones and 25 people in "orange" zones. *Id*. Yet in the same zones, "essential businesses" such as acupuncture facilities, campgrounds, and garages "could admit as many people as they wished." *Id*. Because the New York restrictions "single[d] out houses of worship for especially harsh treatment," the United States Supreme Court concluded that the restrictions were not neutral and generally applicable. *Id*. (quoting *Lukumi*, 508 U.S. at 133).[14] Furthermore, because the New York restrictions imposed limits on worship services that were not tethered to the capacity of the houses of worship, the United States Supreme Court concluded that the New York restrictions were not narrowly tailored. *Id*. at 67.

Subsequently, in *Dayton Valley*, the Ninth Circuit considered a Nevada directive that prohibited attendance of more than 50 people at indoor worship services, but permitted casinos,

---

[14] Furthermore, in *Roman Catholic Diocese*, the record included "statements made in connection with the challenged rules, [which could] be viewed as targeting the 'ultra-Orthodox [Jewish] community.'" 141 S. Ct. at 66. By contrast, here, Plaintiffs have not pointed to any evidence that the State enacted its generally applicable private gatherings restrictions in order to target religious groups.

66

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

bowling alleys, retail businesses, restaurants, and arcades to operate at 50 percent of their fire-code capacity. 982 F.3d at 1230. Because the Nevada directive "treat[ed] numerous secular activities and entities significantly better than religious worship services," the Ninth Circuit concluded that the directive was not neutral and generally applicable. *Id.* at 1233. The Ninth Circuit also held that the 50-person attendance limit on all houses of worship was not narrowly tailored because Nevada had not tied attendance limits to the size of the house of worship. *Dayton Valley*, 982 F.3d at 1234.

Similarly, in *South Bay*, the Ninth Circuit considered the Blueprint's restrictions on houses of worship, which are not at issue in the instant case. At the widespread tier, houses of worship in counties in the widespread tier can only hold religious services outdoors, but commercial entities such as grocery stores and retail stores can operate indoors. *Id.* at *9. Because there were "different capacity restrictions on religious services relative to non-religious activities and services," the Ninth Circuit held that the Blueprint's restrictions on houses of worship were not neutral and generally applicable. *Id.* at *9–*10. The Ninth Circuit later enjoined the Blueprint's 100 and 200 person attendance limits on houses of worship in the substantial and moderate tiers because these limits were not tied to the size of the house of worship. 2021 WL 222814, at *17–*18.

The restrictions at issue here, which prohibit private gatherings, are distinguishable from the restrictions at issue in those cases, which restricted services at houses of worship. Indeed, the Gannons seek to hold gatherings at their private home, which is a significantly smaller space than the large houses of worship at issue in *Roman Catholic Diocese*, *Dayton Valley*, and *South Bay*, and thus more likely to lead to the spread of COVID-19. Watt Decl. ¶ 42. In a smaller space, attendees are likely to be in higher density and more proximity to one another. "[T]he closer the proximity between individuals who gather, and the longer they are in close proximity, the more opportunity there is for the virus to be transmitted via droplets or aerosolized particles containing the virus." Rutherford Decl. ¶ 74. Moreover, smaller spaces have more limited ventilation, which

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

increases the likelihood that COVID-19 will spread. Watt Decl. ¶ 44; Rutherford Decl. ¶¶ 60, 76–77; Reingold Decl. ¶ 20; Cody Decl. ¶ 29. In addition, at private gatherings, it is "uncertain whether participants in these gatherings would maintain social distancing and face coverings during the entirety of the gatherings." Rutherford Decl. ¶ 84. *See supra* Section III-B-3-b-i (analyzing private gatherings in more detail).

The County's private gatherings restrictions are also distinguishable from the restrictions at issue in *Roman Catholic Diocese*, *South Bay*, and *Dayton Valley*. Unlike the large houses of worship in those cases, Tandon has not shown that the County's private gathering restrictions[15] are disproportionate to the space in which he plans to hold gatherings.

In sum, the Court concludes that the State's and the County's private gatherings restrictions are content neutral and satisfy intermediate scrutiny. In the alternative, even assuming that the State's and the County's private gatherings restrictions are not content neutral, these restrictions nonetheless satisfy strict scrutiny because they are narrowly tailored to reduce community spread, protect high risk individuals, and prevent the healthcare system from being overwhelmed. Thus, Plaintiffs have not shown that they are likely to succeed on their free speech and assembly claims.

### 4. Plaintiffs are not likely to succeed on the merits of their free exercise and assembly claims.

Plaintiffs Wong and Busch argue that the State's private gatherings restrictions violate their First and Fourteenth Amendment rights to free exercise and assembly by preventing them from holding Bible studies at their homes.[16] As discussed above, the State's private gatherings

---

[15] As discussed in footnote 7 *supra*, after Plaintiffs filed the instant motion, the County released an updated Mandatory Directive for Gatherings that prohibited indoor gatherings and permitted only outdoor gatherings of up to 200 people.

[16] On January 29, 2021, another court in this district enjoined: (1) the Blueprint's 100 and 200 person limits on services at houses of worship in the substantial and moderate tiers, and (2) the

68

restrictions prohibit indoor gatherings and limit outdoor gatherings to three households or fewer. *See* Section III-A, *supra*. The Court notes that the State does not limit the number of attendees at any outdoor house of worship service.

As a general matter, "[t]he Free Exercise Clause of the First Amendment, which has been made applicable to the States by incorporation into the Fourteenth Amendment . . . provides that 'Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*[.]'" *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 876–77 (1990) (quoting U.S. Const., amend. I). To determine whether a law prohibits the free exercise of religion, courts must first determine whether the law "is neutral and of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "[A] law that is neutral and of general applicability" must only pass rational basis review, meaning that it "need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* By contrast, a law that is not neutral and generally applicable must survive strict scrutiny, meaning that it "must be justified by a compelling government interest and must be narrowly tailored to advance that interest." *Id.* at 531–32.

Below, the Court concludes that the State's private gatherings restrictions are (1) neutral and generally applicable; and (2) rationally related to a legitimate government interest. Moreover, the Court finds that even assuming the restrictions are not neutral and generally applicable, they would satisfy strict scrutiny.

### a.   The State's private gatherings restrictions are neutral and generally applicable.

A law is not neutral "if the object of a law is to infringe upon or restrict practices because of their religious motivation. " *Lukumi*, 508 U.S. at 533. "A law lacks facial neutrality if it refers

---

State's restrictions on other activities within houses of worship, such as a parishioner interacting with clergy. *See Gateway City Church v. Newsom*, 2021 WL 308606, at *16–*17 (N.D. Cal. Jan. 29, 2021). As explained above, the instant motion does not raise any restrictions regarding houses of worship. *See* Section III-A, *supra*.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

to a religious practice without a secular meaning discernable from the language or context." *Id.* Therefore, where laws "make no reference to any religious practice, conduct, belief, or motivation, they are facially neutral." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015).

A law is not generally applicable if it, "in a selective manner[,] impose[s] burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Accordingly, "[a] law is not generally applicable if its prohibitions substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect." *Stormans*, 734 F.3d at 1079 (citing *Lukumi*, 508 U.S. at 542–46). "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531.

As explained above, for counties in the widespread tier, the State's private gatherings restrictions prohibit all indoor gatherings and limit outdoor gatherings to three households. Haddad Decl. Exh. 12; Dunn Reply Decl. Exh. 4. The State's private gatherings restrictions define gatherings as "social situations that bring together people from different households at the same time in a single space or place." *Id.*

The State's private gatherings restrictions are neutral for two reasons. For one, the State's object is not to restrict religious gatherings because they are religious in nature, but because they are gatherings. *Lukumi*, 508 U.S. at 523. For another, the State's restrictions "make no reference to any religious practice, conduct, belief, or motivation." *Stormans*, 794 F.3d at 1076.

The State's private gatherings restrictions are also generally applicable. The State's private gatherings restrictions apply to *all* gatherings, whether religious or secular. *Lukumi*, 508 U.S. at 543. Thus, the State's private gatherings restrictions are neutral and generally applicable.

Resisting this conclusion, Plaintiffs rely on the same body of case law, already described by the Court above, *supra* Section III-B-3-b-iii, which held that certain COVID-related restrictions on *houses of worship* were neither neutral nor generally applicable. *See Roman Catholic Diocese*,

70

141 S. Ct. at 67; *South Bay*, 2021 WL 222814, at *8; *Dayton Valley*, 982 F.3d at 1233. Those

cases are inapposite. They addressed restrictions that singled out houses of worship and treated

them less favorably than secular entities. By contrast, the State's private gatherings restrictions

treat religious and secular gatherings alike and make no reference to religion. Haddad Decl. Exh.

12; Dunn Reply Decl. Exh. 4.

At least one court of appeals panel has distinguished *Roman Catholic Diocese* on similar

grounds. In *Commonwealth* ex rel. *Danville Christian Academy v. Beshear*, religious schools

brought a Free Exercise Clause challenge to a Kentucky order prohibiting in person instruction at

all public and private schools, religious or not. 981 F.3d 505, 507 (6th Cir. 2020), *injunction

denied without prejudice*,[17] 141 S. Ct. 527 (2020).[18] The district court granted a preliminary

injunction, but the Sixth Circuit granted a stay of the preliminary injunction and concluded that the

plaintiffs were unlikely to succeed on the merits of their Free Exercise claim. *Id*. The Sixth Circuit

emphasized that the order "applies to all public and private elementary and secondary schools in

---

[17] On December 17, 2020, the United States Supreme Court declined to enjoin the Sixth Circuit's decision in *Beshear*. 141 S. Ct. 527 (2020). The United States Supreme Court noted that Kentucky students would be going on holiday break starting the following day, December 18, 2020, and school would not resume until January 4, 2020. *Id*. The United States Supreme Court stated that "[u]nder all the circumstances, especially the timing and the impending expiration of the Order, we deny the application without prejudice to the applicants or other parties seeking a new preliminary injunction if the Governor issues a school-closing order that applies in the new year." *Id*.

[18] Following the Sixth Circuit's decision in *Beshear*, another panel of the Sixth Circuit concluded that an Ohio county's order prohibiting instruction in schools, including religious schools, was not neutral and generally applicable. *See Monclova Christian Academy, et al. v. Toledo-Lucas County Health Department*, --- F.3d ----, 2020 WL 7778170, at *2–*4 (6th Cir. 2020). *Monclova* reached that conclusion by comparing schools to other comparable secular actors, an analysis that *Beshear* did not engage in. *Id*. at *3–*4. The *Monclova* panel justified its analysis in part by citing to Justice Gorsuch's dissent from the United States Supreme Court's decision not to grant injunctive relief. *Id*. at *2.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

the Commonwealth, religious or otherwise; it is therefore neutral and of general applicability and need not be justified by a compelling government interest." *Id.* at 509. The Sixth Circuit distinguished *Roman Catholic Diocese* because the restrictions at issue in that case "appl[ied] specifically to houses of worship." *Id.*[19] Furthermore, "the order at issue in *Roman Catholic Diocese* treated schools, factories, liquor stores, and bicycle repair shops, to name only a few, 'less harshly' than houses of worship." *Id.* This same reasoning applies to the State's private gatherings restrictions. Like Kentucky's restrictions on schools, which incidentally burdened religious schools, the State's private gatherings restrictions incidentally burden the religious gatherings that Plaintiffs seek to hold. In sum, recent case law only underscores that the State's private gatherings restrictions—unlike restrictions invalidated elsewhere—are neutral and generally applicable.

With little case law to support them, Plaintiffs last argue that their in-home gatherings are being treated more harshly than other activities, such as filming, going to laundromats, and visiting hotels. Mot. at 20; Reply at 14. Plaintiffs specifically assert that some filming can take place in a home even where Bible studies are banned. Reply at 14. Plaintiffs contend that these exempted activities inflict identical or increased health risks. Mot. at 20. Thus, Plaintiffs argue that the Blueprint is underinclusive, treating comparable secular activities more favorably.

However, to determine whether a restriction is underinclusive, courts must compare religious conduct with "analogous non-religious conduct." *Lukumi*, 508 U.S. at 546. As explained above, the Court concludes that private gatherings are distinct from, and more likely to spread COVID-19 than, socially distanced commercial activities. *See* Section III-B-3-b-i, *supra*.

---

[19] Conversely, following the United States Supreme Court's decision in *Roman Catholic Diocese*, the Second Circuit concluded that New York's restrictions were not neutral because they "explicitly impos[ed] on 'houses of worship' restrictions inapplicable to secular activities." *Agudath Israel of America v. Cuomo*, --- F.3d ---, 2020 WL 7691715, at *7 (2d. Cir. 2020). The State's restrictions at issue here do not explicitly impose restrictions on religious gatherings that are not imposed on secular gatherings—rather, all gatherings are subject to the same restrictions.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Recognizing the unique dangers of gatherings, the State has treated all gatherings, religious and non-religious, alike. Haddad Decl., Exh. 12. The fact that the State treats dissimilar activities differently is of no import. Because the State treats all gatherings, religious and secular, the same, the State's private gatherings restrictions are neutral and generally applicable.

### b. The State's private gatherings restrictions are rationally related to a legitimate government interest.

Because the State's private gatherings restrictions are neutral and generally applicable, they need only satisfy rational basis review. *Lukumi*, 508 U.S. at 531. Under rational basis review, courts must uphold laws "if they are rationally related to a legitimate government purpose." *Stormans*, 794 F.3d at 1084. As explained above, the Court has already found that the State's private gatherings restrictions are rationally related to a legitimate government interest. *See* Section III-B-2, *supra*.

### c. The State's private gatherings restrictions are narrowly tailored to achieve a compelling government interest

In the alternative, even assuming the State's private gatherings restrictions are not neutral and generally applicable, they still are narrowly tailored to achieve the compelling government interests of slowing the spread of COVID-19, protecting high-risk individuals from illness, and preventing the overwhelming of the healthcare system. The Court has already found that the State's private gatherings restrictions are narrowly tailored to achieve these compelling government interests. *See* Section III-B-3-b-iii, *supra*. Accordingly, Plaintiffs have not shown that they are likely to succeed on the merits of their free exercise claims.

### C. Only some Plaintiffs are likely to suffer irreparable harm in the absence of an injunction.

For the Court to grant a preliminary injunction, a plaintiff must show that she is likely to suffer irreparable harm in the absence of an injunction. *Winter*, 555 U.S. at 20. "[I]rreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Az. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).

73

United States District Court
Northern District of California

The Court discusses Plaintiffs' allegations of irreparable harm in three groups: (1) Plaintiffs who claim monetary injury; (2) Plaintiffs who have been or are under threat of being driven out of business; and (3) Plaintiffs who suffer loss of political and religious freedoms.

First, Plaintiffs Khanna, Beaudet, and Evarkiou are business owners who claim monetary injury. *See* Khanna Decl. ¶ 7 (stating that the State and the County orders have led to a loss of revenue and profits for Khanna's winery business); Beaudet Decl. ¶ 3 (stating that Beaudet's restaurant has suffered significant losses); Evarkiou Decl. ¶ 5 (stating that Evarkiou's salon has lost revenue). Monetary injury alone is insufficient to show irreparable harm. *Az. Dream Act Coal.*, 855 F.3d at 978. Thus, Plaintiffs Khanna, Beaudet, and Evarkiou have not shown that they are likely to suffer irreparable harm in the absence of an injunction.

Second, Richards, the gym owner, and Mansour, the facial bar owner, claim that they have been or will be driven out of business. Richards Reply Decl. ¶ 4 (stating that she has been driven out of business by COVID-related restrictions); Mansour Decl. ¶ 7 (stating that "it is unclear whether [her] business will ever recover from [the restrictions]"). The Ninth Circuit has concluded that "[t]he threat of being driven out of business is sufficient to establish irreparable harm.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)). Accordingly, Plaintiffs Richards and Mansour have shown that they are likely to suffer irreparable harm.

Finally, Plaintiffs Tandon, the Gannons, Busch, and Wong claim loss of their political and religious freedoms under the First Amendment. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, courts have held that plaintiffs challenging COVID-related restrictions on religious freedoms are likely to suffer irreparable harm in the absence of an injunction. *See Roman Catholic Diocese*, 141 S. Ct. at 67–68 (concluding that, in the absence of injunctive relief, New York's COVID-19 related restrictions on houses of worship would cause

74

irreparable harm); *South Bay*, 2021WL 222814, at *16 ("We agree that South Bay is suffering irreparable harm by not being able to hold worship services in the Pentecostal model to which it subscribes."); *Dayton Valley*, 982 F.3d at 1234 (holding that Nevada's restrictions on houses of worship would cause irreparable harm). Because Plaintiffs Tandon, the Gannons, Busch, and Wong claim loss of their political and religious freedoms, they have shown that they are likely to suffer irreparable harm in the absence of an injunction.

**D. An injunction would not be in the public interest.**

The final preliminary injunction factor requires that plaintiffs show that the balance of equities tips in their favor and that an injunction would advance the public interest. *Winter*, 555 U.S. at 20. The balance of equities factor focuses on "the effect of each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. By contrast, "[t]he public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs/Blue Mountain Biodiversity Project. v. Connaughton*, 752 F.3d 755, 756 (9th Cir. 2014) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)). When the government is a party, the analysis of these two factors merges. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Thus, the Court must consider what "public consequences" would result from issuing an injunction. *See Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Here, an injunction would not be in the public interest. In reaching this conclusion, the Court covers well-trodden ground. In *South Bay*, the Ninth Circuit affirmed a district court's conclusion that enjoining the Blueprint's restrictions on houses of worship in the widespread tier would not be in the public interest. *See South Bay*, 2021 WL 222814, at *16–*17. The Ninth Circuit explained that if an injunction were granted, "the public will be further endangered by both the virus and the collapse of the state's health system." *Id.* at *17. The Ninth Circuit stated that "it is difficult to see how allowing more people to congregate indoors will do anything other than lead

United States District Court
Northern District of California

United States District Court
Northern District of California

to more cases, more deaths, and more strains on California's already overburdened healthcare system." *Id*.

The Court agrees. The Court has concluded that the State's and County's restrictions, including the State's and the County's private gatherings restrictions, the County's Personal Care Services Directive, and the County's Mandatory Directive for Outdoor Dining, are carefully designed to slow the spread of COVID-19, protect high-risk individuals, and prevent the overwhelming of the healthcare system. *See* Section III-B-1-a, *supra*. If the Court overrode the State's and County's public health officials and enjoined these restrictions, then more deaths, more serious illnesses, and more strain on California's already overburdened healthcare system would result. The Court discusses each harm in turn.

First, if the Court enjoined the State's and County's restrictions, some people in the State and the County would be at increased risk of dying from COVID-19. As of February 3, 2021, COVID-19 has killed over 445,000 people in the United States. The disease has not spared the young or the old. Twenty percent of those who have died of COVID-19 in the United States have been younger than 65 years old, and nearly two thousand people who have died of COVID-19 were younger than 30 years old as of February 3, 2021. Lipsitch Decl. ¶ 28; Rutherford Decl. ¶ 97; *CDC COVID Data Tracker*. In total, the United States is projected to face a death toll as high as the number of Americans that were killed in battle in World War II. Rutherford Decl. ¶ 26.

Second, if the Court enjoined the State's and County's restrictions, some people in the State and the County would be at increased risk of serious illness from COVID-19. COVID-19 can cause pneumonia, respiratory failure, other organ failure, cardiovascular events, strokes, and seizures. Rutherford Decl. ¶ 21; Watt Decl. ¶ 22; Reingold Decl. ¶ 14. Although the risk of severe illness from COVID-19 increases steadily with age, many younger people have become seriously ill from COVID-19. Watt Decl. ¶ 22; Reingold Decl. ¶ 15. For example, the National Collegiate Athletic Association found that college football players who had recovered from asymptomatic or

mildly symptomatic COVID-19 infections had a high rate of myocarditis, which can lead to cardiac arrest with exertion. Rutherford Decl. ¶ 25. People of any age with certain underlying conditions and pregnant women are at increased risk of severe illness from COVID-19. *Id.*; Rutherford Decl. ¶ 99. Approximately six in ten Americans have been diagnosed with a chronic medical condition, and four in ten have been diagnosed with more than one of these conditions. Reingold Decl. ¶ 17. The conditions are more common in, and the related burden of COVID-19 deaths is likely to fall on, communities of color and low-income communities. Lipsitch Decl. ¶ 28; Garcia Decl. ¶¶ 9–15.

Third, if the Court enjoined the State's and County's restrictions, the strain on California's already overburdened healthcare system would increase further. Even one of Plaintiffs' experts, Dr. Bhattacharya, concedes that restrictions might be justified "where hospital overcrowding is predicted to occur" because overcrowding and "the unavailability of sufficient medical personnel" "might induce avoidable mortality." Bhattacharya Reply Decl. ¶ 15. In their briefs, Plaintiffs concede that the State can act to permit the healthcare system from being overwhelmed. *See* Mot. at 1 ("Governor Newsom was correct to focus on the risk that hospitals would be overrun"), 15 (acknowledging "the compelling interest in preventing hospitalizations and deaths resulting from COVID-19").

Plaintiffs and Plaintiffs' experts relied on the now obsolete premise that California hospitals never reached their capacities. Mot. at 1, 9; Reply at 20; Bhattacharya Decl. ¶ 21; Bhatia Decl. ¶ 32, Bhattacharya Reply Decl. ¶¶ 13–17; Bhatia Reply Decl. ¶ 31. Since Plaintiffs' motion and declarations were submitted, the virus has surged in California, and California's hospitals have been overburdened. At times, the State and various counties, including Santa Clara County, have had 0 percent remaining ICU capacity. *See About COVID-19 Restrictions*, California For All, https://covid19.ca.gov/stay-home-except-for-essential-needs/ (last accessed January 19, 2021); COVID-19 Hospitalizations Dashboard, County of Santa Clara Emergency Operations Center,

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

available at https://www.sccgov.org/sites/covid19/Pages/dashboard-hospitals.aspx. As the Ninth

Circuit explained on January 22, 2021, "paramedics in Los Angeles have been instructed to

conserve oxygen in treating patients and not to bring patients to the hospital who have little chance

of survival." *South Bay*, 2021 WL 222814, at *4. Accordingly, the State's and County's

restrictions will prevent overwhelming the healthcare system.

In response, Plaintiffs make two arguments as to why an injunction would still be in the

public interest. Neither carries the day. First, Plaintiffs argue that an injunction is necessary to halt

violations of their constitutional rights. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional

rights."). However, the Court above has found that Plaintiffs' constitutional rights have not been

violated. Moreover, religious worship is widely available to Plaintiffs at houses of worship.

Specifically, the State permits houses of worship to hold outdoor worship services with no

attendance limits in the widespread tier. *South Bay*, 2021 WL 222814, at *16–*17. Outdoor

gatherings and worship services are particularly viable in year-round warm climates like

California's. *See id.* ("Given the obvious climatic differences between San Diego in the winter and

say, New York, the . . . allowance for outdoor services is much more than 'lip service' to the

demands of the First Amendment."). In addition, even in the widespread tier, there are no limits on

indoor activities "other than worship services" at houses of worship. *Gateway City Church*, 2021

WL 308606, at *16–*17 (N.D. Cal. Jan. 29, 2021).[20] For example, individual parishioners are

permitted to interact with clergy inside houses of worship. *Id.* at *14.

---

[20] *Gateway City Church* enjoined "the Blueprint's restrictions on activities at places of worship *other than worship services*." *Gateway City Church*, 2021 WL 308606, at *17 (emphasis added). As the *Gateway City Church* Court explained, activities other than worship services do not involve "people of separate households gathering in close proximity for extended periods of time." *Id.* at *14. Rather, these activities involve individual parishioners from different households—or multiple members of the same household—interacting with clergy in a way that "likely involve[s] no more risk than certain personal care services." *Id.*

78

Case No. 20-CV-07108-LHK

ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

As for the lower three tiers, indoor worship services are permitted at houses of worship. Specifically, houses of worship can hold indoor worship services at 25 percent capacity in the substantial tier and 50 percent capacity in the moderate and minimal tiers. *South Bay*, 2021 WL 222814, at *16–*17.

Plaintiffs also can hold small gatherings at their homes. In the widespread tier, Plaintiffs can hold outdoor gatherings including up to three households. Haddad Decl. Exh. 12. In the substantial, moderate, and minimal tiers, Plaintiffs can hold indoor gatherings of up to three households. *Id*. As a political candidate, Tandon can hold even outdoor gatherings of up to 200 people even in the widespread tier. Bussey Decl. Exhs. A, G.

Second, Plaintiffs argue that an injunction would prevent other harms associated with COVID-related restrictions, including mental health issues, substance abuse, hunger, and negative impacts on children's development. Bhattacharya Reply Decl. ¶ 37–41; Bhatia Decl. ¶ 95. However, some of these harms are at least partially due to the pandemic itself. For example, even if the Court enjoined COVID-related restrictions, private individuals, businesses, and organizations might choose to continue their quarantines, such that people would continue to experience the harms referenced by Plaintiffs. In fact, Plaintiffs' expert emphasizes the extent to which many individuals have made self-quarantine decisions in parallel to the State's and County's restrictions. Bhatia Reply Decl. ¶¶ 60, 62–63. In addition, if the Court enjoined the restrictions, the pandemic will worsen, serious illnesses and death would increase, which could further exacerbate the issues to which Plaintiffs point.

Given the unique risks of gatherings in spreading COVID-19; the deaths and serious illnesses that result from COVID-19; and the overwhelming strain on the healthcare system, the Court finds that enjoining the State's and County's restrictions on Plaintiffs' gatherings and on Plaintiffs' businesses would not be in the public interest. Therefore, Plaintiffs have not carried their burden of demonstrating that an injunction is in the public interest.

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

**IV. CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiffs' motion for a preliminary injunction.

**IT IS SO ORDERED.**

Dated: February 5, 2021

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

Case No. 20-CV-07108-LHK
ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION